**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

IN RE HOLOCAUST                          **REPORT AND**
VICTIM ASSETS LITIGATION,                **RECOMMENDATION**

Application of Burt Neuborne.            CV 06-0983 (FB) (JO)
-------------------------------------------------------X   CV 96-4849 (ERK) (JO)
This Document Relates to:                Consolidated with:
     ALL CASES                CV 99-5161 and CV 97-0461
-------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

Some seven years into his service as Lead Settlement Counsel in this litigation, attorney

Burt Neuborne ("Neuborne") asked to be paid a fee of over four million dollars for that work,

which he represented was a discount of millions of dollars from the figure he might otherwise

claim. Attorneys Samuel J. Dubbin ("Dubbin") and Robert A. Swift ("Swift") – the former

representing a small number of the Holocaust survivors in the plaintiff class, the latter claiming

to represent all of them – objected. They argued, often in quite raw terms, that Neuborne should

get nothing for years of work that have added many millions of dollars to the value of the

settlement fund. Neuborne responded by withdrawing the offer to discount his fee.

As disheartening as such a dispute may be, it is made all the more so because its

protagonists have otherwise done so much good in this litigation. Neuborne, Dubbin, and Swift,

representing over a million victims of the Holocaust and their heirs, have worked hard to seek

redress for their clients from the Swiss entities that added to their victimization by dispossessing

them of their property and by assisting Nazi companies that profited from their misery.

The litigants agreed to cabin their dispute by having me recommend a disposition of five

separate legal issues. I now report on my analysis of those issues and, as a result, respectfully

recommend that the court award Neuborne a total of $3,095,325.

I.      Background

A.      The Litigation And Settlement

In a series of class actions filed in 1996 and 1997, victims of Nazi persecution sought

relief against a number of Swiss financial institutions for their role in collaborating with the Nazi

regime and harming the plaintiffs in a variety of ways.  The litigation has spawned many

decisions in this court and the United States Court of Appeals for the Second Circuit, and I

assume the reader's familiarity with the general background of the litigation that is recounted in

some of them.  Briefly stated,

> Plaintiffs alleged that, before and during World War II, they were subjected to
> persecution by the Nazi regime, including genocide, wholesale and systematic
> looting of personal and business property and slave labor. Plaintiffs alleged that,
> in knowingly retaining and concealing the assets of Holocaust victims, accepting
> and laundering illegally obtained Nazi loot and transacting in the profits of slave
> labor, Swiss institutions and entities, including the named defendants,
> collaborated with and aided the Nazi regime in furtherance of war crimes, crimes
> against humanity, crimes against peace, slave labor and genocide.  Plaintiffs also
> alleged that defendants breached fiduciary and other duties; breached contracts;
> converted plaintiffs' property; enriched themselves unjustly; were negligent;
> violated customary international law, Swiss banking law and the Swiss
> commercial code of obligations; engaged in fraud and conspiracy; and concealed
> relevant facts from the named plaintiffs and the plaintiff class members in an
> effort to frustrate plaintiffs' ability to pursue their claims.  Plaintiffs sought an
> accounting, disgorgement, compensatory and punitive damages, and declaratory
> and other appropriate relief.

*In re Holocaust Victim Assets Litig.*, 105 F. Supp.2d 139, 141-42 (E.D.N.Y. 2000); *see also In re*

*Holocaust Victim Assets Litig.*, 424 F.3d 132, 135-44 (2d Cir. 2005).

In August 1998, the parties and others reached an agreement in principle to resolve the

litigation.  Key elements of the agreement included the defendants' creation of a $1.25 billion

settlement fund, the defendants' waiver of certain legal and factual defenses, the stipulated

revival of certain otherwise lapsed claims for members of the plaintiff class, and a broad range of releases for not only the named defendants but other Swiss business and governmental entities.

The beneficiaries of the settlement fund were not members of a single class, but rather five distinct groups of victims who suffered different forms of Nazi persecution (although I will often use the singular term "class" to refer to all of those groups). Specifically, on March 30, 1999, the court certified five classes of plaintiffs (for ease of reference, I have omitted from the description of each class important terms that define the precise scope of its membership):

1. *Deposited Assets Class*: ... victims or targets of Nazi persecution and their heirs ... who have ... claims against any releasee ... arising in any way from deposited assets or any effort to recover deposited assets.

2. *Looted Assets Class*: ... victims or targets of Nazi persecution and their heirs ... who have ... claims against any releasee ... arising in any way from looted assets or cloaked assets or any effort to recover looted assets or cloaked assets.

3. *Slave Labor Class I*: ... victims or targets of Nazi persecution and their heirs ... who ... performed slave labor for companies [that] deposited the revenues or proceeds of that labor with ... releasees ....

4. *Slave Labor Class II*: ... individuals and their heirs ... who ... performed slave labor at any facility or work site, wherever located, ... owned, controlled or operated by any corporation or other business concern headquartered, organized or based in Switzerland ....

5. *Refugee Class*: ... victims or targets of Nazi persecution and their heirs ... who sought entry into Switzerland ... to avoid Nazi persecution and who ... either were denied entry into Switzerland or, after gaining entry, were deported, detained, abused or otherwise mistreated ....

105 F. Supp.2d at 143-44.

As part of the agreement, the parties deliberately postponed creating a plan to distribute the settlement fund among the plaintiff class members. *Id.* at 142. "Instead, the settlement [set]

forth a fair and open mechanism for the development of criteria pursuant to which distribution

and allocation determinations [would later] be made." *Id*. Class members could commit to the

settlement at the outset, not knowing what their respective shares of the fund might be, or they

could withdraw and pursue their own individual claims. Moreover, "to spare Holocaust

survivors from being forced into an adversarial relationship that would have required them to

squabble over a settlement fund that, while substantial, is necessarily insufficient to do full

justice to all members of each plaintiff class," Submission of Lead Settlement Counsel in Support

of the Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds,

dated November 20, 2000 at 3, *reprinted in* Docket Entry ("DE")[1] 76, Ex. 3, the plan called for

the appointment of a neutral Special Master to make allocation decisions on behalf of all, with

certain procedural protections, in lieu of an adversarial process in which each interested class and

subgroup would have separate representation. *In re Holocaust Victim Assets Litig.*, 105 F.

Supp.2d at 149-51.[2] As will become clear, the uncertainty as to distribution that the parties

---

[1] The lead case in this consolidated litigation is styled *Jacob Friedman, et al. v. Union Bank of Switzerland, et al.*, 96-CV-4849 (ERK). The docket of that lead case has literally thousands of entries. Accordingly, when it became clear that the instant matter would generate a large number of docket entries on its own, the court created a separate docket for purposes of administrative ease dedicated exclusively to items relating to Neuborne's fee application. I use "DE" to refer to the entries in the latter docket, which is styled *In Re Holocaust Victim Assets Litigation Regarding the Application of Burt Neuborne for Counsel Fees*, 06-CV-0983 (FB), and "Lead DE" to refer to items that are found only on the docket of the lead *Friedman* case.

[2] The concern about internecine disputes arose only in part from the division of the plaintiffs into five classes. In addition, each of the plaintiff classes (except the Slave Labor II class) was also divided into five groups of people who were targeted by Nazis for victimization on the basis of their identity as, respectively, Jews, Roma, Jehovah's Witnesses, homosexuals, and disabled persons. Moreover, the members of each class and group were scattered across the globe, with five specific regions being recognized for purposes of distributing the fund: the United States, the former Soviet Union, Western Europe, Eastern Europe, and the rest of the world.

embraced, although of crucial importance in fostering the settlement, has also been the origin of significant controversy.

Before approving the settlement on July 26, 2000, the court approved an extensive notice plan "tailored to the unique circumstances of this case" to advise class members of the proposed settlement and solicit their views about it. *Id.* at 144. It then conducted fairness hearings in both the United States and Israel in late 1999. *See* Order dated November 29, 1999, Lead DE 419; Calendar Entry dated November 29, 1999, Lead DE 436. After taking those steps to solicit the views of the class and reviewing the responses (which included the submission of over half a million initial questionnaires completed by class members), the court concluded that "the response of the classes has been overwhelmingly positive, as the vast majority of class members responding to the notice are interested in participating in the settlement, and only a tiny fraction of class members has expressed dissatisfaction with its terms." *In re Holocaust Victim Assets Litig.*, 105 F. Supp.2d at 147.

B.     The Allocation Of The Settlement Fund

As noted above, a key feature of the settlement proposal was its postponement of any decision about how the $1.25 billion dollar recovery it produced for the class would be distributed among its members. A court-appointed Special Master submitted his proposed plan for accomplishing the distribution on September 11, 2000, and the court adopted it some two months later. *See In re Holocaust Victim Assets Litig.*, 2000 WL 33241660 (E.D.N.Y. Nov. 22, 2000), *aff'd*, 413 F.3d 183 (2d Cir. 2001). For the most part, the details of the distribution plan are not germane to the instant dispute, but one aspect of it has produced tremendous rancor that reverberates to this day. Specifically, the Special Master

recommended initially that $100 million be allocated to [the] Looted Assets Class and that the money be distributed to its neediest members....  I adopted [that recommendation] on November 22, 2000....  On September 25, 2002, I adopted another recommendation of the Special Master that an additional $45 million in "excess" funds be allocated to that class. Finally, on November 17, 2003, I adopted the recommendation of the Special Master that $60 million in "excess" funds be allocated to the Looted Assets Class and be distributed in accordance with the *cy pres* principles that have successfully governed the administration of the initial allocation and distribution of $100 million to the Looted Assets Class in 2001, and the first supplemental allocation and distribution of $45 million in 2002.

*In re Holocaust Victim Assets Litig.*, 302 F. Supp.2d 89, 91 (E.D.N.Y. 2004).  The allocation of the funds to the neediest members of the Looted Assets Class according to the principle of *cy pres* was not, in itself, a cause of much controversy.  Rather, it was the application of the principle – and, more precisely, the refusal by some class members to accept it – that has caused years of strife among and between certain of the class members and their lawyers.  Specifically, after allocating 90 percent of the Looted Asset Class's recovery to Jewish victims and their heirs, the court determined that only four percent of that group's share would be allocated to such persons in the United States, with the bulk of the distribution going to those in the former Soviet Union.  *See id*. at 97-107 (explaining the allocation decision).  That decision and others conforming to it have sparked years of repetitive challenges, primarily by Dubbin on behalf of many of the same individual objectors to the instant application.  *See In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 141-45 (2d Cir. 2005) (describing challenges and affirming district court's allocation decisions).  Of particular relevance to the instant dispute is the fact that Neuborne, having previously advocated for the allocation of a larger share to needy survivors in the United States, defended the district court's decisions on appeal.

C.     Neuborne

Neuborne has served in two distinct roles in this litigation, only one of which is implicated in the pending fee application.  Briefly stated, Neuborne has served as both counsel to the entire plaintiff class and as Lead Settlement Counsel.  In the latter capacity, Neuborne has helped to administer the settlement, provided advice to those attempting to navigate the allocation process, offered advice to the court on a variety of matters affecting the post-settlement litigation, and – most controversially – has submitted adversarial defenses of certain district court rulings in opposition to the appeals of certain class  members who were unsatisfied with the court's allocation decisions.

Early in the litigation, the court appointed an executive committee, including Neuborne, to represent the interests of the then-putative class of plaintiffs in prosecuting their claims.  Pretrial Order No. 1 dated April 18, 1997, Lead DE 26.  Some two years later, the court formally appointed Neuborne to serve as that committee's Lead Counsel.  Order dated April 20, 1999, Lead DE 264.  In his role as plaintiffs' counsel, Neuborne helped hone the plaintiffs' legal theories, advanced their cause in the litigation, and was instrumental in helping to forge what became the parties' settlement agreement.  Neuborne explicitly and repeatedly waived all compensation for that work, and the court placed great emphasis on that fact in endorsing the settlement he helped achieve as procedurally fair.  *In re Holocaust Victim Assets Litig.*, 105 F. Supp.2d at 145-46.  He does not now seek to renege on that commitment in making the instant application to be compensated for the work he has done in his other role in this litigation.

Neuborne's second role – as Lead Settlement Counsel – has been both more extensive in duration and more amorphous, as discussed at length in the substantive discussion that follows.

Briefly stated, as Neuborne described the role in a declaration submitted in late 1999 in support

of the then-pending settlement proposal, in addition to his role as plaintiffs' counsel,

> I also serve, pursuant to the Court's order, as Lead Settlement Counsel in
> connection with the implementation of the settlement agreement. In that capacity,
> I have worked closely with counsel for the plaintiffs ... in formulating and
> implementing the notice program, and with the Special Master ... in preparing a
> plan of allocation and distribution.

November 5, 1999 Declaration of Burt Neuborne ("Neuborne 1999 Dec.") ¶ 1, *reprinted in* DE

76 Ex. 1. As time wore on, Neuborne's role as Lead Settlement Counsel took on a variety of

other functions, some of which the Objectors now assert are not properly compensable (assuming

that Neuborne is not estopped from seeking any compensation at all).

     D.     <u>The Instant Fee Application</u>

     Neuborne first made a public application for payment on December 23, 2005. *See*

December 23, 2005 Declaration of Burt Neuborne ("Neuborne 2005 Fee Dec."), Lead DE 2881.[3]

At that time, Neuborne did not name any specific amount of compensation that he requested, but

simply asked the court to award him "appropriate fees." *Id.* at 54-55. In his next submission,

filed on January 3, 2006, Neuborne specified the full amount he would accept as compensation

for his service as Lead Settlement Counsel: $4,088,500. Memo. of Law in Support of Lead

Settlement Counsel's App. for Counsel Fees, filed January 3, 2006 ("Neuborne Jan. 2006 Fee

---

[3] As discussed below in my analysis of the Objectors' estoppel arguments, Neuborne asserts that
he privately told Chief Judge Korman of his wish to be compensated for his work as Lead
Settlement Counsel much earlier. Declaration of Burt Neuborne in Support of an Application for
an Award of Attorneys' Fees for Post-Settlement Services Rendered to the Plaintiff-Classes as
Lead Settlement Counsel, dated March 17, 2006 ("Neuborne Omnibus Fee Dec."), DE 37 at 94-
95. Consistent with that assertion, Chief Judge Korman himself has recounted on the record a
conversation he had with Neuborne, the date of which he could not recall, in which he "agreed
with [Neuborne] that he would be entitled to legal fees." Transcript of Telephone Conference
dated March 2, 2006 ("Conf. Tr.") at 5, DE 32.

Memo."), Lead DE 2884. Two months later, Neuborne reiterated his request for the same fee but cautioned that he viewed the amount as less than he might reasonably request, and reserved the right to seek far more if the court balked at approving the amount he specified. *See* Memorandum of Law in Support of Lead Settlement Counsel's Application for an Award of Counsel Fees for Post-Settlement Services Provided to the Settlement-Classes, dated March 17, 2006 ("Neuborne March 2006 Memo.") at 35, DE 38. Neuborne offered extensive documentation in support of his claim, including detailed time records.

Neuborne's request generated vigorous opposition from Dubbin – who represented objectors disappointed by the court's allocation decisions, and whose own fee requests had been denied, in part on the basis of opposition from Neuborne – as well as from Swift, who purported to voice the opposition of the entire class. There ensued an extensive and unruly flood of letters, emails, memoranda, and declarations about many aspects of the application and the objections thereto. Among the objections were a variety of criticisms of the time records that Neuborne had submitted to document some seven years of work. Those objections, if not resolved on consent, promised to bog the parties down in extensive and laborious litigation.

In an effort to narrow the parties' disputes, Chief Judge Korman held a telephone conference with Neuborne's counsel, Dubbin, and Swift on March 2, 2006, *see* Conf. Tr., and thereafter formally referred them to me for further discussion. Order dated March 13, 2006, DE 33.

I had a lengthy meeting with the parties on May 18, 2006, at which all concerned sought to cabin their dispute in a way that would obviate the need for protracted hearings about the sufficiency and accuracy of Neuborne's record-keeping. By the end of that meeting, the parties

had reached an agreement to do just that. Specifically, the parties agreed that Neuborne would withdraw his request to be compensated for 1,500 of the 8,378.5 hours of work he had previously claimed, and that a determination of the following five issues would resolve the pending objections to the remaining claim for compensation:

a. <u>Judicial estoppel</u>: whether Neuborne should be denied any compensation pursuant to the doctrine of judicial estoppel. Resolution of this issue in Neuborne's favor would still require a determination of the remaining four issues, but resolving it in the Objectors' favor would moot those questions.

b. <u>The lodestar hourly rate</u>: whether the hourly rate of $700 that Neuborne demands for his work as Lead Settlement Counsel (but not for his work as counsel to the class in achieving the settlement, for which he has sought no compensation) is excessive.

c. <u>Lodestar hours – non-remunerative work</u>: whether Neuborne should be compensated for work that did not result in a net increase to the size of the settlement fund. The parties agreed that a resolution of this issue in the Objectors' favor would result in the exclusion of all but 600 of the hours for which Neuborne seeks compensation.

d. <u>Lodestar hours – "general counsel" work</u>: whether Neuborne should be compensated for work generally characterized as arising from his role as "general counsel" to the court in connection with defense and administration of the settlement. The parties agreed that a resolution of this issue in the Objectors' favor would result in the exclusion of 800 of the hours for which Neuborne seeks compensation. It is also apparent that this issue is moot if the preceding one is resolved in the Objectors' favor.

e. <u>Lodestar adjustments</u>: whether the lodestar amount of Neuborne's fee award, if any, should be increased by application of an "excellence multiplier."

*See* Order dated May 18, 2006, DE 66.[4]

_____

[4] In his March 2006 submission, Neuborne claimed credit for only 8,178.5 hours. Neuborne Omnibus Fee Dec. at 25-26. Prior to the conference of May 18, 2006, he had already notified the court and the Objectors that his submission had inadvertently excluded 200 hours from that total. Neuborne March 2006 Memo. at 2.

Having thus framed the dispute, on July 21, 2006, the parties submitted supplemental letter briefs that set forth their views (or directed me to earlier presentations of them) on each of these specific issues. *See* Final Memo. of Law in Support of App. of Burt Neuborne for Counsel Fees in Connection with Post-Settlement Services Rendered as Lead Settlement Counsel, dated July 21, 2006 ("Neuborne Final Memo."), DE 72; Swift Response to Neuborne Final Memo., dated July 21, 2006 ("Swift Final Memo."), DE 73; Dubbin Response to Neuborne Final Memo., dated July 21, 2006 ("Dubbin Final Memo."), DE 75. After addressing some remaining preliminary matters, I address each of these five issues in turn below.

II.     Discussion

    A.     Threshold Issues

        1.     Notification To The Settlement Class

The participants in the instant dispute disagree as to whether the members of the plaintiff class have sufficient notice of Neuborne's fee application and the ensuing proceedings. At the conference on May 18, 2006, they all agreed that it would be appropriate to resolve the merits of the pending objections to the fee application before resolving the related issue of notice. Swift, however, now advocates a different course, and suggests not only that the issue can be decided now, but that I should be the one to decide it. Swift Final Memo. at 1 n.1 ("Unless your Honor believes that this issue has been decided by Chief Judge Korman, it is ripe for decision by your Honor at this time."). Dubbin's submission is more equivocal: the single paragraph addressing the issue states that the Objectors "rely on their argument in their March 17, 2006 Opposition Memo regarding notice to the class." Dubbin Final Memo. at 1. The paragraph goes on to advocate notice pursuant to Rule 23(h)(1) of the Federal Rules of Civil Procedure. Read in

context, it appears that Dubbin has identified all of the arguments he believes apposite to the issue of notice. Neuborne, in contrast, merely notes the participants' prior agreement to defer the issue without stating whether there are further arguments he would submit on the matter. Neuborne Final Memo. at 5 n.7.

Like Swift and Dubbin, I believe the existing record suffices to resolve the issue of notice. In the absence of an agreement that I should resolve the issue on its merits by decision, I merely offer a recommendation, rather than ordering an outcome as Swift proposes. In making that recommendation, I concur with Neuborne. I conclude that the plaintiff class has received sufficient and reasonable notice of the fee application, and that nothing more is required under Rule 23(h)(1).[5]

The notification rule the Objectors invoke provides that "[n]otice of the motion [for an award of attorney fees] must be served on all parties and, for motions by class counsel, directed

---

[5] I acknowledge that after reaching an agreement with the parties about framing the issues in dispute, I explicitly wrote that "[w]ith the concurrence of all counsel, my report and recommendation *will not address the issue of class notification*." Order dated May 18, 2006, at 2 (emphasis added). Arguably, then, I should not only refrain from accepting Swift's invitation to decide the matter, but should decline even to discuss it in this report. I nevertheless do so for the following reasons. First, my commitment not to address the issue was made "[w]ith the concurrence of all counsel" – a concurrence that Swift, by his conduct, appears to have withdrawn. Second, addressing the matter here promotes judicial efficiency at no detriment to the substantive or procedural rights of any party. The Objectors have either presented me with all of the arguments they would ever contemplate bringing to the court's attention on the notice issue or they have not. If, as appears to be the case, they have done so, then they are in no way harmed by a resolution of the matter now, much less by my non-dispositive analysis of it – but the court will benefit by dispensing with the need for a separate referral. On the other hand, if the Objectors have additional arguments on the subject, they are of course free to raise them in the guise of objections to this Report and Recommendation. To the extent they offer any such new arguments, I respectfully recommend that the court consider them *de novo*, allow Neuborne a full opportunity to respond to all of the arguments, and then decide the issue without any presumption of deference to my analysis here.

to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). There are at least two independent reasons why that rule appears to be no obstacle to awarding Neuborne a fee on the current record.

First, Neuborne's application does not fall within the category of "motions *by class counsel*" that must be "directed to class members in a reasonable manner." If Neuborne were to break his pledge to disavow compensation for his work in securing the settlement, his application for compensation in that role would unquestionably be a motion "by class counsel" that would have to be directed to class members in a reasonable manner. But in seeking compensation for his role as Lead Settlement Counsel, Neuborne's motion is no more governed by Rule 23(h)(1) than are the periodic applications for fees submitted by Michelle Weitz, Neuborne's assistant, who has regularly applied for and received compensation for her legal work in the post-settlement phase of this case without objections. *See, e.g.*, Order dated March 3, 2003, Lead DE 1567 (awarding compensation "for legal assistance [attorney Weitz] provided Professor Neuborne in carrying out his responsibilities as Lead Settlement Counsel").

To be sure, the Advisory Committee on Civil Rules has explicitly noted its intention that the notice provision of Rule 23(h) apply to some attorneys who do not fall within the strict confines of the term "class counsel."

