ORIGINAL
D&F
C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK        MEMORANDUM AND ORDER
-----------------------------------------------------x
IN RE HOLOCAUST VICTIM ASSETS         Case Nos. 06-CV-0983 (FB) (JO)
LITIGATION                                        96-CV-4849 (ERK) (JO)

                                       Consolidated with:

                                       Case Nos. 99-CV-5161
Fee Application of Burt Neuborne.                 97-CV-0461


-----------------------------------------------------x

**BLOCK, Senior District Judge:**

Pending before me is the Report and Recommendation ("R&R") of Magistrate Judge James Orenstein, recommending a fee award to Professor Burt Neuborne ("Neuborne") of $3,095,325 for legal services rendered between January 28, 1999, and September 30, 2005, for performing a multitude of tasks for Judge Korman[1] regarding Judge Korman's approval, implementation and administration of the historic $1.25 billion settlement sum paid by the defendants – a number of Swiss financial institutions – to satisfy the claims of victims of Nazi persecution for the defendants' reputed collaboration with the Nazi regime.

I.

**A. The Nature of the Fee Dispute**

Neuborne had previously been one of the class-plaintiffs' attorneys who brought the settlement agreement to fruition; in that respect, he served, as did a number of other distinguished attorneys, *pro bono*. According to Neuborne, he "withdrew from

---

[1] Judge Korman served as the Court's Chief Judge from March 18, 2000, until March 17, 2007.

active participation in the case" on August 12, 1998, after the settlement had been agreed to "in principle," Decl. of Neuborne dated March 16, 2006, at 3; on January 28, 1999, two days after the agreement had been executed, he began rendering post-settlement services, with his understanding that he would receive a reasonable fee for such services. In recognition of this new role, Judge Korman, on April 18, 1999, named him "Lead Settlement Counsel."

On December 23, 2005, Neuborne filed the present fee application for his post-settlement services; he detailed the nature of his services without requesting a particular fee, presumably leaving it to Judge Korman to fix the fee. *See* Decl. of Neuborne dated Dec. 23, 2005 ("Dec. 23rd Decl.") at 44-45 ("I respectfully request that the Court approve the payment of appropriate fees in connection with my post-settlement representation of the plaintiff-classes.").[2] The application was objected to by Robert A. Swift ("Swift"), one of the plaintiff-class attorneys, claiming that Neuborne had agreed to render such services *pro bono*. Neuborne reacted to this challenge by then placing a value on his post-settlement services of $5,724,950, representing 8,178.50 hours at $700/hour;

---

[2]Neuborne described his post-settlement work as follows: (1) defending numerous appeals challenging various aspects of the Settlement Agreement and its administration; (2) litigating three adversary proceedings in this Court concerning (a) the banks' obligation to pay compound interest, (b) the scope of the releases, and (c) access to information to administer the claims process; (3) appearing in at least 10 district court proceedings concerning settlement administration; (4) petitioning Congress for (a) tax relief on interest earned by settlement fund, and (b) legislation authorizing states to require insurance companies to disclose unpaid Holocaust-era insurance policies: (5) engaging in three sets of negotiations with banks resulting in Amendments 2 and 3 to the Settlement Agreement, and stipulation as to the scope of releases; (6) handling the "day-to-day responsibilities" as "*de facto* general counsel" of the settlement fund. Dec. 23rd Decl. at 4-10.

2

however, "[i]n view of the unique nature of this litigation, and in keeping with the practices of the Special Masters," he "deem[ed] it appropriate to discount the lodestar fee by approximately 25% to $4,088,500." Jan. 3, 2006 Mem. of Law in Supp. of Lead Settlement Counsel's Application for Counsel Fees at 7.[3] Neuborne further offered not to seek compensation for 200 hours of work that had been inadvertently omitted from his application. *See id.*