> [Rule 23(h)] provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel. Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

Fed. R. Civ. P. 23(h) Adv. Comm. Note (2003 amendment). However, the Committee's note illustrates that intention exclusively with examples of attorneys who, like "class counsel," perform work on behalf of a class that serves to secure relief for the class, rather than to administer a settlement (or damages) fund after disposition of the class's substantive claims. Although the point is certainly arguable, I believe that neither the language of the rule nor the advisory committee note compels a finding that Rule 23(h)(1) was designed to govern the circumstances of an application like the one by Neuborne now before the court or the earlier applications to compensate Ms. Weitz that have all been resolved without any formal class notification program.

Second, even if Rule 23(h)(1) applies in these circumstances, its mandate has been satisfied. Neuborne's fee application has been published on the Internet web site devoted to this case, as have all of the related submissions that discuss the many objections to that request. *See* Holocaust Victim Assets Litigation (Swiss Banks) Home Page, http://www.swissbankclaims.com (last visited Mar. 15, 2007). In addition, the instant dispute has been reported and discussed in numerous news and opinion articles published around the world by major news outlets.[6] Despite

---

[6] *See, e.g.*, Menachem Z. Rosensaft, *Profiting from the Holocaust*, L.A. Times, Nov. 19, 2006, at M3; Burt Neuborne, *What Profit? I Gave up $10 Million*, L.A. Times, Nov. 19, 2006, at M3; Ben Harris, *Success in Swiss Banks Case Overshadowed by Lawyer's Fee Row*, Jewish Telegraphic Agency, Oct. 20, 2006; Burt Neuborne, Editorial, *'I have worked hard for Holocaust survivors,'* Miami Herald, Oct. 14, 2006, at A26; David Mermelstein, et al., Editorial, *Honored Lawyer Betrayed Nazi Victims*, Miami Herald, Oct. 12, 2006, at A26; Joseph Goldstein, *ADL's Choice For an Award Angers Survivors*, N.Y. Sun, Oct. 12, 2006, at 2; Joel Siegel, *Getting His Due*, N.Y. Mag., Oct. 9, 2006; Stewart Ain, *Neuborne Honor Questioned*, Jewish Wk. (N.Y.), Oct. 6, 2006, at 3; Joseph Goldstein, *Citing Precedents, Holocaust Survivors File Brief to Reduce Lawyer's $4.1M Fee*, N.Y. Sun, July 24, 2006, at 2; Editorial, *Fair Payment for Good Work*, N.Y. Daily News, July 10, 2006, at 26 ; Burt Neuborne, Letter to the Editor, *Holocaust Case Legal Fee*, N.Y. Times, July 6, 2006, at A20; Opinion, *Billing Holocaust Victims*, Int'l Herald Trib., June 30, 2006, at 6; Editorial, *Billing Holocaust Victims*, N.Y. Times, June 29, 2006, at

14

the fact that a number of the articles have mentioned that the case has been referred to me for a Report and Recommendation, I have received no additional submissions of any kind from any other class members aside from those represented by Swift and Dubbin. In short, the extensive publicity surrounding this fee litigation assures that Rule 23(h)'s requirement of reasonably wide-spread notice is met.

Indeed, as a practical matter, it is hard to imagine a notice program that would, without costing as much as the amount of fees at stake here, be effective enough both to ensure wider notice than has already been effected as a practical matter and to generate substantive views that are not already being vigorously litigated. For any such notification regime to be considered reasonable, there would have to be some basis to believe that depriving the settlement class of the additional funds would be reasonably likely to vindicate some interest not already being represented. In light of the extensive publicity surrounding this dispute, the broad array of substantive objections already raised, and the vigor with which the objectors already before the court have pressed their arguments, it is difficult to imagine that any further notification program would accomplish anything other than a pointless dissipation of significant funds that would otherwise be allocated on a *cy pres* basis to needy class members. Under such circumstances, I

A26; Joseph Goldstein, *Milberg Partner Under Fire Over Fees in Swiss Banks Case*, N.Y. Sun, June 16, 2006, at 12; Joseph Goldstein, *Dissent Mounts Over Funds in Holocaust Settlement*, N.Y. Sun, May 30, 2006, at 5; Nathaniel Popper, *Survivors Ask Court To Alter Swiss Bank Settlement*, The Forward (N.Y.), Apr. 14, 2006, at 1; Lona O'Connor, *Holocaust Survivors Object to Lawyer's Settlement Bid*, Palm Beach Post, Mar. 20, 2006, at A1; Stewart Ain, *Survivors Balking at Lawyer's Fee*, Jewish Wk. (N.Y.), Mar. 3, 2006; *Lawyer's Fee Angers Holocaust Survivors*, Buffalo News (N.Y.), Feb. 26, 2006, at A12; *Holocaust Survivors Take Their Attorney to Court*, Star-Ledger (N.J.), Feb. 26, 2006, at 28; William K. Rashbaum, *Angry Holocaust Survivors Object To Lawyer's $4.1 Million Fee*, N.Y. Times, Feb. 25, 2006, at B1; Nathaniel Popper, *Top Lawyer on Holocaust Restitution Cases Taking Flak Over Fee Request*, The Forward (N.Y.), Jan. 13, 2006, at 1.

believe that the court can best fulfill its obligations under the law, and its obligations as a fiduciary to the Settlement Class by rejecting the calls for further notification measures.

On a related matter, I conclude that the court can award fees to Neuborne without conducting a hearing, notwithstanding Dubbin's assertion – made prior to the parties' agreement on May 18, 2006, to narrow the issues as described above – that a local procedural rule leaves the court with "no discretion about the necessity of a hearing...."  Objections of Class Members to Request by Lead Settlement Counsel for Attorneys Fees and Request for Hearing, dated March 17, 2006 ("Dubbin Initial Memo.") at 9, DE 44.  The cited rule requires a hearing before an award of fees "for attorneys or others ... upon recovery or compromise in a derivative or class action on behalf of a corporation or class...."  Loc. Civ. R. 23.1.  However, Neuborne's fee application is not predicated on his role in securing a "recovery or compromise in a derivative or class action on behalf of a corporation or class[,]" but rather on his work as Lead Settlement Counsel after a compromise had already secured a recovery for the class.  Moreover, the extensive litigation over the instant application ensures that the lack of a hearing will not prejudice the legitimate interests of class members in having the court give due consideration to every objection to Neuborne's fee request.

2.    Attorney Swift's Standing To Litigate Objections

The objections to Neuborne's fee applications come from two sources.  First, Dubbin has lodged a variety of objections on behalf of 17 individual members of the Looted Assets Class whose names or initials are listed in the margin (the "Individual Objectors"),[7] as well as on behalf

---

[7]  The Individual Objectors are Israel Arbeiter, Sam Gasson, Nesse Godin, Herbert Karliner, David Mermelstein, Alex Moskovic, Leo Rechter, Jack Rubin, David Schaecter, Anita Schuster, Henry Schuster, Fred Taucher, Lea Weems, Esther Widman, and three individuals identified in

of the Holocaust Survivors Foundation USA, Inc. ("HSF").[8]  Second, Swift has raised a number

of objections similar to those raised by Dubbin, although the identity of the client making those

objections is to some extent in controversy.  Unlike Dubbin, Swift – who is not himself a

member of the Settlement Class – does not purport to act on behalf of any individual class

member.  Instead, he claims to lodge his objections on behalf of the entire Settlement Class as

such.

The proposition that Swift has objected on behalf of the Settlement Class itself is

somewhat surprising for two reasons.  First, Swift is not alone in representing the Settlement

Class; he is in fact Neuborne's colleague in that capacity.  *But see* Letter from Burt Neuborne to

Chief Judge Korman, dated May 15, 2006, Lead DE 3090 (pending application by Neuborne to

remove Swift from representation of the class).  Swift's views about the merits of Neuborne's

application are therefore no more definitively attributable to the class as a whole than are

Neuborne's.

Second, Swift himself has complained – purportedly on behalf of the Settlement Class, to

be sure – that the class has not yet received adequate notice of the pending fee application.  The

---

Dubbin's submission only by their initials:  "F.K.," "G.K.," and "L.K."  *See* Dubbin Final Memo.
at 1.  In his original submission setting forth objections, Dubbin also listed "D.B." and "J.R." as
Objectors.  Dubbin Initial Memo. at 1.  I cannot discern from the submissions whether the
omission of the latter two individuals from the list of Objectors in Dubbin's latest submission is a
result of their reconsideration of their position, death or incapacitation, or the inadvertence of
counsel.  The discrepancy has no effect on the merits of the dispute now before the court.

[8]  While it is far from obvious that HSF has standing in its own right to object to Neuborne's
application, the court need not determine the question because the remaining class members with
whom HSF joins in raising the objections plainly do have standing.  *See In re Holocaust Victim
Assets Litig.*, 424 F.3d 132, 146 n.13 (2d Cir. 2005) (rejecting Neuborne's objection to HSF's
standing to seek appellate review of an earlier decision in this proceeding for similar reasons).

proposition presents something of a paradox. If Swift is in a position to speak on behalf of the Settlement Class with sufficient authority to raise *its* objections to Neuborne's application, then the fact that he has done so suggests that the class has quite obviously received all the notice it needs to protect its cognizable legal interests. On the other hand, if Swift is correct that the class has not been notified, it logically follows that neither Swift nor anyone else can possibly be in a position to know whether the class objects or consents to a fee application, much less identify the specific objections that the class may have. Moreover, the rule governing fee applications in class actions provides for objections by "[a] class member, or a party from whom payment is sought[.]" Fed. R. Civ. P. 23(h)(2). By its plain language, the rule makes no provision for the class itself to object to its attorney's application. Viewed against the textual background of the applicable rule, Swift's submission is thus as much of a procedural anomaly as it is a logical one.[9]

Nevertheless, I recommend that the court abstain from resolving the thorny question of whether Swift's objections are made on behalf of any party that enjoys standing in this litigation. The objections he raises are largely duplicative of those lodged by the Individual Objectors, and Neuborne has agreed in any event that those objections should not be overruled for want of standing. *See* Order dated May 18, 2006 at 2. As a result, in the analysis that follows, I use the term "Objectors" to refer collectively to Dubbin's clients as well as to whomever it is that Swift

---

[9]  The closest approximation of the role that Swift has arrogated to himself in submitting objections would appear be that of a guardian *ad litem* of the interests of individual class members. *See, e.g.*, *Haas v. Pittsburgh Nat. Bank*, 77 F.R.D. 382 (W.D. Pa. 1977) ("The appointment of a guardian for the class ... provides representation for the class members at a stage of the proceedings where their interests could only be unprofitably protected, and where, not surprisingly, there is normally no class member participation"). Swift has neither sought nor received appointment to such a position, and the fact that a number of individual class members have come forward with objections of their own suggests that no such precautionary measure is warranted in this case.

represents in making his submissions in opposition to Neuborne's fee application. Similarly, despite its imprecision – given the dispute as to whether the class as a whole, or other members of it, have had a sufficient opportunity to participate in the litigation of this dispute – I will use the term "parties" to refer collectively (and exclusively) to the Objectors and Neuborne.

3.     Potential Grounds For Recusal

No party has sought my recusal and I do not believe there is any reason to recuse myself *sua sponte*. Nevertheless, in the interest of transparency, I briefly mention two facts, one of which I discussed explicitly with counsel at my first meeting with them, and the second of which is a matter for public record. First, as I disclosed to counsel at our conference, my late father, as well as his parents and siblings, were victims of Nazi persecution. To my knowledge, however, neither I nor any member of my family qualifies for membership in any certified class in this case. Second, it is a matter of public record – available on the page containing my biographical information on the court's Internet web site, http://www.nyed.uscourts.gov, among other places – that I am an alumnus and a member of the adjunct faculty of the New York University School of Law ("NYU"), where both Neuborne and his counsel are tenured professors. However, as far as I am aware, outside of the adversarial proceedings in this case, I have never met or spoken with either Neuborne or his counsel other than a during a brief introduction to both men at a legal discussion panel event some time in 2005, prior to my assignment to this case.[10] Accordingly, absent any reason to recuse myself, I proceed to analyze the five subsidiary issues pertinent to the pending fee application.

---

[10] At that time, I had accepted an invitation to participate in a similar panel discussion to be moderated by Neuborne's counsel. Upon being assigned to this case, I withdrew from the event.

B.    Judicial Estoppel

Dubbin argues that because Neuborne has made a variety of statements during the pendency of this litigation – before and after the settlement was approved, and to the court as well as to others – to the effect that he has worked for free, he is barred from seeking any award of fees by the doctrine of judicial estoppel.  *See* Dubbin Final Memo. at 1-2.  As explained below, I disagree.[11]

---

[11]  In his submission of July 21, 2006, Swift joins in Dubbin's arguments and incorporates by reference his own arguments in an earlier submission.  Swift Final Memo. at 3 (citing Superceding Memo. of Law of the Settlement Class in Opposition to the Application of Lead Settlement Counsel for Counsel Fees ("Swift Initial Memo.") at 3-5, DE 41).  Those earlier arguments berate Neuborne for his failure to disclose his intention to seek a fee, but as far as I can discern they include no reference to any legal authority remotely warranting – much less requiring – any form of estoppel.  The closest Swift comes to any such argument is his inclusion of a "*see also*" citation to Ethical Consideration 2-19 and Disciplinary Rule 2-106 of New York's Code of Professional Responsibility.  Swift Initial Memo. at 4.  The former provides only precatory guidance for counsel.  *See* N.Y. Code of Prof'l Responsibility EC 2-19 (2007) ("As soon as feasible after a lawyer has been employed, it is desirable that a clear agreement be reached with the client as to the basis of the fee charges to be made."); *see also id.* pmbl. & prelim. stmt. ("Ethical Considerations are aspirational in character....").  The latter is unquestionably mandatory, but became so as a matter of New York law only after Neuborne began his service as Lead Settlement Counsel.  *See* N.Y. Code of Prof'l Responsibility DR 2-106, 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.11(D); N.Y. Comp. Codes R. & Regs. tit. 22, § 1215.1(a)-(b) ("Effective March 4, 2002, an attorney who undertakes to represent a client and ... charges or collects any fee from a client shall provide to the client a written letter of engagement before commencing the representation, or within a reasonable time thereafter...  The letter of engagement shall ... [explain the] attorney's fees to be charged, expenses and billing practices."); *see also* Steven Wechsler, *Professional Responsibility, 2004-2005 Survey of New York Law*, 56 Syracuse L. Rev. 953, 956 (2006) ("Since March 2002 ... New York attorneys have been required to provide clients with a letter of engagement in cases where the fee is expected to be $3000 or more. ") (quotation marks and citations omitted).  While Swift is undoubtedly correct that Neuborne should for any number of reasons have long ago made explicit not only his intention to seek a fee but also his proposed compensation, his argument in that regard does not provide a basis for finding that Neuborne's unfortunate failure to do so prohibits him from making the instant application.

I note as a preliminary matter that there arguably is no live dispute as to whether

Neuborne is judicially estopped. Before recusing himself from this aspect of the litigation, Chief

Judge Korman held a telephone conference with the parties at which he stated that Neuborne had

"rendered extraordinary service" and that he is "entitled to be paid a reasonable fee." Conf. Tr.

11. Later in the same conference, Chief Judge Korman said, "I don't believe that he was

estopped." *Id*. at 34. I do not take either of these statements to constitute a legal ruling on

Dubbin's estoppel argument, nor does it appear that Chief Judge Korman intended any such a

result. *Id*. at 21. However, I do view another statement that Chief Judge Korman made at the

outset of the conference to be an important part of the factual record: "I agreed with [Neuborne]

that he would be entitled to legal fees." *Id*. at 5. Chief Judge Korman's acknowledgment in this

regard corroborates Neuborne's uncontroverted assertion that, early in his tenure as Lead

Settlement Counsel, he notified the court of his desire for compensation and that he agreed to

serve in that capacity based on the court's commitment that he would receive a reasonable fee.

Neuborne Omnibus Fee Dec. at 93-95.

1.     The Applicable Legal Standard

Judicial estoppel is an equitable doctrine that courts can invoke to preclude parties from

asserting inconsistent positions in successive litigation. *New Hampshire v. Maine*, 532 U.S. 742,

750 (2001); *see also* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal

Practice and Procedure § 4477 (2d ed. 2002) ("Wright & Miller"). As the Supreme Court has

described it, the doctrine is essentially one of fair play that protects judicial integrity:

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in
> maintaining that position, he may not thereafter, simply because his interests have

changed, assume a contrary position, especially if it be to the prejudice of the
party who has acquiesced in the position formerly taken by him.

*Davis v. Wakelee*, 156 U.S. 680, 689 (1895); *see also OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
462 F.3d 87, 93 n.3 (2d Cir. 2006) ("judicial estoppel ... is designed to protect the integrity of the
judicial process").

While the basic principle is easily stated, there is no bright-line rule of application to give
it effect – a difficulty that has prompted some courts to disavow the doctrine entirely. *See, e.g.*,
*McGuire v. Continental Airlines*, 210 F.3d 1141, 1145 n.7 (10th Cir. 2000) ("it is well
established that judicial estoppel does not exist in the Tenth Circuit"); *see also* Wright & Miller
§ 4477 nn.2, 16. In this circuit, however, the doctrine remains good law. *See, e.g.*, *Peralta v.
Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006) (describing the doctrine of judicial estoppel as a rule
that allows enforcement in later proceedings of a litigant's earlier commitment).

Although different courts have articulated different formulations of the elements of
judicial estoppel, the test in this circuit has two basic elements: "In order for judicial estoppel to
be invoked, (1) the party against whom it is asserted must have advanced an inconsistent position
in a prior proceeding, and (2) the inconsistent position must have been adopted by the court in
some matter." *Peralta*, 467 F.3d at 105. Each element is exacting. The first element requires
not only that the position of the party to be estopped is inconsistent with an earlier position, but
that it be clearly so. *See, e.g.*, *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72-73 (2d Cir. 1997)
(absent "a true inconsistency between the statements in the two proceedings .... there is no
occasion to apply an estoppel").[12] The second element protects judicial integrity by requiring

---

[12] Moreover, under the law of this circuit, the statement must have been made in a different
proceeding than the one in which the party is to be estopped. *OSRecovery*, 462 F.3d at 93 n.3

something more than just a court's acknowledgment of the prior inconsistent position; namely, an adoption that makes the position part of the court's own action. *See OSRecovery*, 462 F.3d at 93 n.3; *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005) (noting that judicial estoppel is limited to "'situations where a party ... has had [its] earlier [inconsistent] position adopted by the tribunal to which it was advanced'" and where "'the risk of inconsistent results with its impact on judicial integrity is certain'") (quoting *Stichting v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005); and *Simon v. Safelite Glass Corp.*, 128 F.3d at 72). As explained below, I conclude that Dubbin can demonstrate neither of these two elements: there is neither a clear inconsistency between Neuborne's earlier statements and his current fee application nor any judicial adoption of the position that Neuborne was working for free as Lead Settlement Counsel.[13]

_____

("Judicial estoppel ... is likely inapplicable in the instant case where any inconsistencies appear limited to the same proceeding") (citing *Adler v. Pataki*, 185 F.3d 35, 41 n.3 (2d Cir. 1999) ("judicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision.")). The statements on which Dubbin primarily relies for his estoppel argument were made in the course of this litigation, and therefore fail to meet this requirement of the first element. Nevertheless, because the Supreme Court's articulation of the rule refers to different phases of litigation, rather than entirely separate proceedings, *see New Hampshire v. Maine*, 532 U.S. at 749 ("judicial estoppel ... 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase'") (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)), I do not rely on this failing in analyzing Dubbin's estoppel argument.

[13] The Supreme Court has suggested a third element in addition to a party's assertion of inconsistent positions and judicial adoption of the position that the party later seeks to abandon: "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. at 751 (internal quotation marks and citations omitted). Based on my conclusion that Dubbin has demonstrated neither of the two elements mentioned in *Peralta*, there is no need for substantial discussion of the "unfair advantage or unfair detriment" element. I therefore address it no further, aside from the following observation: as the parties'

2.      Neuborne Has Not Advanced Clearly Inconsistent
        Positions

        a.      The Statements At Issue

To provide context for my analysis, I summarize here the statements upon which Dubbin

relies in seeking to estop Neuborne's fee application, with statements by Neuborne himself

presented first in chronological order, followed by the statements of others about Neuborne upon

which Dubbin also purports to rely.  The task is made somewhat more cumbersome than it might

otherwise be as a result of Dubbin's practice, in several instances, of citing an entire document

without providing the particular statements within it on which he purports to rely.  In trying to

identify those statements, I am guided by the general description that Dubbin has provided in

articulating the substance of his estoppel argument:

> Mr. Neuborne has repeatedly represented that he is serving as "Lead Plaintiffs'
> Settlement Counsel" on a "pro bono" basis, or "without fee," or having "waived fees."
> Those representations were made in this Court, in the Second Circuit Court of
> Appeals, in the U.S. District Court for the Southern District of Florida, and in
> numerous publications.

Dubbin Initial Memo. at 10 (footnote listing citations to statements omitted).

---

agreement regarding the issues to be decided reflects, if Neuborne is to be awarded any fees at
all, he will secure such relief only on the basis of a reasonable rate of compensation for work that
is fairly considered to be consistent with his duties as Lead Settlement Counsel.  He will certainly
derive an advantage from such relief – the payment of his fee – but that will by definition be an
advantage the court has determined to be fair.  Likewise, the only detriment to the parties
opposing the relief – the diminution of the settlement fund by the amount of the fee awarded –
will also be, by definition, a fair one:  the payment of a reasonable fee for Neuborne's service.  To
the extent some Objectors may be disappointed because they thought they would receive the
services of Lead Settlement Counsel at no cost, that is not an unfair detriment.  In other words, as
long as the fee award itself – made after consideration of all of the substantive objections now
before the court – is a fair one, there is no risk that the denial of estoppel alone will unduly
prejudice any party or provide a windfall to Neuborne.

i.     Statements By Neuborne

**November 5, 1999.**  The earliest statement upon which Dubbin relies is a declaration

made by Neuborne in November 1999 as part of his effort to persuade Chief Judge Korman to

grant preliminary approval to the settlement of this litigation.  *See generally* Neuborne 1999 Dec.