Shortly thereafter, Samuel J. Dubbin ("Dubbin"), on behalf of 17 individual class members and the Holocaust Survivors Foundation USA, Inc., also filed objections. In turn, Neuborne notified Judge Korman that "to the extent the Court contemplates an award lower than $4,088,500, Lead Settlement Counsel reluctantly withdraws his offer to discount this application by 25%, and to forego the 200 inadvertently omitted hours, since it would be unfair to subject this fee application to two sets of discounts." Mar. 16, 2006 Mem of Law. in Supp. of Lead Settlement Counsel's Application for Counsel Fees at 2. In addition, he conditionally sought a multiplier to offset any reduction in his proposed reduced fee. *See id.*

## B. Judge Korman's Conference

In an effort to resolve the fee dispute before it escalated into full-blown litigation, Judge Korman held a telephonic conference with Swift, Dubbin and Neuborne's

---

[3]Judge Korman appointed a number of Special Masters to assist in the distribution and claims resolution processes. *See* Order dated March 31, 1999 (appointing Special Master for Development of Plan to Allocate and Distribute Settlement Proceeds); Order of December 8, 2000 (appointing Special Masters for Claims Resolution Process for Deposited Assets).

3

attorney on March 2, 2006. *See* Transcript of March 2, 2006 ("Tr."). During that conference, Judge Korman made it perfectly clear to Swift and Dubbin that he reached out to Neuborne to aid him in navigating the complex and time consuming post-settlement aspects of the litigation, and that Neuborne was indeed entitled to a reasonable fee for his services. *See* Tr. at 5 ("I agreed with him that he would be entitled to legal fees."). In doing so, he elaborated as follows:

1. Although he was not clear about the precise time or circumstances when he made it explicit that Neuborne would be entitled to legal fees for his post-settlement services, Judge Korman considered such lack of specific recollection "not material," Tr. at 6, because, in his view, he retained Neuborne for "work that was done post-settlement" for which he was "entitled to counsel fees," *id.* at 7; however, they "never spoke about a number." *Id.* at 5.

2. The designation of Neuborne as Lead Settlement Counsel was "just a meaningless title that [did not] even accurately describe his role once the final judgment was entered," *id.* at 23; a "much more accurate description of his role . . . would probably have been "general counsel to the administrative fund." *Id.* at 23.

3. Regardless of nomenclature, Judge Korman substantively regarded Neuborne "not only [as] kind of a general counsel to the settlement funds, but as an independent person, sort of representative of the settlement groups." Judge Korman "made very few decisions that [he] thought had any kind of potential impact without consulting [Neuborne]." *Id.* at 11. Judge Korman viewed Neuborne "most of all, as counsel to the distribution process," *id.* at 39, and, although Judge Koman had appointed

4

Special Masters to attend to the fund's distribution, he wanted "somebody who was independent of that relationship." *Id* at 11.

4. Judge Korman termed Neuborne's role "extraordinary," *id.* at 10, in which he "rendered extraordinary service." *Id.* at 11. Judge Korman cited, as just some examples of Neuborne's post-settlement work, his efforts in securing Congressional legislation making the settlement fund tax exempt, a potential savings of 25 million dollars; his defense of Judge Korman's distribution decisions, including the preference afforded by Judge Korman to claimants who were not in the United States, *see id.* ("I believe that it was reasonable for me to have an adversarial defense of that position"); his work "in fending off efforts by people to get money from us," *id.* at 9; and the unenviable task of having to review, and oppose, fee requests by Swift and Dubbin. *See id.* at 40.[4] He also made reference to a prior decision in which he "outlined in some significant detail all of the work that Professor Neuborne had done and the contributions that he had made to the case." *Id.* at 8.[5]

---

[4]Neuborne recommended to Judge Korman that Swift should not receive a risk multiplied for his pre- and post-settlement legal services, but did support a $600 hourly rate. *See In re Holocaust Victim Assets Litig.*, 270 F.Supp. 2d 313 (E.D.N.Y. 2000) (agreeing with the recommendations). He also advised against awarding Dubbin a significant fee for his settlement services. *See In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d 363 (E.D.N.Y. 2004))(rejecting *in toto* Dubbin's fee application).