Of particular relevance are the following passages:

> 1.     ... I am a founding member of the plaintiffs' Executive Committee.
> I serve, at the Court's suggestion and with the consent of all counsel, as co-counsel
> for all plaintiffs herein.  In that capacity, I participated fully in the preparation and
> argument of plaintiffs' legal position, and in the extensive negotiations that
> culminated in the settlement agreement currently before the Court.  I also serve,
> pursuant to the Court's order, as Lead Settlement Counsel in connection with the
> implementation of the settlement agreement.  In that capacity, I have worked closely
> with counsel for the plaintiffs ... in formulating and implementing the notice
> program, and with the Special Master ... in preparing a plan of allocation and
> distribution.  I have communicated personally with hundreds of class members, and
> have spoken to large gatherings of class-members.... I have explained the settlement
> agreement and notice provisions to numerous interested persons seeking to assist
> class-members.... I am serving without fee.
>
> ***
>
> 28.     ... [T]he structure and mechanics of the settlement agreement assures
> absent class members the undivided loyalty of dedicated and competent counsel, and
> a Court-appointed Special Master devoted to achieving the fairest possible result for
> members of the plaintiff classes, while avoiding unseemly and psychologically
> destructive formal divisions between and among victims of the Holocaust at the close
> of their lives.  The principal structural impediment to undivided loyalty in certain
> recent class actions has been the potential conflict between and among
> entrepreneurial class counsel, who may have a financial interest in fees generated by
> an expeditious settlement; the defense bar intent on assuring a global settlement; and
> the interests of absent class members in continued litigation.  *Similarly, concerns
> have been expressed that the financial interests of entrepreneurial class counsel may
> cause counsel to favor certain class members at the expense of others in setting the
> terms of any settlement.  Such a "divided loyalty" structural concern is completely
> absent from this case.*  Key members of the plaintiffs' Executive Committee who
> negotiated this settlement agreement are providing their services on a pro bono basis,
> at most requesting that in lieu of attorneys fee payments be made to law schools to
> endow Holocaust Remembrance Chairs ....  *Numerous lawyers, including Lead*

25

*Settlement Counsel, have waived all attorneys fees.* Those relatively few members of the plaintiffs' Executive Committee who are seeking fees personally have agreed to limit their fee applications to the traditional "civil rights" standard of lodestar for time actually expended that materially advances the litigation, and all fees are capped at no more than 1.8% of the settlement fund, with discretion to award a lower sum. *No possibility exists, therefore, of a significant financial conflict of interest between counsel and any class member.*

*** 

33. Even more important than the practical impediments to using separate counsel to represent each subclass and generation, were the adverse social and psychological consequences of such a formal division of Holocaust victims into rival interest groups squabbling over a settlement fund that all agree is inadequate to provide full compensation to the victims. The members of the plaintiff classes are elderly victims of an unparalleled human catastrophe. At the close of their lives, it would be socially and psychologically irresponsible to pit one group of Holocaust victims against another in an unseemly battle for a larger share of a limited settlement fund that cannot do real justice to all. Instead, *freed from any structural conflict of interest caused by financial self-interest, each plaintiffs' counsel pledged to assist the Special Master by making available all relevant factual material, and by providing any necessary legal assistance in an effort to be fair to all class members. If the Court approves the settlement agreement, the process of allocation will then go forward in a scrupulously fair, but non-adversarial manner that respects the rights and dignity of class members.*

34. *While such an effort to temper the formal adversary process by imposing overlapping, non-adversary responsibilities on counsel may not be appropriate in other settings, under the unique circumstances of this litigation, the fourfold safeguards of … dedicated* pro bono *lawyers pledged to assist in the development of the fairest plan of allocation* [and three other safeguards] *satisfies Rule 23, the commands of due process, and the ethical demands of this unique effort to invoke the class action mechanism on behalf of elderly Holocaust victims who lack the resources to assert legal claims of their own.*

*Id.* ¶¶ 1, 28, 33-34 (footnotes omitted; italics supplied by Dubbin in DE 16 at 10-12).

June 26, 2000. Dubbin next cites a declaration that Neuborne submitted in further support of the proposed settlement. *See* Dubbin Final Memo. at 4 (citing Supplemental Declaration Of Burt Neuborne In Support Of An Application For An Order Pursuant To Rule

23(e) Approving The Settlement Agreement As Fair, Adequate And Reasonable, dated June 26, 2000, ¶ 12, *reprinted in* DE 76 at 19); Dubbin Initial Memo. at 10-11 n.8 (citing same). If there is any statement in that document relevant to the estoppel argument, however, I cannot find it. The single paragraph to which Dubbin draws my attention says absolutely nothing about Neuborne's fees or an intention to waive them. To the extent Dubbin cites that paragraph because it refers to the declaration of November 5, 1999, it adds nothing to the analysis of the estoppel issue.

November 20, 2000. The next statement that Dubbin cites is likewise silent on the matter of Neuborne's fee. *See* Dubbin Final Memo. at 4 (citing Submission of Lead Settlement Counsel In Support Of The Special Master's Proposed Plan Of Allocation And Distribution Of Settlement Proceeds at 3 & n.1, *reprinted in* DE 76 Ex. 3). Like the previously discussed statement, this one describes the settlement's approach to fostering a non-adversarial relationship among the various subsets of the settlement class, but says nothing at all about whether or how Neuborne will be compensated.

June 15, 2001. The next statement (in chronological order) that Dubbin cites comes from a footnote in an appellate brief that Neuborne co-authored. *See* Dubbin Initial Memo. at 10-11 n.8 (citing Brief of Plaintiff-Appellees in Response to Appellants Julia Becker Lenini, et al. and the Estate of Nathan Katz at 22 n.51, *Lenini v. Friedman*, No. 00-9217(L) (2d Cir. June 15, 2001) *reprinted in* DE 85 at 62, *available at* 2001 WL 34117787)). The brief sought to defend on appeal the district court's approval of the settlement distribution plan against a challenge by appellants claiming to speak on behalf of Romani Holocaust victims. For purposes of context, I

reprint below not only the footnote that Dubbin cites, but also the pertinent text to which the footnote pertains.

> Although the District Court found that the presence of key settlement counsel serving without fee and the appointment of a neutral Special Master made it unnecessary to appoint separate counsel for each plaintiff class, [FN51] the District Court appointed a separate settlement counsel for the Romani to assure that the interests of the Romani were adequately represented.

***

> [FN51] See Fairness Opinion, SMR, Vol. I, Exhibit 2; Neuborne Declaration, JA at 645-67. The District Court found that separate legal representation of the five victim classes was neither advisable nor required by *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997), or *Ortiz v. Fiberboard*, 527 U.S. 815 (1999). SMR, Vol. I, Exhibit 2 (Fairness Opinion). *Since key settlement counsel were working without fee*, the District Court found that pro bono settlement counsel were capable of presenting conflict-free information and legal analysis to the Special Master concerning each class without the highly inadvisable step of pitting categories of elderly Holocaust victims against each other. In the opinion of persons who work closely with Holocaust survivors, it would have been psychologically harmful to force elderly Holocaust survivors to denigrate the suffering of other victims. As noted, no challenges are pending to Judge Korman's "fairness" decision, including his thoughtful decision to forego adversary representation of each class of Holocaust victims.

2001 WL 34117787, at *34-36 (emphasis added).

February 22, 2002. After the settlement had been approved, Neuborne submitted several declarations providing his views on the extent to which the various attorneys who had represented the plaintiffs in connection with the settlement should be compensated. Dubbin focuses his attention on one of them. *See* Declaration of Burt Neuborne Concerning the Award of Attorneys' Fees, dated February 22, 2002 ("Neuborne 2002 Dec."), *reprinted in* DE 82 at 1. Here again, for purposes of context, I provide excerpts beyond those cited by Dubbin.

> 2. At the Court's suggestion, in February 1997, I assisted in organizing the plaintiffs' Executive Committee, and, with the consent of all parties, agreed to

serve as co-counsel for all plaintiffs in prosecuting this litigation.... Once the Executive Committee was established, I participated fully as a member of the Executive Committee in the formulation and presentation of plaintiffs' legal position, and in the negotiations that culminated in the settlement herein. At the Court's request, I serve as Lead Settlement counsel, and have been intensively involved in the post-settlement efforts to implement the settlement herein....

3.      ... Were this an ordinary class action litigation, under governing law in this Circuit, plaintiffs' counsel would be entitled to a substantial common fund fee award of between 15%-20% of the benefits generated by their efforts. Thus, were this an ordinary litigation, plaintiffs' counsel could expect to receive awards of between $200-$300 million.

4.      Given the extraordinary subject matter of this litigation, however, which is designed to provide certain Holocaust survivors with a modicum of compensation after 55 years, counsel agreed among themselves (and with the Court) at the outset of this litigation that the ordinary rules governing class action compensation should not apply in these proceedings. *One group of lawyers – Melvin I. Weiss, Michael Hausfeld, and Burt Neuborne – whose efforts ultimately proved crucial in achieving this settlement, determined that it would be inappropriate to accept fees from members of the plaintiff-class in connection with the efforts needed to bring about the settlement herein, and informed the Court at the outset of this litigation what they were prepared to undertake the case on a pro bono basis....*

5.      ... Repeated, inaccurate press reports stressing lawyers feuding over fees have irresponsibly fostered the stereotypical image of greedy lawyers seeking to profiteer at the expense of Holocaust victims. *I urge the Court to make it clear that this litigation is an example of counsels' unselfish commitment, not an exercise in greed.*

6.      The decision to waive prevailing fee rules was made by the plaintiffs' Executive Committee at its first meeting at NYU Law School in February 1997. Several members of the Committee, who had agreed to serve without fee, argued that receipt of fees from the plaintiff-class would be inappropriate in this case. Accordingly, they urged any lawyer seeking a fee should be excluded from the case. *I argued that, while I was in position to take the case on a pro bono basis because of my academic appointment at NYU, it was unfair to exclude counsel from participating in an extraordinary effort at achieving a modicum of delayed justice because their individual financial circumstances made it impossible for them to waive all fees.*

7.      ... I make the following recommendations concerning the several applications for attorneys' fees filed herein:

***

(D) <u>Burt Neuborne, Esq.</u>

... In December, 1996, I was initially requested to advise the legal team headed by Robert Swift on issues associated with class action remedies. When disagreements between and among counsel in overlapping class actions threatened to impede the progress of the litigation, I accepted the Court's invitation to attempt to organize a plaintiffs' Executive Committee that would permit unified and effective prosecution of the litigation.... At the request of the Court, and with the consent of all parties, I agreed to serve on the plaintiffs' Executive Committee in a "neutral" capacity, and agreed to serve as co-counsel for all plaintiffs....

I concentrated my efforts on developing the legal theories underlying the plaintiffs' case. I prepared [a variety of pleadings and briefs, presented oral arguments], and participated in the negotiations that culminated in this settlement. At the Court's request, I agreed to serve as Lead Settlement Counsel, and have been intensively involved on a daily basis in the formulation and implementation of the mechanics designed to carry out the settlement, as well as in the defense of the settlement in the Second Circuit.

*I have declined to seek fees in connection with achieving the settlement.* I believe that if I choose to seek fees at traditional levels, I would be entitled to a fee award of many millions of dollars. Under the stringent standard adopted by the plaintiffs' Executive Committee, I would, in my not-so-modest opinion, be entitled to a multiplier for excellence.

Neuborne 2002 Dec. ¶¶ 2-7 (emphasis added).

<u>February 28, 2002.</u>  The next statement Dubbin cites is a brief that Neuborne submitted in related litigation concerning Austrian and German financial institutions. *See* Dubbin Initial Memo. at 10-11 n.8 (citing Reply Brief of Burt Neuborne at 30 n.28, *In re: Austrian and German Bank Holocaust Litig.*, 317 F.3d 91 (2d Cir. Feb. 28, 2002) (No. 01-9193(L)), *reprinted in* DE 85 at 64).  Referring to himself in the third person, Neuborne wrote:

*Neuborne, who had appeared <u>pro</u> <u>bono</u> in both the Swiss bank litigation and the German slave labor cases*, initially declined to submit an application for fees in connection with his work in establishing the German Foundation. When colleagues

pointed out that under the unique floor/ceiling nature of the arbitration agreement, an award would have a minimal impact on funds available to Holocaust victims, Neuborne filed a fee application.

DE 85 at 66 (emphasis added).

  <u>July 9-10, 2002.</u> In addition to statements that Neuborne submitted to various courts, Dubbin also seeks to invoke the doctrine of judicial estoppel on the basis of letters that Neuborne wrote to individuals who objected to the settlement:

> I serve as lead settlement counsel in the Swiss Bank case, having been appointed by Judge Korman on February 1, 1999. *Before that, as you may know, I served without fee as one of the principal lawyers in the case.*
>
>        \*\*\*
>
> *The three principal lawyers who litigated the Swiss bank case and led the negotiations, Melvyn Weiss, Michael Hausfeld, and myself, have declined to seek attorneys* [sic] *fees for having obtained the $1.25 billion settlement.* Several other lawyers who worked on the case have requested an award of fees. I have recommended awards totaling less than $5 million, much of which is pledged to Holocaust-related charity. Given that background, I find it difficult to contain my contempt for Mr. Dubbin's and Dr. Weiss's efforts to raid the settlement fund for their own benefit.

Letter from Burt Neuborne to Leo Rechter, President of the National Association of Jewish Holocaust Survivors (NAHOS, Inc), dated July 9, 2002 (emphasis added), *reprinted in* DE 82 at 15, 18; *see also* Letter from Burt Neuborne to Alex Moskovic, President, Child Survivors/Hidden Children of the Holocaust, Inc., dated July 10, 2002, *reprinted in* DE 82 at 19 (repeating verbatim the first paragraph quoted above).

  <u>August 22, 2002.</u> The next statement on which Dubbin relies is described as the "August 22, 2002 Declaration of Lead Settlement Counsel in Support of Special Master's Supplemental Allocation Recommendation." *See* Dubbin Final Memo. at 4. I presume this citation refers to

the document captioned "Declaration of Burt Neuborne in Support of Proposed Supplemental Distribution," dated August 22, 2002.  Lead DE 1374.  Although Dubbin neglects to cite to a specific part of this document, I assume from its context that the relevant passage is Neuborne's explanation that "[a]ttorneys fees payable in connection with achieving the settlement funds are extremely modest.  Three principal counsel for the plaintiffs – Melvyn I. Weiss, Michael Hausfeld, and Burt Neuborne – have not sought fees for having achieved the settlement." *Id.* ¶ 4(D).  I make that assumption because the quoted language is similar to the language Dubbin cites in Neuborne's letters of July 9-10, 2002; in any event, there is nothing else in the document that appears even remotely pertinent to Dubbin's claim of judicial estoppel.

November 14, 2003.  Dubbin next cites yet another of Neuborne's declarations, this time in response to Dubbin's objections to the Special Master's recommendations regarding allocation of the settlement fund.  *See* Dubbin Final Memo. at 4 (citing Supplemental Declaration of Burt Neuborne in Response to Objections to the Special Master's Interim Report and Recommendation Filed by Samuel J. Dubbin, Esq. at 31 & n.23, *reprinted in* DE 76 Ex. 4).  Like several of the other statements on which Dubbin purports to rely, this one says nothing about Neuborne's fee, but instead merely describes the settlement and cites earlier declarations that Neuborne submitted to advocate its fairness.

February 20, 2004.  The next document on which Dubbin relies is an otherwise untitled affirmation that Neuborne submitted to the court in response to a submission by Dubbin on behalf of HSF.  *See* Dubbin Final Memo. at 4 (citing Affirmation of Burt Neuborne, dated February 23, 2004, *reprinted in* DE 76 Ex. 5).  Dubbin does not specify the part he finds relevant

to his invocation of estoppel.  In light of the following passages, which serve only to undermine

Dubbin's theory, that omission is understandable.

       1.      I have served, at the Court's request, as Lead Settlement Counsel in this case since February 1, 1999.  *Prior to my appointment as Lead Settlement Counsel, I served without fee as co-counsel for all plaintiffs, and as a member of the plaintiffs' Executive Committee.*

***

       16.     ... At the Court's request, *I agreed to serve as Lead Settlement Counsel because my decision to serve the class without fee during the merits phase had removed the [usual] concern over a potential financial conflict between counsel's desire for a fee and one or more category of class members.  Since I had no economic stake in the settlement,* and no reason to favor one or more category of victim over another, the Court believed that I could serve as counsel to the entire class, despite the obvious differences in the membership of various classes and groups within classes.

*Id.* ¶¶ 1, 16 (emphasis added).

    <u>August 23, 2004.</u>  Dubbin next cites portions of appellate briefs that Neuborne wrote in

his capacity as Lead Settlement Counsel in defense of decisions by the district court regarding an

allocation of settlement funds that Dubbin's clients found unsatisfactory and the denial of fees to

Dubbin himself.  *See* Dubbin Initial Memo. at 10-11 n.8 (citing Lead Settlement Counsel's Brief

Opposing The Holocaust Survivors Foundation USA, Inc.'s Opposition To The District Court's

Allocation Of The Settlement Fund at 14, 61-62, *In re Holocaust Victim Assets Litig.*, 424 F.3d

150 (2d Cir. Aug. 23, 2004) (No. 04-1898(L)), *reprinted in* DE 83 at 9; and Lead Settlement

Counsel's Brief In Opposition To Samuel J. Dubbin's Request For Attorney's Fees And Expenses

at 4 n.3, *In re Holocaust Victim Assets Litig.*, 424 F.3d 150 (2d Cir. Aug. 23, 2004) (Docket No.

04-1898(L)), *reprinted in* DE 83 at 22.  The relevant statements from each appear below.

... [T]he District Court found that the procedure for determining allocation in this unique proceeding involving more than one million Holocaust survivors and heirs was fair and reasonable because no structural conflicts relating to economic self-interest prevented *Lead Settlement Counsel, who had waived fees in connection with obtaining the settlement*, from assisting all members of the class in communicating directly with the court and the Special Master.

***

... [T]he District Court requested *Lead Settlement Counsel, with the assistance of other* pro bono *members of plaintiffs' Executive Committee,* to serve the interests of all members of the plaintiff-classes without adopting an adversary posture towards any group of survivors.

***

Such a scrupulously fair process, devoid of structural conflicts of interest between lawyer and client ... is the very epitome of due process under the unique circumstances of this historic settlement.

DE 83 at 12, 18, 19 (emphasis added).

The modest fee structure governing this case is described in *In re Holocaust Victim Asset Litig.*, 270 F. Supp.2d 313 (E.D.N.Y. 2002). To date, plaintiffs' counsel fees have totaled approximately $6 million, with almost $2 million of that sum donated to charity or transferred to Holocaust victims.

*Id*. at 22 n.3.

July 21, 2005. Dubbin next relies on a statement that Neuborne made in the course of litigation about attorneys' fees in Holocaust-related litigation in another district. *See* Dubbin Initial Memo. at 10-11 n.8 (citing Filing of Burt Neuborne on Behalf of Certain Hungarian Objectors at 5 & n.4, *Rosner v. United States*, Docket No. 01-1859-Civ. (S.D. Fla. July 21, 2005), *reprinted in* DE 83 at 25). The cited passage appears below:

No reported fee in a Holocaust-related case has exceeded 5% of the recovery. Indeed, in most cases, the attorneys' fees have been far lower. *For example, in the $1.25 billion Swiss bank settlement, the three principal lawyers worked without fee.* [FN4] Chief Judge Korman awarded modest fees to a

number of additional lawyers in that case totaling less than $7 million ....
Significantly, Chief Judge Korman denied requests for risk multipliers, finding
that the availability of capable lawyers willing to handle the case *pro-bono* made
it inappropriate to charge the plaintiff class as though the Swiss bank case were an
ordinary commercial litigation. See *In re Holocaust Victim Assets Litig.*, 270 F.
Supp.2d 313 (EDNY 2002). See also *In re Holocaust Victim Assets Litig.*, 302 F.
Supp.2d 89, *rehearing denied*, 311 F. Supp.2d 363 (EDNY 2004) (denying fees).

_____

[FN4] Counsel has served since February, 1999 as court-designated lead
settlement counsel in the Swiss bank cases.

DE 84 at 4 (emphasis added).

September 26, 2005. Finally, Dubbin cites the minutes of a transcript in the same Florida

case cited above in which Neuborne discussed his roles in this and related Holocaust litigation.

*See* Dubbin Initial Memo. at 10-11 n.8 (citing Transcript of Fairness Hearing at 28-30, *Rosner v.*

*United States*, Docket No. 01-1859-Civ. (S.D. Fla. Sept. 26, 2005) ("*Rosner* Fairness Hearing

Tr."), *reprinted in* DE 84 at 17). The following excerpts from the cited pages appear to be the

most relevant.

MR. NEUBORNE: ... I would like the record to reflect that I initially – *I served*
*without fee in the Swiss case. I am the lead settlement counsel in the Swiss case in*
*which I served without fee now for almost seven years. That is a 1.25 billion dollar*
*recovery. I was the principal lawyer who put the class together, the theories*
*together, I argued the case, I participated in the negotiations, and lead settlement*
*counsel, and have received no fees in that case at all.*

\*\*\*

.... I did not seek fees in the German case. In fact, I declined to seek fees in the
German case, the case you mentioned, until it was pointed out to me that the fee
structure in that case was a maximum minimum, and that the number of applications
that had been filed were so huge that it was clear that the maximum was going to be
hit. Therefore, if I would have filed, it would not in any way adversely affect money
that would go to Holocaust survivors. And when that was pointed out to me with
great clarity, I then realized that my application competed solely against the other
lawyers and not against the Holocaust victims. And that is why I filed an application.

... I questioned whether or not there was an artificial market in Holocaust cases
that enabled lawyers handle these cases at considerably submarket rates, in which
case the class was entitled to the lowered market, not the actual market.

*Rosner* Fairness Hearing Tr. 28-30 (emphasis added).

ii.    Statements Made By Others

In addition to relying on statements that Neuborne himself has made in various contexts,

Dubbin also cites statements made by others about Neuborne.  For example, Dubbin cites an

article posted on the University of Virginia Law School's web site that describes Neuborne's *pro*

*bono* work but provides only ambiguous information about the source of that description.  The

article notes that Deborah Sturman, who is identified as "Special Liaison Counsel" in the

*Holocaust Victim Assets Litigation*, "said 30 law schools are or were involved ... in addition to a

number of individual law students and attorneys.  At least four law firms, NYU Professor Burt

Neuborne and several others have been deeply involved in the case ....  *All worked pro bono*."

*Students Help Holocaust Victims Recover Funds*, University of Virginia School of Law Web

Site, http://www.law.virginia.edu/home2002/html/news/2001_02/holocaust.htm (last visited

Mar. 15, 2007) (emphasis added), *reprinted in* DE 83 at 4.

Dubbin also cites to a newspaper article purporting to quote a statement by Neuborne that

is critical of certain unspecified attorneys' fee requests:

Many of the attorneys who are working pro bono [in this litigation] are
upset ... that colleagues would accept money for pursuing what may be the most
clear-cut human rights case in the history of the courts.  "They think they get up in
the morning and think about the case in the shower and someone should pay them
for it," said Burt Neuborne, a New York University law professor who headed the
settlement team assembled at the behest of the judge.

But some of the lawyers who have expressed indignation in the case, including Neuborne, will share $50 million being set aside for fees in a separate case, the $4.8 billion settlement with the German government over its use of slave labor during the war.