[5]In that decision, *In re Holocaust Victim Assets Litig.*, 415 F.Supp. 2d 139 (E.D.N.Y. 2004), Judge Korman, responding to an inquiry from the Second Circuit, explained Neuborne's role in submitting briefs to the circuit court in defense of Judge Korman's decisions as "simply providing an adversarial defense of my position for the benefit of the Second Circuit." *Id.* at 131. Not wishing to diminish the other roles Neuborne had played since the settlement, Judge Korman itemized Neuborne's post-settlement advocacy on behalf of the class, and explained:

5

5. In the final analysis, Judge Korman was effusive about the high regard he had for Neuborne's post-settlement services, believing that "there was no one of his ability ... that I would have regarded as able as he was," *id.* at 13, that "there are very few people in his league," and that he thought he had "gotten the best." *Id.* at 31.

Notwithstanding his efforts to set the record straight regarding his retention of Neuborne as his post-settlement counsel and Neuborne's entitlement to a reasonable fee for the extraordinary services he rendered, Judge Korman was not able to achieve a resolution of the parties' fee dispute during this conference since Swift and Dubbin stood steadfast in their view that Neuborne should not receive any fee at all for his post-settlement services and, in any event, the fee he was seeking was not reasonable. Recognizing that he was now at the epicenter of a bitter controversy, Judge Korman promptly referred the matter to the assigned magistrate judge and recused himself;[6] the fee

---

> On other issues, Professor Neuborne acts as something of a general counsel to the administration of the settlement fund. He provides an invaluable administrative service of helping people gain access to me and to the Special Master. He also provides advice as amicus curiae. Professor Neuborne has submitted many insightful declarations and, because of his long involvement in this case, his opinion is one that I respect.

*Id.* at 132.

[6]Pursuant to 28 U.S.C. § 636(b)(1)(B), a district judge may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit ... proposed findings of fact and recommendations" on any dispositive matter other than trial.

dispute was then reassigned to me.[7]

## C. The Magistrate Judge's Report and Recommendation

Following extensive discussions with the magistrate judge and the two objectors, Neuborne agreed to cap his compensable hours at 6,878.50. As the magistrate judge subsequently noted in his R&R, this "obviate[d] the need for protracted hearings about the sufficiency and accuracy of Neuborne's record keeping." R&R at 9. In addition, Neuborne, Dubbin and Swift agreed to limit their dispute to five issues:

1. Whether the doctrine of judicial estoppel precluded Neuborne from claiming *any* compensation.

2. Whether Neuborne's proposed hourly rate of $700 was excessive.

3. Whether Neuborne's compensation should be limited to work (stipulated to total 600 hours) that resulted in a net increase to the size of the settlement fund.

4. Whether Neuborne should be compensated for work (stipulated to total 800 hours) performed in his role as "general counsel" to the court.

5. Whether the fee award to Neuborne, if any, should be increased by an excellence multiplier.

Magistrate Judge Orenstein issued his R&R on March 15, 2007. In sum, he concluded that Neuborne was not estopped from seeking fees for his services as Lead Settlement Counsel, and that the lodestar method employed in common fund and statutory fee cases – namely, an appropriate hourly rate times the compensable number of hours

---

[7] I had previously been randomly assigned in respect to another matter where Judge Korman had recused himself. *See Holocaust Victim Assets Litig.*, 256 F. Supp. 2d 150 (2003) (holding that funds held in settlement escrow account pending distribution should bear compound interest).

7

worked, adjusted in proper circumstances by means of a multiplier – was the proper standard to employ. *See* R&R at 48. The magistrate judge concluded that Neuborne was indeed entitled to compensation for 6,878.50 hours. He concluded, however, that Neuborne's proposed hourly rate of $700 was excessive, and that $450 was reasonable; he also concluded that Neuborne should not be awarded a multiplier. Based on these conclusions, the magistrate judge recommended that Neuborne be awarded a fee of $3,095,325.[8]

In arriving at the $450 hourly rate, the magistrate judge employed market analysis rather than recommending that the Court "simply award Neuborne the amount of compensation it deems reasonable," *id.* at 62; therefore, he "consider[ed] what hourly