Steve Chambers, *Lawyers Want Millions as Cut of Holocaust Settlement*, Plain Dealer

(Cleveland), Aug. 15, 2000, at 8A, *reprinted in* DE 83 at 6.  And finally, there is a citation to a

lengthy article in an NYU alumni magazine that describes Neuborne's work as being *pro bono*

without stating whether the description was provided (explicitly or otherwise) by Neuborne or

was instead obtained or inferred from some other source:

The class-action lawsuit against Swiss banks ... has also rankled some interested parties.... A few American survivors ... have assailed the settlement for giving the bulk of the looted-assets money to survivors in the former Soviet Union and leaving only a small percentage for U.S. survivors.  In an interview, Neuborne (*who took on this case pro bono*) contended that the needs of elderly American survivors, protected by this country's social safety net, were not as profound as those of 135,000 elderly Soviet survivors, who lack such basics as food, winter fuel, and emergency medical care.

Joseph Berger, *Creative Counsel*, New York University Law School Magazine, Autumn 2004, at

19-20 (emphasis added), *reprinted in* DE 82 at 24.

b.    Analysis

To succeed in establishing that Neuborne is subject to judicial estoppel, Dubbin must

show "a true inconsistency" between Neuborne's previous statements and his pending application

to be compensated for his work as Lead Settlement Counsel.  *See Simon v. Safelite Glass Corp.*,

128 F.3d at 72-73 (absent "a true inconsistency between the statements in the two proceedings ....

there is no occasion to apply an estoppel").  This he cannot do.  Indeed, in most instances the

matter is not even a close call:  far from being even arguably inconsistent with Neuborne's

current position, most of the cited statements are clearly consistent with it.  In most instances, the

cited statements draw an explicit distinction between the work Neuborne did to secure a litigation victory in his role as plaintiffs' counsel and a member of the plaintiffs' Executive Committee, and his work in helping to implement and administer the settlement in his capacity as Lead Settlement Counsel – and, with few exceptions discussed below, in each such instance Neuborne attributed his waiver of fees only to the work done in the former capacity.

Dubbin is on even less solid footing in his reliance on statements not directly attributable to Neuborne. Such statements simply cannot serve as the basis for estoppel, as Neuborne did not make them. To the extent such statements reflect an understanding gained as the result of statements Neuborne did make, they add nothing to the analysis. To the extent they reflect an understanding gained in any other way, they are worthless.

Of all the statements made by Neuborne himself on which Dubbin relies, only two warrant further discussion: the first, and the last. In his November 1999 declaration in support of the then-pending settlement proposal, Neuborne did include the following formulation: "Numerous lawyers, including Lead Settlement Counsel, have waived all attorneys fees." Neuborne 1999 Dec. ¶ 28. Taken out of context, Neuborne's use of the "Lead Settlement Counsel" title together with the reference to a waiver of "all" fees can easily support an inference that Neuborne intended to disavow compensation for all phases of his work in this litigation, including his post-settlement work as Lead Settlement Counsel. But the availability of that inference does not carry the day for Dubbin for two separate reasons. First, there is no true inconsistency: the statement that Neuborne has "waived all attorneys fees" may signal a waiver of all fees past or future, or it may refer only to fees incurred as of the time of the statement. Even accepting, as I do, that the most natural reading of the statement (taken out of context) is

one that favors Dubbin's position, the fact that it is susceptible of another interpretation, consistent with Neuborne's current application, is fatal to the estoppel argument. Second, and more compelling, the statement can be read to favor Dubbin's position *only* by divorcing it from the context of the many other statements in the same document that make clear the fact that Neuborne's fee waiver was meant to apply only to his work in securing the settlement. Dubbin's reading may be inconsistent with Neuborne's fee request, but that inconsistency is a false one that vanishes upon any fair reading of the entire document.

The same principles apply with even greater force to the last statement on which Dubbin relies – Neuborne's oral representations to the judge hearing the *Rosner* case that he "served without fee in the Swiss case[,]" that he had done so "without fee now for almost seven years[,]" and that he had "received no fees in that case at all." *Rosner* Fairness Hearing Tr. 28-29. The statements were, of course, literally true: at that time, as now, Neuborne had yet to receive any compensation for his work in this case. Nevertheless, his oral statement did allow a broader inference that is inconsistent with his current fee application. Here again, the fact that competing inferences are sustainable bars the application of estoppel. Moreover, as with the previously discussed statement, placing this statement in context is fatal to Dubbin's argument. In *Rosner*, Neuborne's written statement about serving without fee in the Swiss bank litigation – which served as the basis for his later oral argument in the same case – was made in the context of the fee applications that were made in that case. *See* Filing of Burt Neuborne on Behalf of Certain Hungarian Objectors at 5 & n.4, *Rosner v. United States*, No. 01-1859-Civ. (S.D. Fla. July 21, 2005), *reprinted in* DE 83 at 25. Viewed against that backdrop, anyone interested in the precise nature of Neuborne's fee waiver would either understand that it was limited to his role in securing

the settlement in this case, or at a minimum would have had some uncertainty on the matter. Only a reader – and, at the later oral argument, a listener – with no incentive to gain a clear understanding of the matter would jump to the conclusion that Neuborne intended to signal that he would never seek a fee for his work as Lead Settlement Counsel.

To be sure, Neuborne cannot escape criticism for the murkiness of such statements. Indeed, even the statements in which Neuborne carefully cabined his "*pro bono*" references to discussions of his pre-settlement work could have been clearer in announcing Neuborne's intention to seek a fee for his work as Lead Settlement Counsel (or in explicitly preserving his option to make such an application). In the interest of clear and candid communication with his clients and the court, Neuborne would have been well advised to do so.[14] Such affirmative efforts to avoid any misunderstanding would plainly have helped avoid much of the current controversy, and perhaps some of the ill will that Neuborne's fee application has engendered among class members and other observers. But that is not the standard the court must apply in

---

[14] I acknowledge, of course, that Neuborne made two affirmative statements signaling an intention to seek a fee for his work in administering the settlement. *See* Neuborne Final Memo. at 7. Neither was made to the plaintiff class, and in this regard, I agree with the criticism implicit in Dubbin's argument that a statement in the final sentence of the third paragraph of footnote 21 of a law review article is hardly an effective form of communicating a matter of such import. *See* Dubbin Final Memo. at 5. If anything, the juxtaposition of the broad ambiguous statements Neuborne made to the court and the class about his *pro bono* service with the more precise statements he made to different audiences in which he reserved the right to seek compensation is open to the interpretation that Neuborne sought to burnish an image of selflessness while minimizing attention to a fact that might undermine it. I need not speculate on the matter, however, as it is irrelevant to the legal issue before the court: even if Neuborne deliberately sought to create a false impression about his intentions among lay observers, Dubbin would still need to establish the two elements of judicial estoppel to succeed in his effort to deny Neuborne his fee.

assessing Dubbin's estoppel argument.  The legal hurdle Dubbin faces is much higher, and the statements he cites do not help him clear it.

In short, it is possible – though not likely – that a casual observer of Neuborne's statements over the years could have mistakenly concluded that Neuborne had explicitly foreclosed the possibility that he would seek compensation for his work as Lead Settlement Counsel.  It is even conceivable – though far less likely – that highly interested observers such as the Objectors could honestly have come to the same conclusion.[15]  But if any of them did reach such a conclusion, they were not forced to do so by dint of the statements alone.  I conclude that the statements on which Dubbin relies do not permit the invocation of judicial estoppel.

3.    The Court Has Not Relied On Any Inconsistent
      Statement

Because the doctrine of judicial estoppel "is designed to protect the integrity of the judicial process," *OSRecovery, Inc.*, 462 F.3d at 93 n.3, rather than to enforce the integrity of the attorneys who participate therein, a party seeking to invoke the doctrine must do more than simply demonstrate that the party to be estopped sought to mislead others by reversing position on a given matter.  As noted above, the doctrine is one of equity, and therefore requires in

---

[15] One fact that makes such a result unlikely is that the first order signed by Chief Judge Korman that referred explicitly to Neuborne's role as Lead Settlement Counsel provided for the payment of a small fee to one of his assistants in that capacity.  *See* Order dated March 3, 2003 (directing payment  of "$8,330 from the Settlement Fund to Michelle Weitz, for legal assistance she provided Professor Neuborne in carrying out his responsibilities as Lead Settlement Counsel.").  As far as I can discern from the (admittedly lengthy) docket, neither Dubbin, Swift, nor any class member raised any objection, then or ever, to the occasional award of legal fees for work done in support of Neuborne's role as Lead Settlement Counsel.  That there was no such objection is of course no bar to the objections now before the court, but the fact is at least somewhat in tension with the argument that all concerned expected that Neuborne would complete his assigned tasks at no cost to the class.

addition that the changed position be one that a court has previously adopted. *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. at 750 ("courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position"); *Peralta*, 467 F.3d at 105 ("the inconsistent position must have been adopted by the court in some matter"). Even assuming, contrary to the discussion above, that Neuborne had explicitly and deliberately disavowed the compensation he now seeks for his work as Lead Settlement Counsel, I would recommend against a finding that he is estopped because no court has adopted that disavowal.

Dubbin relies on four decisions – three by Chief Judge Korman in this case and the other an affirmance by the Court of Appeals – in seeking to satisfy the requirements of this second element. Dubbin Final Memo. at 4-5. I examine each assertion in turn and, as explained below, find them all wanting.

a.       The District Court Decisions

At the outset, I note that Dubbin's reliance on *any* decision by Chief Judge Korman to satisfy the judicial adoption requirement appears to be misplaced. When he first sought to raise the issue, Chief Judge Korman explicitly stated that he had "agreed with [Neuborne] that he would be entitled to legal fees." Conf. Tr. 5. Neuborne has likewise asserted, without contradiction, that early in his tenure as Lead Settlement Counsel, he expressed a reluctance to serve in that capacity without payment and received the court's assurance of a reasonable fee. Neuborne Omnibus Fee Dec. at 93-95. That record, at a minimum, casts substantial doubt on the proposition that Chief Judge Korman adopted Neuborne's disavowal of an intention to seek compensation for his work as Lead Settlement Counsel or that such a disavowal was critical to

42

any decision he has made in this litigation.  However, for the reasons explained below,  I do not rely on that record in rejecting Dubbin's argument.

The August 2000 Settlement Approval.  The first decision that Dubbin cites is the court's approval of the settlement agreement over a number of objections, including one based on a potential conflict of interest.  Of all of the decisions at issue, this one comes closest to meeting the requirement of judicial adoption.  As Dubbin describes it:

> The District Court adopted Mr. Neuborne's argument regarding the settlement structure in its August 2000 fairness decision and rejected the contention that separate counsel should have been appointed for classes with conflicting interests. It held a "a 'divided loyalty' structural concern is absent from this case ... [because] plaintiff's lead settlement counsel [has] waived all attorneys fees." *In re Holocaust Victim Assets Litig.*, 105 F. Supp.2d 139, 146 (E.D.N.Y. 2000).

Dubbin Final Memo. at 4.

Dubbin's use of selective quotation marks and bracketed amendments subtly changes the meaning of the relevant passage and masks an important distinction.  To explain, I must first provide a fuller reproduction of that passage.  Under the heading "Procedural Fairness," Chief Judge Korman wrote the following:

> I turn first to the procedural component of the fairness determination. This consideration focuses on the "negotiating process by which the settlement was reached." *Weinberger* [*v. Kendrick*], 698 F.2d [61,] 73 [(2d Cir. 1982)].... In particular, a judge ruling on the fairness of a settlement has a fiduciary duty to ensure that the settlement is not the product of collusion. *See In re Warner Communications Securities Litigation*, 798 F.2d 35, 37 (2d Cir.1986). "So long as the integrity of the arm's length negotiation process is preserved, however, a strong initial presumption of fairness attaches to the proposed settlement." *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 474 (S.D.N.Y.1998).
>
> In a class action, the principal impediment to assuring an untainted settlement process is the financial interest of counsel, who may be improperly influenced to accept certain settlement terms, or to accept a settlement at all,

thereby "subordinat[ing] the interests of class members to the attorney's own economic self-interest."  John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L.Rev. 370, 371-72 (2000).  As plaintiffs' lead counsel observes, however, such a "divided loyalty" structural concern is absent from this case.  Neuborne Decl. I ¶ 28.  Key members of the plaintiffs' Executive Committee who negotiated this settlement are providing their services on a *pro bono* basis....  *Id.*  Numerous lawyers, including plaintiffs' lead settlement counsel, have waived all attorneys' fees....

Moreover, based upon my extensive personal involvement in the process, I know that the compromise was reached as the result of lengthy, well-informed and arm's-length negotiations by competent and dedicated counsel who provided loyal and effective legal representation to all parties.  Counsel for the plaintiff settlement classes are experienced plaintiffs' advocates and class action lawyers.  One could not assemble a more capable group....  While I have independently evaluated the fairness of the settlement, the unanimous support of this group in favor of final approval is entitled to great weight. See [*In re*] *NASDAQ* [*Market-Makers Antitrust Litig.*], 187 F.R.D. [465,] 474 [(S.D.N.Y. 1998)] (where court is satisfied that negotiations were conducted at arm's length and in good faith, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation" (citation omitted)).

105 F. Supp.2d at 145-46.

Dubbin's rendering of that passage appears to suggest that in approving the settlement agreement, the court relied on the fact that Neuborne in particular had waived all of the fees to which he might otherwise be entitled for any aspect of his work in this litigation.  That would not have been an unreasonable decision:  if Neuborne had a stake in the acceptance of the settlement itself (by virtue of the prospect of being paid for work in administering it), and if he were solely responsible for the settlement proposal before the court, there might be a danger that the proposal had subordinated the interests of the class to those of its attorney.  By removing references to the other attorneys who had helped negotiate on the plaintiffs' behalf as well as repeated references to the court's focus on the fairness of the settlement process, Dubbin has (perhaps inadvertently as a

convenient shorthand) made it appear that Neuborne's supposed waiver of future compensation was an important if not paramount concern.

Reading the passage in context reveals that that is not the case. The court explicitly focused its attention on "the 'negotiating process by which the settlement was reached.'" *Id*. at 145. It also satisfied itself through independent analysis that the process was a fair one. Thus, even without relying on Chief Judge Korman's agreement that Neuborne would in fact be paid for his post-settlement work, I can conclude that the cited decision turned only on the waiver by some of the plaintiffs' attorneys of the right to seek compensation for having secured the settlement.[16]

The November 2000 and March 2004 Allocation Decisions. Dubbin next refers to two decisions by the district court that adopted the Special Master's allocation decisions. *See* Dubbin Final Memo. at 4 (citing *In re Holocaust Victim Assets Litig.*, 2000 WL 33241660, at *1, *4 (E.D.N.Y. Nov. 22, 2000); *In re Holocaust Victim Assets Litig.*, 302 F. Supp.2d 89, 92 (E.D.N.Y. 2004)). Although Dubbin cites these decisions, he does not even assert that either one adopted any statement by Neuborne that is inconsistent with the instant application for compensation. With respect to the 2000 decision, he writes only that "the court relied on the 'fair allocations process' described in Mr. Neuborne's submissions and also cited its fairness decision." Dubbin

---

[16] Adding that agreement into consideration, of course, provides an even stronger basis to find that there was no judicial adoption of the position Dubbin attributes to Neuborne. If Chief Judge Korman had already decided that Neuborne would be paid for his work as Lead Settlement Counsel, the fairness decision obviously could not have adopted a contrary position. If he made that decision later, he quite plainly did so on the ground that it was consistent with his earlier approval of the settlement. Accordingly, the uncontroverted assertions by both Neuborne and Chief Judge Korman that they did at some point agree that Neuborne would be paid a reasonable fee for his work as Lead Settlement Counsel necessarily vitiates at least one of the two elements Dubbin must establish to invoke judicial estoppel on the basis of the fairness decision.

45

Final Memo. at 4. Likewise, with respect to the 2004 decision, Dubbin says no more than that

"the District Court expressly relied on Mr. Neuborne's 2003 Supplemental Declaration." *Id.*

It is hardly surprising that Dubbin does not argue – as he must if his estoppel claim is to

succeed – that either decision adopted any statement by Neuborne that could be construed as a

waiver of his fee, as neither of the cited decisions makes any mention of such a statement. The

2000 decision says nothing about Neuborne's fee, and the only statement by Neuborne that it

cites is the declaration of June 26, 2000 – a statement which, as noted in the preceding section,

also says nothing about the waiver of fees. Similarly, the 2004 decision says nothing about

Neuborne's fee. To the extent that it purports to "adopt" Neuborne's declaration of November 14,

2003, it explicitly does so only for the purpose of rejecting Dubbin's then-pending "challenge to

[the court's] continued use of the American Jewish Joint Distribution Committee, Inc., for

distribution of settlement funds." *In re Holocaust Victim Assets Litig.*, 302 F. Supp.2d at 92.

Judicial estoppel of Neuborne's fee request is unavailable on the basis of such an adoption of an

unrelated statement.

b.  The Circuit Court Decision

Dubbin finally points to the decision by the Court of Appeals that affirmed the allocation

decisions discussed above as an example of judicial "adoption" of Neuborne's supposed waiver

of fees as Lead Settlement Counsel. As Dubbin describes the opinion, the court

> affirmed the allocations relying in part on the reasoning of the district court
> centered on Neuborne's "pro bono" status and the "fair allocations" process
> argument. The Second Circuit quoted from the District Court's fairness finding
> which had stated that Professor Neuborne was serving as a lawyer for class
> members "without fee." *In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 138
> (2d Cir. 2005). The Second Circuit's opinion also quotes from Mr. Neuborne's

explanations of the "fair allocation process he devised to justify the allocations process and result. *Id.*, at 137.

Dubbin Final Memo. at 5. There are two significant flaws with Dubbin's reliance on the appellate decision, one only slightly less obvious than the other. First, to the extent that the appellate court can be said to have adopted Neuborne's statements, it did so by proxy, relying only on the district court's analysis of those statements rather than the statements themselves. Thus, Dubbin's argument in this respect rises no higher than the argument based on the district court's underlying decisions – an argument I find wanting for reasons discussed above. Second, Dubbin flatly ignores the fact that the portions of the appellate opinion on which he relies are merely part of the court's recitation of the factual and procedural background of the case before it. *See In re Holocaust Victim Assets Litig.*, 424 F.3d at 135-44 (section of opinion under the headings "Background" and "I. Swiss Bank Settlement"). Dubbin likewise ignores the fact that the court later described the precise issue under review in a manner that demonstrates the irrelevance of Neuborne's statements about his fee: as the court noted, rather than attacking the approval of the settlement or "the findings that underlie the District Court's initial decision to distribute the settlement funds in this case to the neediest class members[,]" *Id.* at 146, the "appellants ask us to review only the *manner* in which the *cy pres* distribution of funds to the neediest Looted Assets Class members was accomplished ...." *Id.* (emphasis in original). The court's analysis and resolution of that issue centered on the lack of merit in the appellant's arguments, and in no way adopted any statement by Neuborne about his compensation.

In short, none of the statements by Neuborne on which Dubbin relies is truly inconsistent with his pending request to be paid for his work as Lead Settlement Counsel, and none of the

cited judicial decisions adopted any such commitment to work for free. As a result, while Neuborne's application is evidently a profound and surprising disappointment to some – both due to the amount he requests and, rather less reasonably, the fact that he seeks any compensation at all – the doctrine of judicial estoppel does not bar him from pursuing it. I therefore recommend that the court consider the fee application on its merits.

C.     Application Of The Lodestar Method In This Case

If the court agrees that Neuborne is not estopped from seeking a fee for his work as Lead Settlement Counsel, all of the remaining questions before it involve the application of the lodestar method, in which an attorney's compensation is calculated based on the product of an appropriate hourly rate and the appropriately compensable number of hours he has worked, and then, in appropriate circumstances, adjusted by means of a multiplier. *See In re "Agent Orange" Products Liability Litig.*, 818 F.2d 226, 232 (2d Cir. 1987) (describing lodestar method). Although the parties disagree on many important matters, there appears to be no dispute that the court should use that method rather than simply award Neuborne a percentage of the settlement fund he has helped administer.

While either approach would arguably be appropriate in a setting involving a common fund rather than the operation of a fee-shifting statute, *see Masters v. Wilhelmina Modeling Agency*, 473 F.3d 423, 436 (2d Cir. 2007) (citing *Wal-Mart Stores, Inc. v. Visa, USA, Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)), I agree that the lodestar method is preferable here. Among other reasons, the lodestar approach seems better geared to the service for which Neuborne seeks to be compensated: while a percentage award might more closely approximate the value of an attorney's work in creating the fund from which his compensation is to be paid, a lodestar fee can

better approximate the value of his service in administering it.  *See Savoie v. Merchs. Bank*, 166 F.3d 456, 460-61 (2d Cir. 1999) (upholding use of the lodestar method where use of the percentage method would have accomplished none of its intended benefits); *see also In re Holocaust Victims Assets Litig.*, 270 F. Supp.2d 313, 323-24 (E.D.N.Y. 2002) (using lodestar method to determine Swift's fee for his work before and after the settlement was secured).

An attorney's reasonable compensation approximates the fees that "plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel."  *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52 (2d Cir. 2000).  In a complex class action, re-creating this hypothetical negotiation between class members and counsel can become inordinately complicated, particularly because the adversary system "is typically diluted – indeed suspended – during fee proceedings," *id*., although that problem is hardly present in this case.  One purpose of a market-based inquiry is to spread the costs of litigation among the class of beneficiaries, thus avoiding unjustly enriching those who do not contribute to the costs of litigation.  *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 393 n.17 (1970) (citing *Trustees v. Greenough*, 105 U.S. 527, 531-37 (1881)); *see also Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939).[17]

---

[17]  Here too, that principle does not apply with full force, in part because those who oppose Neuborne's request for a fee, being among the group that has received the smallest allocation of settlement funds, will pay a much smaller share of it than the vast majority of class members who either voice no objection to Neuborne's application or support it.  Indeed, to the extent that Swift's submission voices the view of no one but himself, and to the extent that Dubbin purports to act on behalf of the HSF group, they will pay nothing at all to compensate Neuborne, no matter what the court decides.

Simply determining the likely outcome of the imagined interplay of market forces is not sufficient, however. The court must also consider all of the circumstances of the case and award an amount that is reasonable. *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp.2d 503, 521 (E.D.N.Y. 2003) (citing *Goldberger*, 209 F.3d at 47). Such an award is proper only if made with moderation and "a jealous regard to the right of those who are interested in the fund." *Goldberger*, 209 F.3d at 53. The court must therefore act as "a fiduciary who must serve as a guardian of the rights of absent class members." *Id.* at 52 (quoting *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977)).