---

[8]Magistrate Judge Orenstein also addressed two threshold issues regarding (1) whether class members had sufficient notice of Neuborne's fee application and (2) whether Swift had standing to raise objections on behalf of the entire class. On the notice issue, the magistrate judge concluded (1) that Federal Rule of Civil Procedure 23(h)(1), which provides that motions for attorney fees by class counsel must be "directed to class members in a reasonable manner," did not apply because Neuborne was not seeking any fee for his role as class counsel; and (2) that even assuming that Rule 23(h)(1) applied, its requirements had been satisfied because Neuborne's application "has been published on the Internet web site devoted to this case and "has been reported and discussed in numerous news and opinion articles published around the world by major news outlets." R&R at 14. On a more practical level, Magistrate Judge Orenstein reasoned that "it is hard to imagine a notice program that would, without costing as much as the amount of fees at stake here, be effective enough to ensure wider notice than has already been effected . . . and to generate substantive views that are not already being vigorously litigated." *Id.* at 15.

On the issue of Swift's standing, the magistrate judge recommended that the Court "abstain from resolving the thorny issue of whether Swift's objections are made on behalf of any party that enjoys standing in this litigation." R&R at 18. In that regard, he noted that Swift's objections "were largely duplicative or those lodged by [Dubbin], and Neuborne has agreed . . . that those objections should not be overruled for want of standing." *Id.*

8

rate the 'market' would have produced in this case." *Id.* In doing so, the magistrate judge rejected Neuborne's contention "that his hourly rate should be set by reference to the fees he or other similarly qualified attorneys might be able to obtain in the setting of a law firm's representation of a private client," *id.* at 65, believing that "the most appropriate way to determine Neuborne's lodestar hourly rate [was] to attempt to recreate the arm's-length bargain that he would have struck at the outset of his service if he had in fact sought to negotiate a specific fee rather than accept the court's simple assurance of some amount of payment." *Id.*

The magistrate judge reasoned that, if Neuborne had engaged in an arm's length fee negotiation, "he would have bargained with a person with a fiduciary duty to the class – either the court or some appropriate class representative," *id.*, and that "in the context of this unique litigation, any fiduciary bargaining on behalf of the plaintiff class would be able to persuade Neuborne to accept a significant discount of the rate he customarily charges the private clients who retain him as a sole practitioner." *Id.* at 66. The magistrate judge candidly acknowledged, however, that he could " do no more than make a rough approximation of the hourly rate such bargaining would likely produce." *Id.* at 68. Hewing to the notion "that the court set a lodestar rate that is in line with the prevailing market rate," *id.* (citation omitted), the magistrate judge conclusorily stated that "[t]here are any number of rates that would satisfy that standard," but, in his view, "the lowest such hourly rate that arm's length bargaining in this case might have produced is $450, and the highest is $600." *Id.*

After addressing, and rejecting, numerous challenges to the 6,8750.50 hours for which Neuborne sought compensation, and Neuborne's application for an excellence multiplier, the magistrate judge then turned to the six factors set forth in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), applicable to setting fees for settlements of common fund class action cases: "(1) counsel's time and labor; (2) the litigation's complexities and magnitude; (3) the litigation risk; (4) quality of representation; (5) the relationship of the requested fee to the settlement; and (6) consideration of public policy." *Id.* at 52. The magistrate judge concluded that due to the "unique circumstances of this case," calling for "the need for moderation," R&R at 98, the lowest level within his $450-$600 range was indicated; he reasoned that the $450 hourly rate represented "the fairest accommodation of Neuborne's unquestionably valuable work as Lead Settlement Counsel and the equally unquestionable need of the class for whom he performed that work." *Id.*

Finally, the magistrate judge noted that "the participants in this fee dispute, on both sides, appear to have lost sight of the admirable example they helped set seven years ago" in respect to the settlement agreement. *Id.* at 102-03. He exhorted the parties "to put aside their differences and their emotions" and enter into a renewed spirit of cooperation by now agreeing "on a fair amount of compensation for Neuborne for his years of fine work" (presumably, the magistrate judge's recommended fee), rather than to "formulat[e] objections [to the R&R] to the assigned district judge or in seeking review from a higher court that could keep this matter from being resolved for many months." *Id.* at 103.