In particular, the court must assess the overall reasonableness of a contemplated fee award from a number of perspectives that are generally described as the *Goldberger* factors: "(1) counsel's time and labor; (2) the litigation's complexities and magnitude; (3) the litigation risks; (4) quality of representation; (5) the relationship of the requested fee to the settlement; and (6) considerations of public policy." *Masters*, 473 F.3d at 436; *see also Goldberger*, 209 F.3d at 52 (citing *In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)); *see Wal-Mart Stores, Inc.*, 396 F.3d at 121-22 (applying the *Goldberger* factors). Courts applying this test recognize that it can produce a range of reasonable awards in any given case, but caution that in common fund circumstances, "'courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable.'" *Masters*, 473 F.3d at 436 (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 122); *see also Goldberger*, 209 F.3d at 52-53. With those principles in mind, I turn to an analysis of each component of a lodestar award, beginning with the parties' dispute about Neuborne's proposed hourly rate of $700, then turning to the two discrete issues that the parties have agreed will determine the number of

compensable lodestar hours, and finally considering the propriety of the "excellence" multiplier that Neuborne requests and the overall reasonableness of the award I contemplate.

D.    The Lodestar Hourly Rate

The first step in the lodestar method is to determine an appropriate hourly rate of compensation for the attorney who asks to be paid. Neuborne suggests that for an attorney of his skill, expertise, and reputation, the appropriate hourly rate is $700. *See* Neuborne Final Memo. at 11-15. Dubbin contends that a reasonable hourly rate for Neuborne's service would be within the range of $200 to $380 (or possibly, depending on the method by which the court might implement one of Dubbin's proposed approaches, as high as $415). Dubbin Final Memo. at 9, 11 n.9. In particular, he disputes that the record sufficiently demonstrates Neuborne's ability to command such a high rate in the relevant market, and also argues that his rate should in any event be discounted for a number of reasons, including: (1) the fact that Neuborne is primarily a law professor whose hourly compensation for teaching is much lower; (2) the fact that he performed all of the work himself rather than delegating some tasks to a less-expensive associate; and (3) the fact that Neuborne bears fewer costs – in terms of both overhead and lost opportunities for alternate work – for providing legal services than a comparable law firm attorney. *See* Dubbin Final Memo. at 9-14.[18] Having considered all of their arguments and the applicable law, I respectfully recommend for the reasons discussed below that the court award Neuborne a fee based on an hourly rate of $450.

---

[18] Swift joins in Dubbin's arguments but offers none of his own on this issue. *See* Swift Final Memo. at 4.

1.      <u>Dubbin's Objections</u>

a.      <u>The Sufficiency Of The Record</u>

Dubbin notes that it is Neuborne's burden to establish his reasonable hourly rate. Dubbin

Final Memo. at 12 (citing *Blum v. Stenson*, 465 U.S. 886, 895 & n.11 (1984)). While the

principle is generally sound, Dubbin overstates it, and in doing so erroneously contends that the

evidence Neuborne has presented is insufficient. Neuborne has submitted an affidavit about his

own billing rate, Neuborne Omnibus Fee Dec. at 111-13, and has supplemented it with the

declarations of three well-regarded colleagues, each of whom attests to the proposition that the

hourly rate of $700 Neuborne claims is in line with the prevailing rates of similarly qualified

attorneys. *See* Neuborne Omnibus Fee Dec. Ex. H. Regardless of the persuasive value of those

declarations under the circumstances of this litigation, at a minimum those submissions satisfy

the burden of production that the Supreme Court identified in *Blum*:

> To inform and assist the court in the exercise of its discretion, the burden is on the
> fee applicant to produce satisfactory evidence – in addition to the attorney's own
> affidavits – that the requested rates are in line with those prevailing in the
> community for similar services by lawyers of reasonably comparable skill,
> experience, and reputation.

465 U.S. at 895 n.11. Viewed against that standard, Dubbin's complaint that Neuborne's

evidence is insufficient is unavailing.

b.      <u>The Proposed Analogy To<br>Neuborne's Academic Salary</u>

As an opening gambit on the merits of Neuborne's proposed hourly rate, Dubbin suggests

a comparison to Neuborne's salary as a law professor, which he notes the parties have stipulated

to be $300,000 per year. Assuming an average work load of 1,600 hours per year, Dubbin

calculates that Neuborne's salary represents an hourly rate of $187.50. Dubbin Final Memo. at

10. Dubbin's math is far better than his logic in this regard. Neuborne's salary as a teacher is no

more relevant to the instant inquiry than the amount he might charge to paint his neighbor's

house, were he inclined to market such a service. The level of compensation for the service that

a teacher provides to his students and to the university that employs him says nothing about the

value of the legal services he provides to the clients who engage him, and Dubbin offers no legal

authority to the contrary.

c.      The *"Agent Orange"* Precedent And
        The  Proposed "Academic Discount"

Although Neuborne's academic salary is completely irrelevant, his status as a teacher is

not. As Dubbin correctly notes, Judge Weinstein took a similar circumstance into account in a

previous case as the basis for reducing a successful class counsel's lodestar hourly rate. *See*

Dubbin Final Memo. at 10-11 (citing *In re "Agent Orange" Prod. Liab. Litig.* 611 F. Supp. 1296,

1330 (E.D.N.Y. 1984), *aff'd in part and rev'd in part on other grounds*, 818 F.2d 226, 230 (2d

Cir. 1987)). Dubbin begins by observing that Judge Weinstein applied an hourly rate of $125 for

the academic attorneys who participated in the case and rates of $150 and $100 for the law firm

partners and associates, respectively, who also participated. From that premise he reasons that

one measure of a "reasonable rate," applying Judge Weinstein's model, is the current mid-point

between partners and associates at private law firms. Dubbin Final Memo. at 10-11. He then

provides some statistics to arrive at a current "mid-point" hourly rate of $380.

The plain language of the *"Agent Orange"* opinion, however, compels no such result.

While the court did employ a lodestar hourly rate of $125 for the six law professors involved in

that litigation, it explained that decision not by resort to some perceived rule that professors should be deemed to warrant compensation halfway between the respective rates of partners and associates, but on the ground that law professors did not "have to give up any clients [or] ... need the kind of bread and butter work that a practicing lawyer requires." *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. at 1330.[19]

Neuborne contends that, unlike the law professors in the *"Agent Orange"* litigation, he "abandoned a flourishing and lucrative consulting practice based on market rates in order to accept the Court's invitation to serve as Lead Settlement Counsel" and that his rate should therefore be fixed to the rate he could command in the private market. Neuborne Omnibus Fee Dec. at 116; *see also* Second Supplemental Declaration in Support of Application For Attorneys' Fees filed March 8, 2006, DE 28 at 15 (referring to a private client who paid Neuborne an hourly rate of $700). Leaving aside the potential factual dispute such an assertion might raise if dispositive, I note that it does not in any event undermine Judge Weinstein's reasoning. Neuborne's assertion that he gave up other paying clients does not establish a "need" different from the academic lawyers in the *"Agent Orange"* litigation, it merely shows that he had a wider range of choices than they.[20]

[19]  Further undermining Dubbin's argument is his reliance on data from a survey of New York State and New York City practitioners in arriving at his proposed $380 hourly rate. Dubbin Final Memo. at 11. Even if the "mid-point" methodology was appropriate, statistics about the hourly rates charged by lawyers across the state would be useless. Pursuant to controlling case law, the pertinent geographical market for purposes of the instant application is the Eastern District of New York. *See Farbotko v. Clinton County*, 433 F.3d 204, 208 (2d Cir. 2005) (citing *Polk v. N.Y. State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir. 1983)).

[20]  Moreover, Neuborne's assertion that he did in fact give up alternative paying work does not necessarily mean that he had to do so, as did the academic lawyers in the *"Agent Orange"* case. In that regard I note that Neuborne's dedication to this case has apparently not prevented him

54

I nevertheless find the *"Agent Orange"* precedent to be of limited utility to this litigation because, whatever the merits of its reasoning, the approach runs counter to more recent precedent in this circuit. That trend has been to look exclusively to market forces as such, and to discourage reliance on any particular circumstance as a proxy for how those forces might operate – even with respect to law professors. *See Petrovits v. New York City Transit Auth.*, 2004 WL 42258 (S.D.N.Y. Jan. 7, 2004) (awarding $250 hourly rate to a clinical law professor based on market analysis); *Moon v. Gab Kwon*, 2002 WL 31512816 (S.D.N.Y. Nov. 8, 2002) (same); *Gavin-Mouklas v. Info. Builders, Inc.*, 1999 WL 728636 (S.D.N.Y. Sept. 17, 1999) (same); *Davis v. City of New Rochelle*, 156 F.R.D. 549, 558 (S.D.N.Y. 1994) ($300 hourly rate awarded based on market analysis); *David v. Sullivan*, 777 F. Supp. 212, 222 (E.D.N.Y. 1991) (awarding $250 and $200 hourly rates to two clinical law professors based on market analysis). More generally, to the extent that any law professor who takes on private clients is likely to do so as a sole practitioner rather than as part of a law firm, the "academic discount" that Dubbin proposes would almost certainly run afoul of the reasoning, if not the rule, of *McDonald v. Pension Plan*

---

from an active role in litigation as Legal Director of the Brennan Center for Justice at NYU. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003); *Brooklyn Legal Svcs. Corp. v. Legal Svcs. Corp.*, 462 F.3d 219 (2d Cir. 2006); *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005); *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp.2d 222 (S.D.N.Y. 2006); *Velazquez v. Legal Svcs. Corp.*, 356 F. Supp.2d 267 (E.D.N.Y. 2005); *Velazquez v. Legal Svcs. Corp.*, 349 F. Supp.2d 566 (E.D.N.Y. 2004); *McConnell v. Federal Election Comm'n*, 251 F. Supp.2d 919 (D.D.C. 2003); *McConnell v. Fed. Election Comm'n*, 251 F. Supp.2d 176 (D.D.C. 2003); *Molinari v. Powers*, 82 F. Supp.2d 57 (E.D.N.Y. 2000). I have no reason to doubt the veracity of Neuborne's declaration that he has in fact cut back on more lucrative alternative endeavors, and I do not by any means suggest that the court would benefit from a factual hearing on the matter. My only point in citing other cases in which Neuborne has appeared as counsel in the past seven years is to note that he apparently could have accommodated at least some of the needs of this case through alternative reductions of the time spent on less remunerative duties. That he chose not to do so is entirely to his credit, but it is not necessarily a choice that the plaintiff class should be required to subsidize.

*of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 97 n.6 (2d Cir. 2006) ("it would be error to use an attorney's status as a solo practitioner as an automatic deduction or shortcut for determining the reasonable hourly rate").

The "academic discount" that Dubbin proposes would moreover create a perverse disincentive for academic attorneys to accept engagements for which they may be particularly well-suited, and from which society as a whole would benefit. If an academic lawyer can in fact command higher rates in a case in which a private client directly pays her fee, but is required to endure a discount in a common fund case in which her compensation is paid by the court, she could be dissuaded from taking on the latter work.[21]

If the "academic discount" that Dubbin proposes is merely in tension with the recent case law of this circuit, his separate argument predicated on assumptions about Neuborne's fixed overhead costs flatly contradicts that case law. Dubbin argues that "Neuborne's lack of comparable New York City overhead or other expenses or business risk is also fatal to his claim of $700 per hour." Dubbin Final Memo. at 11 (suggesting an hourly rate of no more than $250 based on considerations of overhead expenses). In fairness, I acknowledge that although made shortly after the advent of *McDonald*, the argument was made after the court *sua sponte* raised a question about the relevance of the relatively lower costs that Neuborne faces compared to a law

---

[21]  If the court accepts my recommendation not to apply the "academic discount" that Dubbin proposes, it need not address an issue that Neuborne raises in response:  namely, whether any such discount must be offset by a corresponding multiplier.  Neuborne argues that Judge Weinstein's decision to award such a multiplier in the *"Agent Orange"* litigation (thereby raising the professors' effective hourly rate from $125 to $187.50) was an attempt to neutralize the effect of the academic discount.  Neuborne Final Memo. at 13.  I perceive no such linkage in Judge Weinstein's opinion, but the matter is irrelevant if the court follows the more recent case law and declines to use Neuborne's role as a professor as a proxy for his market power.

firm partner.  *See* Conf. Tr. 34.  While I cannot fault Dubbin for pursuing the argument under the

circumstances, the controlling law of this circuit forecloses it.  *McDonald*, 450 F.3d at 97 n.6

("Overhead is not a valid reason for why certain attorneys should be awarded a higher or lower

hourly rate.").[22]  As discussed below in exploring the market forces that might affect Neuborne's

actual hourly rate, *McDonald* does not make considerations such as Neuborne's lower overhead

costs completely irrelevant, notwithstanding Neuborne's assertion that "[o]verhead has absolutely

nothing to do with it."  Neuborne Final Memo. at 15; *see McDonald*, 450 F.3d at 97 n.6.

*McDonald* means only that Neuborne's status as a sole practitioner, like his status as a law

professor, does not short-circuit the relevant inquiry into Neuborne's market power.

> d.    The Proposed Discount For
>        Delegable Tasks

Another objection that Dubbin raises to Neuborne's claimed hourly rate of $700 is the fact

that Neuborne seeks such compensation for all of the work he has done for seven years simply

because he has done it himself, even though he need not have done so if he had less experienced

attorneys at his disposal to assist him.  As Dubbin argues, "Clients would expect many of the

tasks in such a matter to be handled by lower-cost partners and associates and paralegals ...."

Dubbin Final Memo. at 12.  As a practical critique of how lawyers go about negotiating for their

fees, the objection is a fair one, and I consider it below in trying to determine the rate that

Neuborne would have achieved had he sought to fix a rate at the outset of his service as Lead

Settlement Counsel.  But to the extent Dubbin proposes any kind of formulaic approach that

---

[22]   Indeed, at least one court has used an attorney's solo practitioner status to justify a higher
award than that suggested by comparison with an attorney of comparable experience working at a
firm.  *Barfield v. New York City Health & Hosp. Corp.*, 2006 WL 2356152 (S.D.N.Y. Aug. 11,
2006).

57

would hypothesize the "blended rate" that a fictional "Neuborne Law Firm" might negotiate, the case law of this circuit explicitly forbids it. *McDonald*, 450 F.3d at 98-99. Nothing in that opinion, however, appears to foreclose consideration of how Neuborne's status as a sole practitioner who would necessarily perform all tasks himself might affect the negotiations over his hourly rate.

e.     The Proposed "Opportunity Cost"
                     Approach

Finally, Dubbin objects to the proposed $700 hourly rate on the basis of Judge Easterbrook's opinion in *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1989). Dubbin notes that the court in *Gusman* decided that the most appropriate measure of an attorney's market rate is his opportunity cost in taking on the engagement for which he seeks a fee.

> The court noted that an attorney who worked 2,000 hours per year but only billed 100 hours at the rate of $250, and devoted the other 1,900 hours to civil rights litigation where his payment would be fixed by the court, did not have the same "market rate" as the attorney who worked 2,000 hours and billed 1,900 hours at a rate of $250 to paying clients and works [sic] 100 hours in civil rights cases. The former example describes Mr. Neuborne and undercuts his claim to a market rate of $700 per hour.

Dubbin Final Memo. at 12-13.

I do not presume to quarrel with Judge Easterbrook on matters of economic theory. Nevertheless, I find Dubbin's application of the *Gusman* case unpersuasive for two reasons. First, to the extent that it suggests an inquiry into something other than what arm's-length negotiation would produce, *see Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52 (2d Cir. 2000), it embraces a different conception of an attorney's "reasonable hourly rate" than the law of this circuit, and this court must adhere to the latter. *See, e.g.*, *McDonald*, 450 F.3d at 96 ("A

reasonable hourly rate is a rate 'in line with ... prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation.'") (alteration in original) (quoting *Blum*, 465 U.S. at 895 n.11). Second, even if *Gusman* is better authority, Dubbin offers no support for his conclusory allegation that Neuborne is comparable to the attorney who works primarily on matters for which compensation is fixed by the court. To be sure, Neuborne has given only one example of an instance in which he received the $700 hourly rate he claims here, but that does not by any means establish the point that Dubbin seeks to make in citing *Gusman*.

2.   Neuborne's Proposed Market Rate

For the reasons discussed above, none of Dubbin's objections to Neuborne's proposed hourly rate, and none of his proposed alternative rates, provides a useful basis for determining Neuborne's fee. Nevertheless, it remains Neuborne's burden to establish an appropriate hourly rate for his services in this litigation, and I therefore turn to examine the arguments he makes in support of his application. The task requires a "case-specific inquiry" into the prevailing market rate in this district, *Farbotko*, 433 F.3d at 209, and in conducting that inquiry a court may rely on its own knowledge of the relevant market. *McDonald*, 450 F.3d at 96-97.

a.   The Need To Approximate Market
     Forces

Before making any effort to approximate the hourly rate that the "market" would produce in this case, I address a threshold matter about the utility of any such inquiry. In one sense, any such exercise is entirely speculative. I can surmise about the kind of bargaining that might have taken place had Neuborne sought to achieve clarity on the matter at the beginning of his tenure as

Lead Settlement Counsel rather than after years of service, and in the following discussion I give it my best shot (though I note that the conclusory declarations supplied by Neuborne's colleagues are virtually useless in that regard). I readily concede that my attempt is not only speculative but also necessarily subjective.

In another – and in my view far more important – sense, however, there is absolutely no need to speculate about the agreement that the "market" would have produced in this case. We know precisely what agreement the "market" would have produced because there was in fact a negotiation that reflected the application of the relevant participants' market power. Specifically, the court asked Neuborne – who had already performed yeoman service on behalf of the class as plaintiffs' counsel – to take on the new role of Lead Settlement Counsel. Neuborne raised the matter of compensation and the court expressed a willingness to award Neuborne a reasonable fee. *See* Neuborne Final Memo. at 7; Conf. Tr. 11. Had Neuborne been unwilling to perform the service being asked of him without more certainty about his reward for doing so, nothing prevented him from asking for it. But there is nothing in the record to suggest anything more than that Neuborne was content to rely on the court's determination of an appropriate amount in setting his fee at some point in the future. That agreement is every bit as much the product of "market" forces as an agreement, reached after extensive negotiations, to work for a specific flat fee or a specific hourly rate. Such agreements – in which one party consents to have the extent of his consideration depend on another party's subjective assessment of his performance – are unremarkable, and are routinely enforced even when the party giving such consent is later disappointed in the result. *See, e.g.*, *United States v. Rexach*, 896 F.2d 710, 713 (2d Cir. 1988)

(citing Restatement (Second) of Contracts § 228 cmt. a).  In a very real sense, then, the market analysis Neuborne proposes is not only speculative but counterfactual.

As a general proposition, I would have no quarrel with Neuborne's basic point:  the law of this circuit has rules for determining the appropriate compensation for an attorney who, for one reason or another, is excused from the normal requirement to negotiate his fee in advance with his client, and judges should not blithely ignore those rules to vindicate their subjective notions of fairness.  But where the lawyer who seeks to be paid had no reason at the start of the engagement to postpone the negotiation of his compensation, it would be unfair to let an application of that principle reward the lawyer's needlessly nebulous – and possibly unrealistic – expectations.  Neuborne could have specified the precise terms on which he was willing to serve as Lead Settlement Counsel.  If he was unwilling to have the assigned judge make a *post hoc* subjective determination of a fair amount for his fee, he had every opportunity to say so and to decline the appointment until satisfied with the court's proposed compensation plan.  Such a negotiation would likely have been uncomfortable, and I can sympathize with Neuborne's instinct to punt on the issue at the time of his engagement, even if another choice might have been better for all concerned.  But the price of having done so should, in fairness, be a forfeiture of his right to insist on a speculative reconstruction of the negotiation he decided to forego seven years ago.[23]

_____

[23]  Another way to articulate the same principle would be to view the vague agreement between Neuborne and the court as Neuborne's entirely understandable *ex ante* assent to have the court apply the principles articulated in *Goldberger* when the time came to award a fee.  Specifically, Neuborne's failure to insist on a specific compensation plan may simply have recognized that the court – acting as the fiduciary of the class and with a "jealous regard" for the rights of absent class members – would inevitably insist on moderation in awarding a fee and that it would take into account the unique circumstances of this litigation in assessing the reasonableness of any contemplated fee award.  *See Goldberger*, 209 F.3d at 53 (citations omitted).

Based on the history of this case, I believe the court could find an exception to the case law requiring an analysis of the prevailing market rate (as well as the other components of a lodestar fee calculation) and simply award Neuborne the amount of compensation it deems reasonable. Nevertheless, I now proceed to conduct the market analysis Neuborne advocates, and recommend that the court do so as well, for two reasons. First, the forfeiture theory I have identified may (or may not) be valid, but it is undoubtedly novel, and all of the participants in this litigation have a strong interest in finality that counsels against innovation that might prolong the proceedings. Second, even under a market-based approach to determining an attorney's hourly rate for purposes of calculating his lodestar fee, the relevant case law requires the court to assess the reasonableness of the overall award against a variety of factors – a task to which I turn at the end of this discussion. That assessment would likely produce much the same result as the more direct approach I have discussed here. Accordingly, I now consider what hourly rate the "market" would have produced in this case.

b.      Defining The Relevant Market

Before the court can determine the appropriate "market" rate for Neuborne's services, it must first identify the relevant market in which those services are offered. To the extent Neuborne offers the opinions of his colleagues, each appears implicitly to suggest that the relevant market is that for general litigation services offered by law firms in New York City to private clients. *See* Neuborne Omnibus Fee Dec. Ex. H. If that is the appropriate market, I credit the assertion that Neuborne could, at least in some circumstances, command a $700 hourly fee. But that conclusion by itself neither mandates a lodestar hourly rate in that amount nor forecloses

the consideration of market forces at work in this case that might, if present in other cases in the general litigation market the declarants describe, produce a lower hourly rate.

At an even more basic level, however, the implicit argument to consider the general market for legal services provided by law firms is at odds not only with the realities of this case, but with Neuborne's own statements on the subject. Most obviously, in the same memorandum in which he seeks to defend the proposed $700 rate on the strength of the declarants' assertions about the market for general litigation services, Neuborne explicitly acknowledges that he does not compete in that market. To the contrary, Neuborne writes that he "occupies a unique practice niche as a highly successful academic lawyer ...." Neuborne Final Memo. at 15. If the court accepts that assertion at face value, it has very little information on which to determine the prevailing rate in the relevant "unique practice niche" in which Neuborne competes, let alone to assess the propriety of his proposal.[24]

---

[24] In this regard, the declaration of Nancy B. Rapoport, Dean of the University of Houston Law Center ("Rapoport Declaration") provides at least some support for the argument Neuborne advances. Neuborne Omnibus Fee Dec. Ex. H, add., *reprinted in* DE 39. The circumstances of Dean Rapoport's career make her experiences more analogous to Neuborne's than those of the other declarants; she is active in academia and maintains a simultaneous litigation practice in Houston. Rapoport Declaration ¶¶ 1, 2. Noting that "[l]awyers get paid for what the market commands for their services, not what their profit structure might be[,]" *id*. ¶ 3, Dean Rapoport acknowledges that she billed "anything from $0 to $600 per hour" during the preceding year. *Id*. ¶ 2. It is therefore obvious that market forces operate to produce a variety of hourly rates for Dean Rapoport's services, some much lower than the $600 she can occasionally command. One of those market forces is the practical reality that an attorney who enjoys the support of a major educational institution has a greater ability to be flexible in fee negotiations that an attorney whose compensation derives solely from legal fees and whose costs are paid primarily from such fees. Although such differences between an academic and a private attorney cannot serve as a substitute for a more searching assessment of market forces, neither can they be completely ignored in the endeavor to determine an appropriate hourly rate.