## D. Objection to the Magistrate Judge's Report and Recommendation

The magistrate judge's hopes proved to be wishful thinking. On March 29, 2007, Dubbin filed objections to the R&R. Largely repeating the objections he had raised before the magistrate judge, Dubbin argued:

1. that Federal Rule of Civil Procedure 23(h) required that notice of Neuborne's application be provided to the class, and that Local Rule 23.1 required an evidentiary hearing on the application;

2. that Neuborne's application was barred by judicial estoppel;

3. that Neuborne should not be compensated for "general counsel" work;

4. that Neuborne's hourly rate should be reduced; and

5. that Neuborne's compensation should be limited to work that generated a financial benefit to the class.

On that same day, Neuborne objected to the magistrate judge's recommended hourly rate, arguing that "the record conclusively establishes [it] to be $700 per hour." Neuborne's Not. of Objection to R&R at 1. Terming his objection "conditional," Neuborne offered to withdraw it "if the objectors [were] prepared to accept the [R&R]." *Id.* at 3. Swift, to his credit, did not file objections.

After spending a considerable amount of time reviewing the 104-page R&R and the extensive objections, I scheduled oral argument for May 21, 2007. Dubbin and Neuborne then withdrew their objections; at my urging, they also agreed not to appeal if I adopted the R&R. *See* Letter from Neuborne dated May 18, 2007; Letter from Dubbin dated May 18, 2007.

II.

## A. The Nature of the District Court's Role

Magistrate judges act under the supervision of the district court when they receive a referral, and the authority for making final decisions "remains at all times with the district judge." *Matthews v. Weber*, 423 U.S. 261, 270 (1976). Had Dubbin and Neuborne not withdrawn their objections, I would have been obliged to review the R&R *de novo*. *See* 28 U.S.C. § 636(b)(1) ("A [district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). Even in the absence of objections, a district court may, in its discretion, conduct *de novo* review, *see Thomas v. Arn*, 474 U.S. 140, 154 (1985) ("[W]hile [§ 636(b)(1)] does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard."); at the very least, the district court must review an R&R for plain error. *See Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir. 2000) ("Such discretion is exercised based on, among other factors, . . . whether the magistrate judge committed plain error[.]").

Clearly, there is no plain error in any aspect of the R&R. It is exhaustive and meticulous in addressing every argument subsumed by the parties' submissions, and the magistrate judge is worthy of encomiums beyond the prototypical, and appreciated, "thoughtful and thorough" comment made by appellate courts when they occasionally praise the work of a lower court. However, considering the importance of this historic litigation and the court's fiduciary obligation to class members to protect the settlement

12

fund from undue diminution, *see, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 996 F. 2d 1425, 1438 (2d Cir. 1993) ("A judge in a class action is obligated to protect the interests of absent class members."), I believe *de novo* review of the reasonableness of the recommended fee to be appropriate. In doing so, I have considered the rationale by which the magistrate judge arrived at the fee, the subsequently rendered decision by the Second Circuit in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110 (2d Cir. 2007), and whether there are others reasons to approve the fee.

## B. The Reasonableness of the Recommended Fee

My review of the record satisfies me that all of the 6,878.50 hours fixed by the magistrate judge were for post-settlement services. The first entry in Neuborne's contemporaneous time records is for a "discussion among counsel re structure [of the settlement distribution]" on January 28, 1999, two days after the settlement agreement had been executed, *see* Dec. 23rd Decl., Ex. C; each entry thereafter was in keeping with his post-settlement role defending Judge Korman's rulings on post-settlement issues,[9] and