Moreover, it is not simply Neuborne that occupies a "unique" market. So too does this litigation, and here again I rely on Neuborne's own assessment. As Neuborne has previously informed the court, "[g]iven the extraordinary subject matter of this litigation ... counsel agreed among themselves (and with the Court) at the outset of this litigation that the ordinary rules governing class action compensation should not apply in these proceedings." Neuborne 2002 Dec. ¶ 4. Much more recently, in the *Rosner* litigation in Florida, Neuborne questioned the proposition that a court should look to the general market for legal services in determining the appropriate compensation for counsel in Holocaust-related litigation. *Rosner* Fairness Hearing Tr. 30 ("I questioned whether or not there was an artificial market in Holocaust cases that enabled lawyers who handled these cases at considerably submarket rates, in which case the class was entitled to the lower market, not the actual market.")).

It is hardly a novel proposition that a lawyer who can command a high rate for one kind of service will accept much lower compensation for another.[25] Accordingly, even if the

---

[25] Such a willingness to accept lower fees in certain circumstances does not reflect a suspension of market forces, but rather a different manner in which the same forces can operate. A lawyer who accepts a lower level of monetary compensation for an engagement may value other inchoate benefits enough to accept the trade-off. Such benefits can include the satisfaction of performing a service to a needy or deserving client or the community, the lucrative goodwill generated by public recognition of that service, and the accretion of knowledge and experience that makes the lawyer better able to charge a higher fee to wealthier clients. Even in "markets" where there are artificial constraints on an attorney's rate, the same principle applies. For example, an attorney cannot negotiate the level of her compensation for appointments under the Criminal Justice Act ("CJA"), as that compensation is set by statute. *See* 18 U.S.C. § 3006A. But that does not mean that market forces are suspended; only that they influence other choices than the selection of a fee. An attorney who is confident of her ability to attract other paying clients can easily decide to maximize her fees by declining to accept any appointments under the CJA. Nevertheless, there are several well-regarded law firm partners who regularly accept such appointments, at a considerable monetary opportunity cost, because they plainly place a premium on the experience. The lower monetary rate such attorneys receive for those appointments is every bit as much a "market" rate as the higher fees they command from their other clients.

declarants are right that Neuborne could find clients who would pay him $700 per hour in some circumstances, the court should nevertheless base its determination of the appropriate hourly rate in this case on all of the circumstances. *See McDonald*, 450 F.3d at 97 n.6.

Accordingly, I disagree with Neuborne that his hourly rate should be set by reference to the fees he or other similarly qualified attorneys might be able to obtain in the setting of a law firm's representation of a private client. Instead, I believe the most appropriate way to determine Neuborne's lodestar hourly rate is to attempt to recreate the arm's-length bargain that he would have struck at the outset of his service if he had in fact sought to negotiate a specific fee rather than accept the court's simple assurance of some amount of payment. *See Goldberger*, 209 F.3d at 53.

      c.      <u>Recommendation For A Reasonable<br>Hourly Rate</u>

Had Neuborne engaged in arm's length negotiation about his fee at the inception of his service as Lead Settlement Counsel, he would have bargained with a person with a fiduciary duty to the class – either the court or some appropriate class representative. I believe that fiduciary would have insisted that Neuborne lower his rate to account for his lower overhead as an academic, his other income from both teaching and Holocaust-related litigation (to the extent it would have been known at the time of the hypothetical bargain), and his handling of tasks that could otherwise be delegated to a less experienced – and less expensive – attorney. I also believe that the fiduciary would have insisted on a lower rate to account for the large number of hours for which Neuborne would likely bill as Lead Settlement Counsel. Although my experience as a law firm partner was brief, it was relatively recent, and the law of this circuit allows me to bring that

experience to bear in assessing Neuborne's application.  *McDonald*, 450 F.3d at 96-97 (citation omitted).  From that experience (including my own fee negotiations and those of other about which I was informed) I know that in an increasingly competitive market, it is commonplace for sophisticated consumers of legal services to bargain for and obtain similar concessions from even the most experienced and well-regarded attorneys.

Of course, simply because the class fiduciary would have made such demands does not mean that Neuborne would have acceded to any or all of them.[26]  But I do believe that in the context of this unique litigation, any fiduciary bargaining on behalf of the plaintiff class would be able to persuade Neuborne to accept a significant discount of the rate he customarily charges the private clients who retain him as a sole practitioner.  Even if Neuborne rejects the idea that a *court* should seek to impose on him a just price for his services, *see* Neuborne Final Memo. at 15,[27] I cannot believe that, if Neuborne had to make the decision for himself in the context of

_____

[26]  To be clear:  in surmising the nature of the demands that the class fiduciary would have made, I do not suggest that the court simply use Neuborne's status as an academic or as a sole practitioner as a proxy for determining a market-based rate, nor do I suggest the creation of a fictional "blended rate."  Such short-cuts are forbidden under the law of this circuit.  That law, however, does not prohibit the court from recognizing that such concerns can and do come up in real arms-length negotiations, and therefore permits the court to account for the effect of such bargaining tactics on the outcome of the negotiation it attempts to recreate.  *See McDonald*, 450 F.3d at 97-98 n.6 ("Working as a solo practitioner may be relevant to defining the market ....") (citing *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053,1059 (2d Cir.1989)).

[27]  Neuborne observes that "'it is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services on the market rather than being paid by court order.'"  *Id*. (quoting *In re Continental Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992)).  Neuborne's attempt to distinguish subjective notions of fairness from an objective assessment of the market is inapposite.  In contrast to the circumstances in the case he quotes, there can be no meaningful difference in this case between the price Neuborne would receive if he were selling his services in the "market" and the one to be paid by the court.  That is because the "buyer" with whom Neuborne would have had to negotiate in the "market" relevant to this case *is* the court.  Neuborne is not seeking

bargaining with the class, he would have insisted on wielding against his clients the full extent of his perceived market power rather than striving to achieve a just result. By any fair assessment of the record in this case, Neuborne has done exemplary work to help achieve the historic righting of a terrible wrong, and I am confident that the bargaining that would have attended any effort to set a price for his services *ex ante* would have persuaded Neuborne to reduce the fee he would normally charge another paying client.[28] Even if Neuborne – who, as Legal Director of the Brennan Center for Justice at NYU routinely litigates on behalf of other clients he deems worthy, presumably without the kind of market-based hourly compensation he seeks here[29] – could not be

---

to have the court order an adverse party to pay the price to which some fictional buyer would have agreed; he is instead simply asking the court to name the reasonable fee that the court itself promised when it entered into an agreement with Neuborne seven years ago.

[28] Indeed, the record suggests – albeit inconclusively – that Neuborne was previously prepared to accept an hourly rate of $500 as the basis for his compensation, at least in the form of a "discounted lodestar." *See* Neuborne Omnibus Fee Dec. Ex. H (Declaration of James E. Johnson ¶ 3); *id.* Ex. I (reprinting Stewart Ain, *Survivors Balking at Lawyer's Fee*, The Jewish Week, Mar. 3, 2006).

[29] *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003) (Neuborne, as Legal Director of Brennan Center, appearing on behalf of certain United States Senators); *Brooklyn Legal Svcs. Corp. v. Legal Svcs. Corp.*, 462 F.3d 219 (2d Cir. 2006) (representing Brennan Center as *amicus curiae*); *Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005) (representing Brennan Center as *amicus curiae*); *Velazquez v. Legal Svcs. Corp.*, 164 F.3d 757 (2d Cir. 1999) (representing, *inter alia*, lawyers employed by the Legal Services Corporation and their indigent clients); *Kruse v. City of Cincinnati*, 142 F.3d 907 (6th Cir. 1998) (representing Brennan Center as *amicus curiae*); *Rockefeller v. Powers*, 74 F.3d 1367 (2d Cir. 1995) (representing individual voters); *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp.2d 222 (S.D.N.Y. 2006) (representing non-profit organizations participating in the global effort to slow the spread of HIV/AIDS); *Velazquez v. Legal Svcs. Corp.*, 356 F. Supp.2d 267 (E.D.N.Y. 2005) (representing, *inter alia*, lawyers employed by the Legal Services Corporation and their indigent clients); *Velazquez v. Legal Svcs. Corp.*, 349 F. Supp.2d 566 (E.D.N.Y. 2004) (same); *McConnell v. Fed. Election Comm'n*, 251 F. Supp.2d 919 (D.D.C. 2003) (representing certain Senators); *McConnell v. Fed. Election Comm'n*, 251 F. Supp.2d 176 (D.D.C. 2003) (same); *Molinari v. Powers*, 82 F. Supp.2d 57 (E.D.N.Y. 2000) (representing presidential candidate and voters); *Arkansas Right to Life State Political Action Comm. v. Butler*, 29 F. Supp.2d 540 (W.D. Ark. 1998) (representing

so persuaded, I believe that the fiduciary would ultimately find some other attorney with similarly sterling credentials who could.

I candidly acknowledge that I can do no more than make a rough approximation of the hourly rate such bargaining would likely produce. I doubt it would be as high as the $700 Neuborne now claims, nor as low as even the highest rate that Dubbin proposes. Indeed, the fact that the parties have proposed such rates in the context of adversarial proceedings suggests that those numbers approximate the likely opening bids of the fictional bargaining process that I am trying to replicate here.

There is no objectively "correct" market rate, and the law does not in any event require such precision; it requires only that the court set a lodestar rate that "is in line with" the prevailing market rate. *McDonald*, 450 F.3d at 96. There are any number of rates that would satisfy that standard; in my view the lowest such hourly rate that arm's-length bargaining in this case might have produced is $450, and the highest is $600. For reasons I explain in the final part of this discussion, application of the *Goldberger* factors compels me to recommend the lowest rate in that range. Moreover, to the extent that market forces have already produced a result – an

intervening defendants including a union and a community service organization); *Velazquez v. Legal Svcs. Corp.*, 985 F. Supp. 323 (E.D.N.Y. 1997) (representing, *inter alia*, lawyers employed by the Legal Services Corporation and their indigent clients); *Rockefeller v. Powers*, 909 F. Supp. 863 (E.D.N.Y. 1995) (representing voters). Although the record does not disclose the extent to which Neuborne is compensated for the litigation services he provides at the Brennan Center, I note that one of the declarations in support of his claimed hourly rate suggests that his compensation in that capacity not based on an hourly fee structure. Declarant Schwarz notes that he has been Senior Counsel at the Brennan Center on a full time basis since September 2002, and later describes the basis for his knowledge of prevailing fees in New York by writing, "With respect to fees, I was a recipient of them until 2002, and have since kept up with what is charged by New York City firms by my frequent contact with colleagues in private practice." Neuborne Omnibus Fee Dec. Ex. H (Declaration of Frederick A. O. Schwarz, Jr. ¶¶ 2, 4).

agreement by Neuborne to accept appointment upon an assurance from the court no more precise than the promise of a fee, rather than to engage at the outset in a distasteful exercise in haggling – I reach the same conclusion, namely, that the court should award a fee based on a lodestar hourly rate of $450.

  E.  <u>Lodestar Hours</u>

  Neuborne claims to have worked a total of 8,378.5 hours in his capacity as Lead Settlement Counsel, but he has never sought lodestar compensation for all of that work. As noted above, he initially proposed a discount of the overall fee, and then, pursuant to the parties' agreement of May 18, 2006, agreed that he would waive compensation for 1,500 hours of work. Accordingly, the parties agreed that the maximum number of hours for which Neuborne will be compensated is 6,878.5. The parties further agreed that the precise number of compensable hours would be determined by the resolution of two legal issues. The first such question is whether Neuborne's compensation – assuming that he is not estopped from seeking any – should be limited to the amount of time he spent on tasks that increased the plaintiffs' overall recovery. If the answer to that question is yes, the parties agreed that Neuborne's compensable time would total 600 hours. Otherwise, the court must resolve a second issue; namely, whether Neuborne can claim compensation in his role as Lead Settlement Counsel for the time spent performing what the parties have called "general counsel" duties. The parties agreed that if the Objectors prevail on that issue, the compensable time will be reduced by an additional 800 hours (for a total of 6,078.5 hours); if Neuborne prevails, the parties agree that his total compensable time will be 6,878.5 hours. *See* Order dated May 18, 2006. I discuss each of these issues in turn.

1.     Compensation For Non-Remunerative Work

Dubbin argues that if Neuborne is not estopped from seeking compensation, his fees should be limited to the work that produced "a material benefit for the class."  *See* Dubbin Final Memo. at 17; Dubbin Initial Memo. at 38-40.[30]  He supports his assertion with no legal authority; to the contrary, most of his submission on the matter is devoted to quarreling about the amount of Neuborne's work, if any, that can fairly be described as having produced such a salutary result – a quarrel that has plainly been mooted by the parties' stipulation.  Indeed the entirety of Dubbin's argument on the proposition now at issue is the following single sentence from his initial submission to Chief Judge Korman:  "If Mr. Neuborne were not estopped from seeking fees for reasons explained above, then under the standards he urged for other lawyers he is would be [sic] entitled to compensation only for the work that actually yielded the claimed dollar enhancements."  Dubbin Initial Memo. at 38.  That argument suffers from at least two significant flaws.

Dubbin's reliance on "the standards [Neuborne] urged for other lawyers[,]" although not illuminated by any citation to the record, appears to refer to Dubbin's earlier unsuccessful attempt to obtain compensation for his own work in this litigation.  *See generally In re Holocaust Victim Assets Litig.*, 302 F. Supp.2d 89 (E.D.N.Y. 2004); *In re Holocaust Victim Assets Litig.*, 311 F. Supp.2d 363 (E.D.N.Y. 2004), *aff'd*, 424 F.3d 150 (2d Cir. 2005), *cert. denied*, 126 S.C. 2901 (2006).  In rejecting Dubbin's application, the court applied a legal standard that all concerned agreed was appropriate.  That standard, known as the "common fund" doctrine,

---

[30] Swift's submission of July 21, 2006, does not address this issue.

70

presumes that, if attorneys' fees are to be paid from [a "common fund that is created for the satisfaction of class members' claims when a class action reaches settlement or judgment"], it will be because some benefit – be it monetary or otherwise – was conferred on the class by virtue of the attorney's work.

311 F. Supp.2d at 376 (the bracketed quotation from Newburg on Class Actions § 14.6 (4th ed. 2002) appears earlier on the same page); *see also* Samuel Dubbin's Verified Motion for Attorneys' Fees and Expenses, dated March 18, 2002, at 36, 43, Lead DE 1187 (Dubbin's endorsement of applicability of common fund doctrine submitted in support of his fee application); Supplemental Declaration of Burt Neuborne, dated July 21, 2003 ¶ 5, Lead DE 2063 (Neuborne's endorsement of same submitted as part of opposition to Dubbin's fee application); Letter from Robert Swift to Chief Judge Korman, dated August 16, 2000, Lead DE 672 (stating that "plaintiffs['] counsel who joined with me in a fee petition will continue ... to seek a fee under the common benefit fund theory in accordance with prevailing case law in this Circuit.").

Neuborne responds that Dubbin's reliance on the standard is misplaced, and "results from confusing the standard for awarding common fund fees to counsel for an objector – requiring a showing of tangible benefit to the class – and the standard for compensating court-designated counsel." Neuborne Final Memo. at 17. I need not agree with that proposition that the two standards are materially different to reject Dubbin's argument. Under either formulation, Neuborne can and should be compensated for his work as Lead Settlement Counsel regardless of whether that work increased the plaintiffs' overall recovery.

The standard that the court applied in rejecting Dubbin's request required a showing that "some benefit – be it monetary or otherwise – was conferred on the class by virtue of the

attorney's work."  *In re Holocaust Victim Assets Litig.*, 311 F. Supp.2d at 376.  By its very terms, that standard would not, in the circumstances of the current dispute, limit Neuborne's compensable hours to those spent working on matters that increased the settlement fund.  To the contrary, Neuborne need only show that his work conferred "some benefit" on the class, a benefit that need not be measured exclusively in monetary terms.  There can be – and is – no dispute that it did.  Neuborne has worked for years to help administer the settlement and to help class members understand and benefit from it.

Even if Neuborne's work as Lead Settlement Counsel had failed to add a single penny to the settlement fund, it would still be compensable.  Indeed, if the fact that Neuborne's work has produced the serendipity of additional recovery for the class were to be considered a reason to limit his compensation, the precedent would create a perverse incentive to future administrators that would be at odds with their fiduciary duties.  Moreover, such a rule would create a significant disincentive to any lawyer considering an invitation to perform a similar administrative role:  such an attorney would face the daunting prospect of being denied any compensation if she failed to increase the recovery *after* the parties had already completed negotiating the terms of their settlement.  In short, I agree with Neuborne that the rule Dubbin purports to discern from prior litigation in this case would produce an absurd result.  The court should therefore decline to limit Neuborne's fee to 600 hours of compensable time.

> 2.     Compensation For Neuborne's Work As "General
>        Counsel"

I next address the issue of whether Neuborne's compensation should include payment for work that the Objectors have characterized as his "general counsel" duties.  At issue are the hours

– stipulated by the parties to be 800 in number – that Neuborne spent advising the district court about the implementation of the settlement agreement and defending on appeal the district court's decisions in implementing it.

The reference to Neuborne's "general counsel" work as a convenient shorthand appears to stem from Chief Judge Koran's use of the phrase in an order explaining his understanding of the basis of Neuborne's standing as Lead Settlement Counsel to submit briefs in connection with appeals by others of district court decisions in this litigation. After summarizing Neuborne's work as plaintiffs' counsel in achieving the settlement and then describing various aspects of Neuborne's "vital role" in implementing it (including the submission of appellate briefs that raised the issue of Neuborne's standing to do so), Chief Judge Korman added a description of a separate aspect of Neuborne's post-settlement efforts:

> On other issues, Professor Neuborne acts as something of a general counsel to the administration of the settlement fund. He provides an invaluable administrative service of helping people gain access to me and to the Special Master. He also provides advice as amicus curiae. Professor Neuborne has submitted many insightful declarations and, because of his long involvement in this case, his opinion is one that I respect. In this capacity, however, Professor Neuborne's recommendations have never been binding on me. In fact, in the context of the various appeals now pending before the Second Circuit, on more than one issue I decided to exercise my discretion in a manner different from that suggested by Professor Neuborne.

*In re Holocaust Victim Assets Litig.*, 415 F. Supp.2d 130, 132 (E.D.N.Y. 2004).

The Objectors raise three separate arguments as to why the court should not now compensate Neuborne for this portion of his work out of the settlement fund. First, Swift contends that the issue is unripe for determination because the court must first conduct an evidentiary hearing as to the precise tasks for which Neuborne seeks compensation that fall

within this category. Swift Final Memo. at 3. Second, all of the Objectors suggest that if

Neuborne is to receive any compensation for this category of his work, it should come from the

court itself. *Id*. at 3; Dubbin Final Memo. at 14. Third, Dubbin argues that it would be

inappropriate to compensate Neuborne for conduct – defending on appeal the district court's

allocation of the settlement fund, notwithstanding the preference of American class members to

receive a larger share – that Dubbin characterizes as an unethical betrayal of Neuborne's own

clients. Dubbin Final Memo. at 14-16. As explained below, I disagree with the Objectors on

each ground.

a.     <u>No Hearing Is Required</u>

As noted at the outset, the parties have stipulated that a decision on the propriety of

compensating Neuborne for time spent performing what the parties have characterized as

"General Counsel" work will determine whether Neuborne is credited with 800 hours of the total

time for which he seeks compensation. *See* Order dated May 18, 2006. Notwithstanding this

stipulation, which was part of a more comprehensive agreement aimed at avoiding protracted

litigation about particular time entries over the several years of Neuborne's service, Swift now

claims that the issue cannot be determined without an evidentiary hearing on just such matters.

His position is not only foreclosed by his prior agreement, it is also wrong.

Swift notes that "Chief Judge Korman has commented that he needed legal advice at

multiple junctures in the case as well as a lawyer for 'adversarial defense of my position in the

Second Circuit.'" Swift Final Memo. at 3 (quoting *In re Holocaust Victim Assets Litig.*, 415 F.

Supp.2d at 131). Without explicitly acknowledging the declaration in which Neuborne gives a

somewhat different explanation of his standing for submitting a brief in the course of appellate

74

review of a decision by Chief Judge Korman, *see* Neuborne Final Memo. at 21-22 (citing Letter

from Burt Neuborne to Chief Judge Korman, dated September 14, 2004 ("Neuborne Clarification

Ltr.")), Swift then goes on to write:

> It is not open for Mr. Neuborne to re-characterize those hours simply as the "defense" of the lower court's opinions. The stipulated 800 hours were devoted to advising, counseling and arguing on behalf of the lower court separate and independent of work for the Settlement Class. Otherwise, there is a factual dispute which undermines the Stipulation and requires an evidentiary hearing as to all anomalies in the detailed time submitted by Mr. Neuborne.

Swift Final Memo. at 3.

There can be no question that Swift, at the time he entered into the stipulation to narrow

the issues in the dispute on May 18, 2006, was aware of the discrepancy between Chief Judge

Korman's description of the basis for Neuborne's standing to submit arguments in the appeal by

American Holocaust survivors of the decision regarding allocation of the settlement fund and

Neuborne's statement on the matter. Swift Initial Memo. at 13 n.6 (citing Chief Judge Korman's

description of Neuborne's role); *see also* Neuborne Clarification Ltr. He should not now be

heard to characterize that array of descriptions as a newly discovered circumstance that calls into

question the propriety of the parties' agreement. Swift entered into a stipulation, the precise

purpose of which would be vitiated if his request for an evidentiary hearing were granted. I

conclude that Swift and his clients should be held to that agreement.

Even in the absence of the stipulation, there are at least two reasons why no hearing is

needed. First, it is simply incorrect to say that Neuborne seeks "to *re-characterize* [the] hours" at

issue in this part of the dispute. Swift Final Memo. at 3 (emphasis added). Neuborne has not

offered a new explanation of his role now that his fee application is in dispute – the explanation

to which Swift objects is the one Neuborne gave at the time his standing was questioned, and it was made in direct response to the characterization provided by Chief Judge Korman with which he disagreed. If Neuborne had somehow lulled the Objectors into a misunderstanding of his role before they agreed to waive an evidentiary hearing on his time entries, Swift's argument might have at least some force. But that is simply not the case.