---

[9]Neuborne participated in eight appeals resulting in decisions: (1) *In re Holocaust Victim Assets Litig.*, 225 F.3d 191 (2d Cir. 2000) (affirming denial of motion to intervene by individuals of Polish descent); (2) *In re Holocaust Victim Assets Litig.*, 2001 WL 868507 (2d Cir. July 26, 2001) (affirming overruling of individual objections to allocation formula); (3) *In re Holocaust Victim Assets Litig.*, 282 F.3d 103 (2d Cir. 2002) (remanding for resolution of ambiguity regarding Swiss-ownership requirement for releases); (4) *In re Holocaust Victim Assets Litig.*, 413 F.3d 183 (2d Cir. 2005) (affirming approval of settlement and allocation formula); (5) *In re Holocaust Victim Assets Litig.*, 424 F.2d 132 (2d Cir. 2005) (affirming allocation of supplemental funds); (6) *In re Holocaust Victim Assets Litig.*, 424 F.3d 150 (2d Cir. 2005) (affirming denial of Dubbin's fee application); (7) *In re Holocaust Victim Assets Litig.*, 424 F.3d 158 (2d Cir. 2005) (affirming rejection of gay- rights group's proposed allocation); (8) *In re Holocaust Victim Assets Litig.*, 424 F.3d 169 (2d Cir. 2005) (affirming rejection of disability-rights groups' proposed allocation).

aiding in the implementation and administration of the distribution of the settlement sum. The more amorphous issue centers on the proper means by which to arrive at the reasonable hourly rate.

Before withdrawing his objection, Neuborne faulted the magistrate judge for ignoring the "fair market value" of his services, and instead deriving a reasonable hourly rate from "a hypothetical negotiation between [Neuborne] and the presiding Judge that concededly never took place." Neuborne's Not. of Objection to R&R at 1. However, the magistrate judge's view of the means for discerning the appropriate market value proved prescient in light of the Second Circuit's subsequent decision in *Arbor Hill*.

There, in connection with a claim for statutory attorney fees, the circuit court delved into the history of attorney-fees jurisprudence subsequent to the enactment in 1976 of the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988(b), explaining the two methods that had evolved for calculating such fees: The first, a two-step process, entailed calculating the lodestar and then adjusting it based on case-specific considerations, *see* 493 F.3d at 144; the second, developed by the Fifth Circuit, was to consider twelve specified factors which, unlike the lodestar method, contemplated a one-step inquiry. *Id.* Noting that "the Supreme Court has not yet fully resolved the relationship between the two methods," *id.* at 116, the Second Circuit, acknowledging that it "has done little to resolve this confusion," *id.*, abandoned the use of the "lodestar" nomenclature, viewing it "as a metaphor [that] has deteriorated to the point of unhelpfulness." *Id.* at 117. It believed that "the better course – and the one most consistent with attorney's fees jurisprudence – is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case -

specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate," *id.*; this, then would produce a "presumptively reasonable fee." *Id.* at 118.

Since in *Arbor Hill* the district court did not strictly apply the "forum rule" (i.e., basing the hourly rate on the prevailing rates in the forum district ), the circuit court then considered the continued viability of that rule, believing "that the district court's assessment of the reasonableness of a prevailing party's decision to retain out-of-district counsel is best considered in setting the hourly rate – rather than in deciding whether to adjust a presumptively reasonable fee." *Id.* at 119. In doing so, it "clarif[ed] that a district court may use an out-of-district hourly rate – or some rate in between the out-of-district rate sought and the rates charged by local attorneys – in calculating the presumptively reasonable fee if it is clear that a reasonable paying client would have paid those higher rates." *Id.* The court recognized that "t]he legal communities of today are increasingly interconnected," that "to define market simply by geography is too simplistic," and that "[s]ometimes, legal markets may be defined by practice area." *Id.* at 120. Therefore, the court concluded that "[b]y asking what a reasonable, paying client would do," rather than rigidly applying the forum rule, "a district court best approximates the workings of today's market for legal services." *Id.*

In sum, it is market forces, rather than any particular factors, that govern. Relevant to the present case, the circuit court recognized in *Arbor Hill* that "the district court (unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable paying client, who wishes to pay the least amount necessary to litigate

the case effectively," *id.* at 112; therefore, it is required to "approximat[e] the negotiation that might ensue were the client actually required to pay the attorney's fees." *Id.* at 120. In making that assessment, the court counseled that the district court should

> consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether the attorney had an interest (independent of that of his client) in achieving the ends of the litigation or initiated the representation himself, whether the attorney was initially acting *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) the attorney expected from the representation.

*Id.* at 112.