Second, Swift's argument has little force to the extent that it focuses exclusively on his perception of the nature of the 800 "general counsel" hours. Specifically, Swift appears to believe that these hours represent the portion of Neuborne's time that was "devoted to advising, counseling and arguing on behalf of the lower court," *id.*, and thus that Neuborne's characterization of those hours "simply as the 'defense' of lower court's opinions" is deeply flawed. *Id.* That the 800 hours includes Neuborne's efforts to argue in favor of the district court's allocation decisions is not disputed; the only question thus appears to be whether other tasks – namely, "advising, [and] counseling ... the district court" – are also included. If they are not, and if there are substantive reasons why Neuborne should not be compensated for the latter category of tasks, then a factual hearing might be needed to determine the appropriate extent of Neuborne's compensation.

Neither Swift nor Dubbin has offered any argument as to why hours spent "advising [and] counseling ... the district court" are not compensable. Instead, they focus their substantive arguments about the general counsel issue solely on Neuborne's defense of the district court's allocation decisions.[31] As a result, the factual issue that Swift apparently wants resolved –

---

[31] To the extent the Objectors can be understood to contest the specific "advising and counseling" portion of Neuborne's "general counsel" role by analogy to the decision in *Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737 (6th Cir. 1979), *see* Swift Final Memo. at 3-4; Dubbin

whether the time Neuborne spent advising and counseling the district court should be included in the 800 hours assigned to the "general counsel" category – is of no moment. If the advising and counseling tasks should *not* be included in the 800 hours the parties agreed to assign to the "general counsel" role, they would presumably be included instead in the residual hours the parties have agreed did not result in a monetary benefit to the class. If Neuborne can be paid at all for such work – that is, if he is not estopped from seeking any fee – then in the absence of any argument by the Objectors to the contrary, he can be paid for the "advising [and] counseling" portion of it, regardless of whether that work should properly be counted in the "general counsel" category or the residual category. On the other hand, if Neuborne should be paid only for work that did result in a monetary benefit to the class, then the parties have agreed that he should be compensated for precisely 600 hours. Either way, there is no need to resolve the factual issue that Swift cites.

---

Final Memo. at 14, their argument is inapposite. In *Reed*, the court merely noted that the special master, a law professor, had replicated tasks normally performed either by the parties' respective attorneys or by the district court itself – analyzing and evaluating the law relevant to the desegregation case at bar. The appellate court concluded that for such matters, a district judge "must depend on his own resources, which include the work of his staff and the offerings of counsel." 607 F.2d at 748. That role differs sharply from the role that Chief Judge Korman described and to which the Objectors seek to bind Neuborne: expanding on his description of Neuborne as "something of a general counsel *to the administration of the settlement fund*[,]" Chief Judge Korman wrote that Neuborne "provides an invaluable *administrative service* of helping people gain access to me and to the Special Master" and that "[h]e also provides advice *as amicus curiae*." *In re Holocaust Victim Assets Litig.*, 415 F. Supp.2d at 132 (emphasis added). The "administrative service" the court describes – a service provided "to the administration of the settlement fund" rather than to the court as such – is plainly not comparable to the work of the law professor in *Reed*. To the contrary, by recognizing that Neuborne's advice came "as amicus curiae" the Chief Judge plainly placed such advice within the category of "offerings of counsel" that the court in *Reed* took pains to distinguish from the kind of non-compensable assistance provided by the law professor.

b.      The Proper Source Of Neuborne's
        Compensation

The next objection that Swift raises is an argument that Neuborne should seek

compensation for his "general counsel" duties from some source other than the settlement fund.

The argument is a *non sequitur*.  Chief Judge Korman asked Neuborne to serve as Lead

Settlement Counsel and Neuborne agreed to do so.  He now seeks compensation from the

settlement fund for the work he performed in that capacity.  That request is all that is before the

court.  If some part of the compensation should be denied on the ground that the "general

counsel" work that Neuborne performed was not within the scope of his compensable duties then

the corresponding portion of his fee request should be denied regardless of whether he may

successfully seek compensation from another source.  Conversely, if Neuborne's "general

counsel" work was within the scope of his mandate, then – unless he is estopped from seeking

any fee – he should be paid for it out of the settlement fund as he would be for any other

compensable work as Lead Settlement Counsel.  Either way, the argument about the potential

availability of other sources of payments adds nothing to the one substantive argument that the

Objectors raise, and to which I will turn in the next section:  that Neuborne's "general counsel"

work should not be compensated because it was inconsistent with his duties.[32]

Before reaching that argument, however, I pause to address the merits of the argument

about the potential availability of other funding sources.  Swift cites *In re Austrian German

Holocaust Litig.*, 250 F.3d 156 (2d Cir. 2001), for the proposition that there is such an alternate

---

[32]  To be clear, I make no recommendation as to whether court funds are or should be available to
Neuborne for his "general counsel" work in the event the court declines to award him that portion
of his fee from the settlement fund.  Neuborne has not sought such relief and any opinion about
the merits of such an application if made would therefore be premature.

source of funds. *See* Swift Final Memo. at 3. The decision he cites says nothing of the sort; indeed, it does not address the matter at all. The closest it comes is a reference to the fact that in considering the petition for a writ of mandamus at issue, the appellate court "invited the district court to respond and it [did] so through counsel ...." 250 F.3d at 160. The opinion provides no information about how that counsel was compensated, if at all. Nevertheless, I assume for the purpose of this discussion that Swift's assertion about the payment arrangements in that case is correct, and that it does not improperly rely on evidence outside the record of this case. Even with that assumption, however, Swift's argument is unpersuasive.

The petitioners in the cited case included both named plaintiffs and defendants in the class action, all of whom had reached an agreement to dispose of the claims before the court – with prejudice to the claims of the named plaintiff, "but without prejudice to the rights of any absent putative class members to assert their own claims in any forum." *Id*. at 159. The district court had refused to accede to their agreement, citing a number of concerns. The issue on mandamus was whether the court exceeded the scope of its institutional role in making that decision, and the appellate court answered that question in the affirmative. *See id*. at 164-65.

Swift's attempt to analogize that case to this one is thus strained. In the earlier case, the appellate court invited the district court to respond to the arguments about its power *qua* district court, and it appointed counsel (presumably paid with court funds) to assist it in that effort and to oppose the arguments of the plaintiff class *qua* class. Here, by contrast, Neuborne's disputed "general counsel" work was done on behalf of the class as such, and defended the merits of a decision that benefitted the class as a whole – albeit to the chagrin of some of its members. That work – unlike the work of the district court's counsel in the *In re Austrian German Holocaust*

*Litigation* case – vindicated the settlement to which all agreed, and defended it as such against the depredations of those, including the Objectors, who sought to upset the proper implementation of that settlement. If such work may properly be compensated at all, which I discuss below, the compensation should come from the class that enjoyed the benefit rather than from the taxpayer-funded court budget. If the public is to subsidize the plaintiff class in such a manner, the decision should be made by the legislature rather than the judicial branch.

   c.  The Propriety Of Neuborne's
       "General Counsel" Work

   Dubbin joins in the objections to the "general counsel" portion of Neuborne's fee application discussed above and adds another more substantive one. He argues that Neuborne's actions in defending the district court's allocation decisions were adverse to the class, and that such actions – which Dubbin describes with such emotionally fraught terms as "betrayal" and "abandonment" – are not compensable from the settlement fund. *See* Dubbin Final Memo. at 14-16. I disagree.

   It is in the nature of class action litigation that there arise circumstances when some members of a class have interests adverse to those of other members. The allocation of settlement funds is just one example, but as Neuborne correctly points out, the lawyer representing a class as a whole need not be disqualified from defending such an allocation simply because by doing so he takes a position that is adverse to some class members. *See In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 18-19 (2d Cir. 1986); *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 588-90 (3d Cir. 1999) (cited in Neuborne Final Memo. at 18 & n.20). The same principle applies here: just as Neuborne's defense of the district court's allocation decision did

not create a disqualifying conflict of interest, it also did not exceed the scope of his mandate as Lead Settlement Counsel.  To the contrary, it was an integral part of that job.

Indeed, as much as he objects on emotional grounds to Neuborne's conduct, Dubbin appears to recognize that defending the district court's allocation decisions was implicit in his role.  As Dubbin himself acknowledges, "Lead [Settlement] Counsel's conception of his role as the defender of the District Court was an apparent outgrowth of the mechanism chosen at the settlement stage when the district court determined separate counsel were not necessary despite *Amchem* [*Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)] and *Ortiz* [*v. Fibreboard Corp.*, 527 U.S. 815 (1999)]."  Dubbin Final Memo. at 15.  Precisely so:  the parties agreed to a settlement proposal that left to a later day a decision about allocating the settlement fund among the various constituent groups that made up the plaintiff class, and Neuborne's availability to defend the outcome of that process – with or without compensation – was understood from the start.[33] Indeed, that commitment by all participants in the settlement to a process for generating an allocation of the fund rather than a vested interest in any particular share of it was an essential part of the settlement agreement, and the district court rejected the few objections that were made (by others) to the lack of certainty about the allocation.  *See In re Holocaust Victim Assets Litig.*, 105 F. Supp.2d 139, 149-51 (E.D.N.Y. 2000).  If the parties objected to a regime in which Neuborne, as Lead Settlement Counsel, would defend the outcome of the allocation process against the challenges of disappointed class members, the time to raise that objection was before the settlement was approved, not after the allocation decision was made.

---

[33] Moreover, whether or not Neuborne is paid for his work in helping defend and administer the settlement once it has been approved does not give him a stake in the settlement itself, and therefore does not run afoul of *Amchem* and *Ortiz*.

In framing his challenge on this issue, Dubbin unfairly bolsters his "betrayal" motif by misleadingly describing Neuborne's duty of loyalty. He first quotes Neuborne's explanation of his role as Lead Settlement Counsel, *see* Dubbin Final Memo. at 16 (quoting Neuborne Clarification Ltr.) ("I have committed myself to defending the results of the process, even when I do not wholly agree with the outcomes."), and then notes that Neuborne has acknowledged favoring a greater allocation for American survivors than the court ultimately ordered. *Id*. Against this backdrop, Dubbin criticizes Neuborne's decision to defend an outcome he had previously opposed as an ethical lapse motivated by greed:

> Such a curious role for a "Lead Plaintiffs' [sic] Counsel" was impossible for class members to understand, at least until Mr. Neuborne filed his fee petition. That explained everything, because rather than undertake to carry out *his clear-cut ethical obligation to advocate for what he believed was right for his "clients"* he chose to defend the position of the Judge from whom he was expecting millions of dollars ....

Dubbin Final Memo. at 16 (emphasis added).

It is hard to know where to begin in rejecting such an unworthy attack on Neuborne's ethics. As convenient a starting point as any is the seemingly willful obtuseness implicit in Dubbins' mischaracterization of Neuborne's role. Dubbin himself clearly represents a subset of the class, and just as clearly has an ethical obligation to advocate their interests as such – although the zealous fulfillment of that obligation certainly does not require him to make a baseless accusation of misconduct against a colleague. In contrast, Neuborne had a broader mandate that included no such obligation to a specific subset of the overall class. In litigating against the defendants and seeking to secure the settlement he represented all plaintiffs; likewise,

and more to the point, in his role as Lead Settlement Counsel his duty was to the class as a whole and in particular to the implementation of the settlement to which it had agreed.

A separate problem with this aspect of Dubbin's argument is the conflation of two distinct concepts: Neuborne's agreement or disagreement with the *result* of a Special Master's (or a court's) consideration of a given issue and, on the other hand, the extent of his "obligation to advocate for what he believed was right for his 'clients' ...." In that regard, his various roles as plaintiffs' counsel and Lead Settlement Counsel were not in conflict. In neither role did Neuborne have any obligation to favor the interests of Dubbin's clients over those of other class members, and in both roles the interests of the class as a whole were plainly advanced by Neuborne's efforts to defend the process by which the Special Master and the district court made their respective determinations. Neuborne's duty to defend that process would exist even if he disagreed with a given result of its operation.

Dubbin makes much of the fact that Neuborne did in fact disagree with the allocation of the settlement fund and advocated for larger allocations to Dubbin's clients, among others. Indeed, he goes so far as to ask, rhetorically, "What kind of advocate does that?" Dubbin Final Memo. at 16. That Dubbin feels the need to ask such a question is at the root of much wasteful litigation that has set some members of the plaintiff class against others and dissipated resources that could otherwise have benefitted its neediest members. But the question having been asked, I recommend that the court answer it clearly and emphatically: What kind of advocate does what Neuborne has done here? An advocate who is faithful to his ethical duty.

Once any segment of the class put itself in opposition to the allocation process itself, as Dubbin's clients did, Neuborne's duty to defend that process – even against the wishes of those

whose position he had favored – was clear.  Had Neuborne failed to defend the process simply because he disagreed with its result, he would indeed have betrayed the class's trust.  That he instead honored his commitment to the class as a whole is to be commended rather than criticized.  It is certainly no basis for denying a portion of his fee.

   F.   Lodestar Adjustments

      1.   Neuborne's Application For An "Excellence Multiplier"

   Neuborne asks the court to increase his fee – above the lodestar amount of $4,814,950 that he believes to be appropriate – by operation of a multiplier.  Although he has been somewhat less than consistent in his articulation of the proposed magnitude of such relief,[34] Neuborne appears to have decided that the appropriate multiplier is 1.32 (the effective multiplier used to award Swift fees for all of his work on behalf of the plaintiff class), and that such relief should be characterized as "an excellence multiplier designed to assure the accurate valuation of [his] services."  Neuborne Final Memo. at 16; *see also id*. at 23 (specifying magnitude of requested multiplier).  In support of this prong of his application, Neuborne cites the services he provided

---

[34]  At the outset of the March 2006 memorandum explaining the basis for his fee request, Neuborne asked the court to grant a multiplier only as contingent relief.  Specifically, Neuborne identified a discounted lodestar amount – $4,088,500 – that he was prepared to accept without any enhancement by means of a multiplier.  Recognizing that the court might not award the full requested amount, Neuborne suggested the use of a multiplier as an alternate rationale for achieving the same result, without any suggestion that it would be appropriate to use a multiplier to award anything more.  *See* Neuborne March 2006 Memo. at 1-2.  In the event the court declined to award the amount he initially requested, Neuborne asked the court to grant him not only "a true market lodestar award of $5,731,900" but also two separate multipliers:  "an excellence multiplier of 1.5 *and* a multiplier for enhancement of the value of the settlement fund."  *Id*. at 35 (emphasis added).  The excellence multiplier he requested would, if granted, have added $2,865,950 to his fee; the second multiplier "for enhancement of the value of the settlement" would have added an unspecified amount.

to help achieve the implementation of the settlement as well as the efforts that succeeded in adding millions of dollars to the value of the settlement fund. *Id*. at 16.

Swift opposes any such enhancement; indeed he argues that such relief "[c]annot [b]e [a]warded." Swift Final Memo. at 4.[35] While I disagree with the proposition that an award of such relief exceeds the court's authority, I concur that it would be inappropriate under the circumstances of this case.

Both sides of this dispute cite the court's decision earlier in this litigation to use a multiplier in determining Swift's fee. *See In re Holocaust Victim Assets Litig.*, 270 F. Supp.2d 313 (E.D.N.Y. 2002). That opinion identified the circumstances that might warrant an enhanced fee award in a given case: either the need to provide an incentive for counsel to take on an engagement that other lawyers, viewing the case *ex ante*, might shun as unduly risky, *see id*. at 320-21; or a combination of exceptional success with evidence of service superior to the quality one would reasonably expect in light of counsel's hourly rate. *See id*. at 324 (citing *Blum v. Stenson*, 465 U.S. 886, 898-99 (1984); *Pennsylvania v. Del. Valley Citizens' Council*, 478 U.S. 546, 565 (1986). The decision also noted, however, that such enhancement is normally awarded only in a "'rare case[,]'" *id*. (quoting *Blum*, 465 U.S. at 899), and went on to cite a number of cases that either awarded no multiplier or rejected requests for specific enhancements. *Id*. at 325 (citing *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 51-56 (2d Cir. 2000) (no multiplier); *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2001 WL 709262 (S.D.N.Y. June 22, 2001) (refusing to apply 2.03 multiplier); *In re Auction Houses*, 2001 WL 170792 (S.D.N.Y. Feb. 23, 2001) (no multiplier); *Varljen v. H.J. Meyers & Co.*, 2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000)

---

[35] Dubbin's submission of July 21, 2006, does not address this issue.

(refusing to apply 1.6 multiplier); *Berlinsky v. Compagnie Generale D'Electricité*, 970 F. Supp. 348 (S.D.N.Y. 1997) (reducing proposed 2.97 multiplier to 1.4)).

While Neuborne and Swift invoke the same standard, they apply it in different ways. Swift analyzes the issue almost exclusively in terms of risk and, concluding that there is none, asserts that Neuborne is ineligible for a multiplier. To the extent he even implicitly acknowledges the possibility of an excellence enhancement, he dismisses it in conclusory fashion by conflating it, erroneously in my view, with the distinct concept of a risk multiplier. *See* Swift Final Memo. at 4 (because Neuborne's "work was in no way contingent on the outcome or his compensation in jeopardy .... the cases cited by him which award an excellence multiplier for at-risk, contingent, pre-settlement work are inapposite"); *Goldberger*, 209 F.3d at 55-56 (discussing quality multiplier without considering risk).[36]

Neuborne, in contrast, does not address the issue of risk, and rightly so. As Neuborne has previously acknowledged, "where able and dedicated counsel were available to prosecute the action without fee, it would be inappropriate to award a multiplier as a market enhancement, since no such enhancement was necessary." Neuborne 2002 Dec. ¶ 6. So too here: by his own account, Neuborne – however reluctantly – agreed to serve as Lead Settlement Counsel on the assurance that he would receive a reasonable fee. No promise of enhancement in the form of an

_____

[36] Swift's argument in this regard is not only incorrect, it is also at odds with the Objectors' assertion that Neuborne's compensation should be limited to the post-settlement work he did that increased the plaintiffs' recovery. If the latter were indeed the appropriate rule, Neuborne's acceptance of the role of Lead Settlement Counsel would have been quite risky, as his compensation would be contingent on the achievement of a difficult and unlikely goal. Accordingly, in the event the court rejects my recommendation that Neuborne's compensable lodestar time should not be limited to 600 hours, I respectfully recommend that it consider awarding a significant risk-based multiplier.

excellence multiplier was needed to persuade him to serve, even though there was plainly no guarantee that the court would automatically view as reasonable whatever hourly rate Neuborne might later request.  Awarding a risk-based enhancement as a reward for work that Neuborne was willing to do even without the promise of such compensation would be inappropriate.

Neuborne thus justifiably focuses his attention exclusively on the quality of his work, which he believes is beyond question, and the extraordinary success he has achieved for the plaintiffs in helping to administer the settlement.  Swift understandably does not quarrel with either proposition, as the record plainly establishes both.  I therefore conclude that the necessary predicates for an excellence multiplier are present in this case.

That conclusion, however, does not end the matter.  First, I believe that the millions of dollars of compensation that I recommend as a lodestar fee award constitutes fair and sufficient remuneration for Neuborne's work, notwithstanding the fact that I recommend fewer millions than Neuborne demands.  That alone is an adequate reason to deny the request for a multiplier. *See Goldberger*, 209 F.3d at 56 (affirming denial of an excellence multiplier, notwithstanding unquestionably stellar representation, where the district court considered the relevant factors and relied upon them in awarding "generous hourly fees").

Second, as in so many other respects, this case is unique.  The instant fee application does not simply involve a question of how most fairly to distribute the unexpectedly large spoils of risky but ultimately successful litigation.  Neuborne's clients include many thousands of individuals in serious need for whom every dollar awarded to counsel represents a true loss in quality of life for their remaining days. To the extent that Neuborne insists on receiving appropriate compensation for services that he never promised to perform for free, his clients must

in fairness suffer that loss regardless of the undeniable fact that their need is greater than his. But

to the extent he also now seeks even greater compensation in the form of a premium that

recognizes his considerable talent and success, the court should turn him down so as best to

achieve the salutary purpose of the *cy pres* distribution plan Neuborne has for years so eloquently

defended.

2.      <u>Application Of The *Goldberger* Factors To The</u>
<u>Recommended Award</u>

As a result of the foregoing analysis, I recommend that the court calculate Neuborne's fee

by using the lodestar method to multiply an hourly rate of $450 by a total of 6878.5 compensable

hours, without any further multiplier, to produce a total lodestar fee of $3,095,325. If the court

accepts that recommendation, the final step in its analysis will be to assess that amount against

the six *Goldberger* factors to ensure that it is reasonable. *See, e.g.*, *Masters v. Wilhelmina Model*

*Agency, Inc.*, 473 F.3d, 423, 436 (2d Cir. 2007); *In re Sterling Foster* 238 F. Supp.2d 480, 488-

89 (E.D.N.Y. 2002); *In re Twinlab Corp. Sec. Regulation*, 187 F. Supp.2d 80, 86 (E.D.N.Y.

2002); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp.2d 229, 233-34 (S.D.N.Y. 2005); *In re*

*WorldCom, Inc. Sec. Litig.*, 388 F. Supp.2d 319 (S.D.N.Y. 2005); *In re Visa Check/Mastermoney*

297 F. Supp.2d 503, 524-25 (E.D.N.Y. 2005); *In re Ashanti Goldfields*, 2005 WL 3050284, at *3

(E.D.N.Y. Nov. 15, 2005); *In re Keyspan Corp. Sec. Litig.*, 2005 WL 3093399, at *5-*8

(E.D.N.Y. Sept. 30, 2005). I therefore proceed to consider each in turn.

1.      <u>Neuborne's time and labor.</u> Neuborne unquestionably devoted a tremendous

amount of time and labor to implementing the settlement in his role as Lead Settlement Counsel.

Neuborne claims to have worked 8,378.5 hours over a period lasting approximately seven years,

and while the Objectors have voiced significant reservations about that total, the parties have very responsibly agreed to resolve such concerns by excluding 1,500 hours from the total.

Neuborne's work as Lead Settlement Counsel has included a wide variety of tasks, some indubitably appropriate, some more controversial – such as the defense on appeal of the court's allocation decisions – and some that although not litigated here have plainly been less important and arguably of a type that should not require compensation from the class, such as the review of academic articles and participation in panel discussions. *See, e.g.*, Neuborne Omnibus Fee Dec. at 77-78, 98-99, 129-30, 132. In light of the parties' agreement to cut 1,500 hours from Neuborne's time – whether to reflect tasks that should not have been included, time entries subject to second-guessing (as is inevitable in virtually any lengthy representation), or both – the court's task under *Goldberger* becomes to assess whether the fee of approximately $3.1 million is reasonable compensation for work equivalent to roughly half of a full-time job for 81 months.[37] Viewed in that way, the fee I recommend is equivalent to compensation of $458,566.67 per year. The amount is far less than some law firm partners earn and far more than is typically paid to equally talented, experienced, and well-regarded attorneys who devote their careers to public service. It is certainly reasonable compensation for the amount of time and effort Neuborne has invested in this case.