To be sure, *Arbor Hill* dealt with reasonable hourly rates in the context of a fee-shifting statute, but its view of the role of the district court in "disciplining the market" by "stepping into the shoes" of the reasonable paying client and approximating the negotiations that might have ensued between the client and the attorney if the client were to have paid the fee, is conceptually supportive of Magistrate Judge Orenstein's hypothetical negotiation that Judge Korman and Neuborne would have entered into in fixing a reasonable fee.

To the extent, however, that much of the magistrate judge's decision reaches for guidance and support from common fund and statutory fee cases, it somewhat undercuts the *sui generis* nature of the present fee case, as exemplified by the need for Judge Korman to explain Neuborne's role to the circuit court. Although parallels to many of the

*Goldberger* factors, governing common fund fee applications, resonate, as do the factors in the statutory fee cases, the one factor that dominates all others in this case is the special nature of Neuborne's role as part and parcel of Judge Korman's fiduciary responsibilities to maximize the monies available for distribution to Holocaust victims and to make sound decisions in the administration and distribution of the settlement fund. Given the extraordinary services Neuborne rendered *pro bono* in negotiating the settlement fund, and his initial submission of his fee application without requesting a specific sum, I believe that Neuborne, at the outset, understood that he was performing services for Judge Korman that should not be measured by the hourly rate he could have commanded in the commercial market, and that his $700/hour proposals were simply ill-advised reactions to Swift and Dubbin's challenges.

For their part, Dubbin and Swift, in opposing Neuborne's fee request, produced a positive result that should not be overlooked – a savings of nearly a million dollars from the $4,088,500 reduced fee that Neuborne might very well have been awarded if not for the aggressive opposition they mounted, which – appropriately – was done without any claim of remuneration.

In reality, the magistrate judge's recommended fee award should be accepted for a number of reasons: First, I view Neuborne's services to be more akin to the fiduciary responsibilities of the special masters than to the services rendered by attorneys in common fund and statutory fee cases; the recommended fee falls comfortably within the range of fees paid to the special masters, whose bills I have reviewed, and less than the fee fixed for the special masters appointed in another recent public fiduciary setting. *See In re World*

17

*Trade Center Disaster Site*, 2006 WL 3627760 (S.D.N.Y. 2006) (setting special master's fees at $500/hour in 9/11 litigation).[10] Second, given that Neuborne was held in such special regard by Judge Korman, who believed that he had "gotten the best" for the "extraordinary role" that he carved out for Neuborne, it is inconceivable that Judge Korman would not have been willing to pay Neuborne at least $450/hour if they had negotiated the fee in advance. Finally, with Swift not filing objections to the R&R, and with Dubbin and Neuborne withdrawing theirs, the parties have recognized that the time has come for there to be peace, or in language more befitting for the victims of the Holocaust,

---

[10]Federal Rule of Civil Procedure 53 authorizes the court to appoint special masters to "perform duties consented to by the parties; in extraordinary circumstances, to "make or recommend findings of fact" in non-jury trials; and to "address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge." Fed. R. Civ. P. 53(a)(1). The rule further requires that the appointing order to set forth "the basis, terms and procedure for fixing the master's compensation. *Id.* 53(b)(2)(E). Such compensation may be paid either by the parties, or "from a fund or subject matter of the action within [the] court's control." *Id.* 53(h)(2)(B).

In appointing a special master, the court "must protect against unreasonable expense or delay." *Id.* 53(a)(3). Prior to the enactment of Rule 53, the Supreme Court explained that a special master should be

> adequately remunerated for actual work done, time employed, and the responsibility assumed. His compensation should be liberal, but not exorbitant. The rights of those who ultimately pay must be carefully protected; and while salaries prescribed by law for judicial officers performing similar duties are valuable guides, a higher rate of compensation is generally necessary in order to secure ability and experience in an exacting and temporary employment which often seriously interferes with other undertakings.

*Newton v. Consolidated Gas Co.*, 259 U.S. 101, 104 (1922).

*shalom b'byat.*

## CONCLUSION

The Court accepts the magistrate judge's R&R; accordingly, Neuborne is awarded attorney fees in the amount of $3,095,325.

**SO ORDERED.**

/SIGNED/

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
December 6, 2007