  2. <u>Complexities and magnitude of the litigation.</u> The fact that the work for which Neuborne seeks compensation is one that became necessary only as the result of a settlement did

---

[37] After excluding the 1,500 hours pursuant to the parties' agreement, Neuborne's compensable time of 6,878.5 hours works out to just over one thousand "billable" hours per year – a number that is roughly half of the billable time that most law firms expect their full-time attorneys to work each year.

not absolve him of the need to conduct litigation as Lead Settlement Counsel. Indeed, partly

because the unique settlement in this case required class members to commit themselves to (or

opt out of) an elaborately described allocation *process* that assured them "exit, loyalty, and voice"

from behind a Rawlsian veil of ignorance rather simply accepting specific amounts – and partly

because the Objectors largely failed to honor that commitment – Neuborne's role as Lead

Settlement Counsel has required him to undertake litigation that has been extraordinary in both

complexity and scope. *See, e.g.*, *In re Holocaust Victims Assets Litigation*, 105 F. Supp.2d 139

(E.D.N.Y. 2000) (explaining settlement approach and delineating breadth and variety of the

classes and claims); Neuborne March 17, 2006 Declaration Ex. G; Michael J. Bazyler,

*www.swissbankclaims.com: The Legality and Morality of the Holocaust-Era Settlement With the*

*Swiss Banks*, 25 Fordham Int'l L.J. 64, 66-86 (2001) (describing complexity of distribution);

Symposium Transcript, *Allocating the Proceeds of Settlements: Looted Assets, Successor*

*Interests, Recovered Properties, and Settlement Funds*, 25 Fordham Int'l L.J. 257, 258-63 (2001)

(Special Master Judah Gribetz discussing enormous challenges of allocation process). Even

identifying class members was enormously difficult, posing challenges that continued into the

post-settlement phase. The Swiss banks deliberately destroyed a significant portion of the

records pertaining to accounts held by victims of Nazi persecution, which necessitated

development of a post-settlement process that could "enable any person with a potential claim to

have names matched against the database of 4.1 million accounts for which records exist." *In re*

*Holocaust Victims Assets Litigation*, 105 F. Supp.2d at 154; *see also id*. at 153, 155-58;

Symposium Transcript, *supra*, at 263-68 (Michael Bradfield describing the destruction of Swiss

bank records and creation of Deposited Assets Class claims procedure). There were similarly

daunting obstacles in distributing settlement proceeds to the Refugee Class, arising from the Swiss government's retention of only minimal records of those "who sought entry into Switzerland in whole or in part to avoid Nazi persecution and who ... were denied entry into Switzerland or, after gaining entry, were deported, detained, abused, or otherwise mistreated." *In re Holocaust Victims Assets Litigation*, 105 F. Supp.2d at 160-61. Notification of the Slave Labor Class II, about whom there was almost no information, was made exceedingly difficult "because the [defendant Swiss companies] ... consist almost entirely of affiliates or subsidiaries of Swiss entities that were incorporated in Germany and elsewhere" and therefore class members "had no reason to know at the time that the company was Swiss [and now] may not be aware that they are in the class even if they have notice of the settlement." *Id*. at 161-62.

Neuborne has submitted ample evidence of complexity and magnitude of his work as Lead Settlement Counsel. In addition to litigating the 29 matters before this court and the United States Court of Appeals for the Second Circuit, and lobbying Congress to secure further benefits to the class, Neuborne has expended significant effort on monitoring the claims process, public education, and streamlining multiple aspects of fund management. *See* Neuborne Omnibus Fee Dec. at 76-77; *see also id.*, Ex. C. While he could likely devote himself exclusively to the kind of practice that would remunerate such sophisticated work more handsomely, the roughly $3.1 million fee I recommend is reasonable compensation in this case, and significantly more than attorneys who work in the public sector receive for work that can be equally complex and demanding.

3.      The litigation risks.  Courts assessing fee awards against the *Goldberger* factors typically strive to ensure that a common fund fee creates appropriate incentives for attorneys to

accept worthy but risky engagements. Doing so requires due consideration for an attorney's gamble that her investments of time, resources, and effort in a given case will pay off in adequate compensation. Such concerns have no place here. The only risk that Neuborne assumed in agreeing to serve as Lead Settlement Counsel was the one he created by failing to address more precisely and transparently the subject of his compensation. Although the sum I recommend is eminently reasonable in light of other factors, it is overly generous in terms of the risk that Neuborne shouldered when he accepted the court's request to serve as Lead Settlement Counsel. When Neuborne told the court he was reluctant to serve in that capacity without payment, he was assured "reasonable" compensation, and he was apparently content to let the matter rest there until some seven years into his tenure. The "risk" factor therefore compels no higher award than the one I recommend.

4. The quality of Neuborne's representation. A consideration of the quality of Neuborne's work requires an assessment of both the skills he brought to bear and the successes he achieved. *Goldberger*, 209 F.3d at 55. By any such standard, Neuborne is entitled to a significant fee. Indeed, notwithstanding Dubbin's attempt to quibble with the sufficiency of Neuborne's evidence on this point, it is precisely this factor that gives me the most pause in recommending an award as low as approximately $3.1 million.

With Neuborne's help, close to $950 million has thus far been distributed to almost 400,000 individuals. *See* Settlement Distribution Statistics as of January 23, 2007, *available at* www.swissbankclaims.com (last visited Mar. 12, 2007). Moreover, Neuborne asserts that his services directly increased the fund by $52.7 million. Neuborne Omnibus Fee Dec. at 110-15. The Objectors take issue with the assertion, and argue that the credit for that additional recovery

belongs primarily to the legislature that enacted the tax relief measure from which it arises rather than to Neuborne and his colleague Melvyn Weiss for their lobbying efforts in that regard. Between that and other criticisms, the Objectors contend that Neuborne should be credited with increasing the plaintiffs' overall recovery by no more than approximately $20 million. *See* Swift Initial Memo. at 9-10. I cannot resolve that dispute on the current record, but I need not try. There is no reasonable dispute that Neuborne has increased the value of the settlement by an amount that far exceeds the fee he claims. Since his task was simply to help administer and protect the fund, rather than to increase it, Neuborne's success in this regard justifies a significant fee. Indeed, if the court were to ignore all of Neuborne's other work in administering the settlement and view the application as a request for a fee for increasing the common fund by the $20 million that Swift, at least, concedes is unquestionably attributable to Neuborne's efforts, the award I recommend would be reasonable. That amount is less than the full lodestar amount Neuborne claims, and the latter is itself less than 25 percent of the $20 million enhancement to the fund. Although courts no longer may presume that any "benchmark" percentage is warranted in a common fund case, awards in the range of 25 percent have often been approved. *Goldberger*, 209 F.3d at 51-52.

Even without *any* success in securing additional benefits for the class, the record sufficiently demonstrates that Neuborne has brought to his task an array of skills and a range of experience that warrants significant compensation. *See* Neuborne Omnibus Fee Dec. Ex. E (curriculum vitae), *id.*, Ex. G, H (several declarations attesting to the high quality of Neuborne's work in general and with respect to the settlement administration in particular). Moreover, although it is not dispositive, I find persuasive in this regard Chief Judge Korman's assessment of

the high quality of Neuborne's work over the years.  *See, e.g.*, Memorandum dated September 13, 2004, *reprinted in* DE 5-4; *In re Holocaust Victims Assets*, 270 F. Supp.2d at 316; *In re Holocaust Victims Assets*, 302 F. Supp.2d 89, 92 (E.D.N.Y. 2004) (referring to Neuborne's "characteristically comprehensive and thoughtful" submission to the court); *In re Holocaust Victims Assets* 105 F. Supp. at 150 (referring to Neuborne as "a brilliant scholar and advocate").

The Objectors offer little, if anything, of value to contradict Chief Judge Korman's view. Swift, in a supplemental declaration, makes a conclusory allegation about "Neuborne's unpolished skills as a negotiator" being as much the source of certain post-settlement disagreements as anything attributable to Swift himself.  Supplemental Declaration of Robert A. Swift in Opposition to Lead Settlement Counsel's Application for Counsel Fees, dated July 21, 2006, ¶ 11, DE 74.  Dubbin contends that the materials Neuborne has submitted do not sufficiently establish the customary rate he seeks to charge, but provides no criticism of the quality of Neuborne's work (as opposed to his criticism of the positions Neuborne has chosen to advocate).  In short, nothing the Objectors offer warrants an award lower than the amount I recommend on the basis of the quality of Neuborne's work.  If anything, this factor viewed in isolation would justify a much greater award, and it is only in the context of other factors that I believe the amount I recommend is fair.

5.     The relationship of the requested fee to the settlement.  The award of approximately $3.1 million that I recommend represents less than one quarter of one percent of the $1.25 billion settlement fund Neuborne has worked to administer, and an even smaller percentage of the even larger amount that has been made available to the class as a result of Neuborne's efforts.  Even viewed solely in comparison to the amount that Neuborne has added to

the plaintiffs' recovery, as noted above, the award I recommend is well within the range courts have approved in common fund cases. Accordingly, the relationship of the proposed award to the size of the fund is no reason to reduce the former.

That said, neither is there any reason to increase the award simply because it is so small a fraction of the overall fund. Such comparisons are of limited utility under the circumstances of this case, where Neuborne is to be paid only for his work in administering the fund, and not for his work in helping to create it. The latter should not be taken into account even indirectly, as Neuborne has explicitly and repeatedly waived all fees for his work as class counsel in securing the settlement fund. That work was unquestionably excellent and generous, but Neuborne was unequivocal in waiving any compensation for it. He does not argue that it should be factored into the calculation of an appropriate fee for his work as Lead Settlement Counsel, nor could he properly do so in light of the court's reliance on that waiver in approving the settlement as procedurally fair. In such circumstances, the size of the fund is as inapt a factor for determining compensation as is the risk factor discussed above. To the extent that the size of the fund has in itself complicated Neuborne's task or increased his workload, such considerations are adequately – and more directly – taken into account by the other factors addressed above.

6. <u>Considerations of public policy.</u> The final *Goldberger* factor, while the most amorphous, is also in my view the most important under the circumstances of this case. *See Wal-Mart v. Visa*, 396 F.3d at 123 ("Public policy concerns oftentimes redefine the focus of the court."). As all parties are plainly aware, any award of fees in this case takes money that would otherwise be distributed from a *cy pres* common fund to the neediest members of the class and gives it to attorneys who, however deserving, have far less need. That consideration alone does

not necessarily outweigh other arguments, but it is exceptionally weighty, particularly in light of the atrocity by which the members of the plaintiff class were originally victimized. Although a court considering a fee award in a common fund case must always have a "jealous regard" for the interests of absent class members, *Goldberger*, 209 F.3d at 53 (citation omitted), that interest is at its acme in the circumstances of this litigation.

The countervailing consideration of public policy appears to be the great societal value of cases like this, in which all of the attorneys at odds in this litigation have struggled to bring some measure of justice to the victims of one of the greatest crimes against humanity in the history of our species. There can be no doubting the value of that effort, and of the historical role that this case in particular has played in it. *See, e.g.*, Michael J. Bazyler, *www.swissbankclaims.com: The Legality and Morality of the Holocaust-era Settlement With the Swiss Banks*, 25 Fordham Int'l L. J. 64, 106 (2001) (concluding that the Swiss settlement "open[ed] the floodgates" of possible restitution). But any public policy argument based on the value of the litigation and its result, while critical to the consideration of a fee application for work in achieving the settlement, is of limited relevance to Neuborne's request to be paid for his work as Lead Settlement Counsel.

To be sure, Neuborne's service in the latter role has been of vital importance. I also note that none of the Objectors has offered any evidence that other lawyers of comparable skill would have been able or willing to undertake the arduous tasks that Neuborne has performed in the allocation and administration process for either no fee or a lesser fee than Neuborne demands. Such evidence, if available, would of course weigh in the balance. *See In re Holocaust Victims Assets Litig.*, 270 F. Supp.2d at 320-21 (quoting *Goldberger*, 209 F.3d at 55).

In that regard, I offer two observations. First, it is not at all obvious that the public policy interest in encouraging counsel to take on the kind of administrative role that Neuborne played here is as strong as the interest in encouraging counsel to accept the riskier engagement of representing a class at the inception of litigation. Second, even assuming that the interests are the same, there is ample evidence in the case law that the kind of award I recommend here is adequate. A survey of the common fund cases in which attorneys' fees were awarded in the Eastern District of New York since *Goldberger* was decided reveals a range of compensation for talented counsel similar to the award I urge here. *See In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306 (E.D.N.Y. 2006) (awarding $2,181,250 for 8,304 billed hours); *In re Ashanti Goldfields*, 2005 WL 3050284 (E.D.N.Y. 2005) ($4,125,000 for 10,575 hours); *In re Sterling Foster & Co., Inc.*, 238 F. Supp.2d 488 (E.D.N.Y. 2002) ($550,000 for 5,000 hours); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp.2d 80 (E.D.N.Y. 2002) ($3,178,307.10 for 7,750 hours); *In re Arakis Energy Corp.*, 2001 WL 1590512 (E.D.N.Y. 2001) ($6,000,000 for 13,000 hours). Even in this case, the fee awards for the lawyers who have not waived compensation for their work in securing the settlement have reflected a similar balancing of interests. *See In re Holocaust Victims Assets Litig.*, 270 F. Supp.2d 313 (E.D.N.Y. 2002) (awarding Swift's firm $1,125,000 for over 2,000 hours); Order dated September 18, 2002, Lead DE 1384 (awarding $1.5 million to the firm of Lieff, Cabraser, Heimann & Bernstein, LLP for over 3,000 hours); Order dated September 18, 2002, Lead DE 1383 (awarding $1.1 million to the firm of Berger & Montague, P.C. for over 3,000 hours); Order dated September 18, 2002, Lead DE 1382

(awarding $1 million to the firm of Cohen & Malad, P.C. for an unspecified number of hours[38]);

Order Dated September 18, 2002, Lead DE 1381 (awarding $300,000 to the firm of Fleishman &

Fisher for approximately 1,000 hours).[39]

*　　*　　*

If my task were purely to pick what I believe to be a fair amount of compensation for

Neuborne's service as Lead Settlement Counsel, I might well recommend an award higher than

$3.1 million.  But Neuborne would have me eschew such methodology, and although I disagree

with him about the rationale, I concur in the result.  Because of the unique circumstances of this

case, I am persuaded that the need for moderation is at its strongest, and that the court should

therefore grant an award that is not merely "in the lower range of what is reasonable[,]" *Masters*,

473 F.3d at 436; but the lowest such award.  In my view, the award of approximately $3.1

million that I recommend is the fairest accommodation of Neuborne's unquestionably valuable

work as Lead Settlement Counsel and the equally unquestionable need of the class for whom he

performed that work.

---

[38]  A large portion of the time records submitted by Cohen & Malad, P.C. were filed under seal and appear to remain so.

[39]  To the extent Neuborne might argue that he has even greater experience, skills, and talent than the attorneys before the bar in the cited cases, I need not agree or disagree.  It in no way undermines the court's appreciation of Neuborne's quality to note that the public interest in securing the availability of counsel for such cases requires an incentive to attract well qualified attorneys, whether or not they are the cream of the profession.

3. <u>If Necessary, The Court Should Impose A</u>
<u>Downward Adjustment Of The Lodestar Fee To</u>
<u>The Amount Neuborne Initially Requested</u>

Although no party has raised the issue, I write *sua sponte* to address one other consideration that may arise if the court disagrees with some or all of the preceding analysis. Specifically, I respectfully recommend that regardless of the outcome of any other subsidiary issue, Neuborne's total fee award should be capped at $4,088,500, and that the court should therefore impose the corresponding downward adjustment of Neuborne's lodestar fee to the extent necessary to achieve that result.

When he first submitted an application to be compensated for his work as Lead Settlement Counsel, Neuborne did not specify the fee he sought; instead he merely asked for a an award of "appropriate fees."  *See* Neuborne 2005 Fee Dec. at 55.  Several weeks later, he specified the fee he deemed appropriate:  Neuborne stated that although he was entitled to a still higher fee, he would accept compensation in the amount of $4,088,500, an amount that represented the full amount to which he was entitled discounted by 25 percent.  Neuborne Jan. 2006 Fee Memo. at 7.  That amount also included a further discount corresponding to a waiver of the 200 hours of time he had inadvertently failed to include in his initial calculation of compensable lodestar hours.  Neuborne March 2006 Memo. at 2.  In his March submission, Neuborne reiterated his willingness to accept such a discount that he was willing to impose on himself – but he explained that his willingness to do so was contingent on the court acceding to his request.  *Id.*  In the event that the court considered an amount less than the $4,088,500 he sought, Neuborne advised that he would "reluctantly" withdraw his offer to endure any discount. Neuborne also addressed the issue of a multiplier:  he would do without one if the court acceded

to his fee request without question, but would seek a multiplier to the extent necessary to bring a lower award up to the amount of $4,088,500 that he had unilaterally decided was fair. *Id.*

Neuborne's malleable methodology for achieving the result he wanted, combined with his threat to seek even more if opposed, did not produce the result he desired. With the Objectors persisting in their opposition to his application, Neuborne seeks far more than he previously identified as appropriate compensation. Specifically, as discussed above, Neuborne asks the court to grant him "a lodestar award of $4,814,950, plus an appropriate multiplier of 1.32 ...." Neuborne Final Memo. at 23. Neuborne does not calculate the result of that request, and understandably so: the total amount of $6,355,734 is well over two million dollars more than the amount he was originally prepared to accept as compensation. Even more troubling is the fact that that total is more than a half-million dollars above the "true market lodestar" to which he initially claimed to be entitled, and which he claimed should be enhanced by a multiplier only to the extent necessary to achieve the requested amount. Neuborne March 2006 Memo. at 1.

As Neuborne surely recognizes, those additional dollars would be paid by clients who can scarcely afford them, the vast majority of whom have raised no objection to the already large award he originally sought. And yet, there appears to be no reason to make those clients pay such sums other than Neuborne's unhappiness over having to litigate the matter of his fee. To be sure, Neuborne has likely incurred litigation costs in connection with the instant fee dispute. But he has not identified those costs and I doubt that they represent more than a small fraction of the difference between the amount he now seeks and the much lower amount he was previously prepared to accept.

The overall effect of Neuborne's stance is that if he prevails on all of his arguments, his response to the Objectors' intransigence will force innocent clients to pay far more than the amount he originally identified as sufficient compensation for his services. Such an unjust result would be an unworthy capstone to Neuborne's exemplary service to the class, and the court should not condone it. Accordingly, regardless of any other ruling it may make on the subsidiary issues discussed above, I respectfully recommend that the court should decline to award Neuborne any fee above a maximum of $4,088,500.

III. Recommendations

For the reasons set forth above, I respectfully recommend as follows:

A.  The court should resolve the instant fee application without requiring further notice to the class, aside from the notifications provided by posting relevant documents on the docket and on the class web site.

B.  The court should rule that Neuborne is not estopped from seeking fees for his work as Lead Settlement Counsel.

C.  The court should use the lodestar method to determine the fee for Neuborne's work as Lead Settlement Counsel for the period from January 29, 1999, to September 30, 2005.

D.  The court should compensate Neuborne based on a lodestar hourly rate of $450.

E.  The court should compensate Neuborne based on a total of 6,878.5 lodestar hours, reflecting the stipulated reduction of 1,500 hours from the 8,378.5 hours Neuborne originally claimed but not other reductions. In particular,

1.  The court should not limit Neuborne's compensable time to the 600 hours the parties have stipulated are to be attributed to work that increased the size of the Settlement Class's overall recovery; and

2.  The court should not reduce Neuborne's compensable time by the 800 hours the parties have stipulated are to be attributed to what they have described as Neuborne's "general counsel" work.

F. The court should not make any other adjustments to Neuborne's lodestar fee. In particular,

    1. The court should not award an "excellence multiplier;"

    2. The court should find that the total lodestar fee of $3,095,325 resulting from the foregoing recommendations is reasonable under the circumstances of this case; and

    3. Regardless of any other ruling on the subsidiary issues addressed above, the court should not in any event award Neuborne a fee greater than the amount of $4,088,500 he requested on January 3, 2006.

To the extent that Neuborne will seek fees for any work performed between October 1, 2005, and the date of the court's order, I further recommend that he be required to submit a detailed fee application, based on appropriate time records, no later than 30 days from the date of the court's order. Finally, should Neuborne seek compensation for work performed on behalf of the Settlement Class after the date of the court's order, I recommend that he be required to submit applications based on contemporaneous time records on a quarterly basis, with the application for each quarter due no later than 30 days after the quarter's end.

My final recommendation, which I acknowledge exceeds the scope of my mandate, is directed to the participants in this litigation rather than to the court. When the proposal to settle this litigation was still under judicial review, the government of the United States aptly endorsed it as "'an excellent example of how cooperation and the will to [fulfill] a moral obligation can lead to voluntary resolution of disputes over Holocaust-era claims.'" *In re Holocaust Victim Assets Litig.*, 105 F. Supp.2d at 148 (quoting Transcript of Fairness Hearing (Nov. 29, 1999) at 31-32). As a new and neutral observer, it is my opinion that the participants in this fee dispute,

on both sides, appear to have lost sight of the admirable example they helped set seven years ago – but not, I hope, irrevocably.

There is still time for the parties to put aside their differences and their emotions. The Objectors can decide that the time has come to forego further attempts to prevent a payment to Neuborne that will in any event largely be paid by others. Neuborne can likewise decide that however richly deserved his compensation may be – and it is – it must necessarily be paid by those whose needs are far greater, and therefore accede to the lower amount of compensation I recommend. I make these observations not to suggest any specific bargain, nor to coerce a settlement in any way. I instead appeal to each individual participant in this litigation to find a way to continue to help redress the evil the Nazis began so long ago rather than let it continue to spread rancor among its victims. In doing so, I of course recognize that what I propose is something no court can or should command; it is, instead, a voluntary decision by each party to engage in a private act of grace.

There is undoubtedly much fodder in this Report and Recommendation for the talented attorneys on both sides to use in formulating objections to the assigned district judge or in seeking review from a higher court that could keep this matter from being resolved for many months. It is my sincere hope that they will instead recover the sense of cooperation and moral obligation that originally produced a fair settlement. If the attorneys and Individual Objectors involved in this litigation do so, I have no doubt that they can reach agreement on a fair amount of compensation for Neuborne for his years of fine work and proceed from there to the speedy completion of the distribution of the remainder of the settlement fund to the many needy people who await it.

IV.     Objections

This Report and Recommendation will today be filed electronically on the court's ECF system and is therefore deemed served on the parties (as defined in Part II.A.2 above) as of today's date.  Any objections by any of those parties to this Report and Recommendation must be filed with the Clerk no later than April 2, 2007.  Failure to file objections within that period, absent the entry of an order extending that deadline pursuant to Federal Rule of Civil Procedure 6(b)(1), will waive the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
         March 15, 2007

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge